David Stebbins (pro se Plaintiff)
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                                    PLAINTIFF

VS.                              Case 3:22-cv-00546-JSW

EMILY REBÔLO, D.B.A. "ENCLAVE EMILY,"
TRYSTEN BURGE, D.B.A. "ECHO WILDER,"
JOHN DOE #1, D.B.A. "CREETOSIS"
JOHN DOE #2, D.B.A. "JUST EMI"
JOHN DOE #3, D.B.A. "SIDALPHA"
JOHN DOE #4, D.B.A. "BIBI FAIZI"                    DEFENDANTS
JOHN DOE #5, D.B.A. "ROGUE, INTERNET MAN"
KARL POLANO, D.B.A. SOFIANNP
SHIRA PERLMUTTER
ALPHABET INC.
YOUTUBE LLC,
DISCORD INC., AND
TWITCH INTERACTIVE INC.

## FIRST AMENDED COMPLAINT

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Amended Complaint in the above-styled action.

## I: IDENTITIES OF THE PARTIES

1.      I am a Youtube channel owner and a Twitch streamer who operates under the psuedonym "Acerthorn." My Youtube channel can be found at www.youtube.com/acerthorn, and my Twitch channel can be found at www.twitch.tv/acerthorn.

2.      Emily ReboloYoutuber who owns and operates two separate Youtube channels, one called "Enclave Emily," which can be found at  https://www.youtube.com/c/EnclaveEmily, and another called "Freak," which can be found at

https://www.youtube.com/channel/UCRro1gfrlNZO5dlox02icpQ. She has the email address of enclavemily@gmail.com and can be served with process at the following address:

Rua da Ilha, 10

3000-214 Coimbra

Portugal

3.        Trysten Burge (whose last name I had previously erroneously spelled as "Burger" (with an extra R at the end) in the original complaint) is another Youtuber who owns the Youtube channel "Echo Wilder," which can be found at https://www.youtube.com/c/EnclaveEmily. He can be served with process at the following address:

214 4th Ave, Apt. 7

International Falls, MN 56649

4.        John Doe #1 is another Youtuber who owns and operates the Youtube channel "Creetosis," which can be found here:

https://www.youtube.com/channel/UCKMErrXK2DuGk8uWLFANOtQ. He also runs a server on Discord called "The Owl Server," which can be found at https://discord.gg/rf4FRAnAqp. His person Discord account is Creetosis#0001.I do not know his real name and address, but he is a member of the Youtube Partner Program, so his name and address is on file with Youtube (so he can get paid for his videos). I plan to obtain his name and address from Youtube when this case progresses to discovery.

5.        John Doe #2 is a Youtuber and Twitch Streamer who owns and operates, to my knowledge as of the time of this writing, two Youtube channels and one Twitch channel. The two Youtube channels are called "Just Emi," which can be found at https://www.youtube.com/channel/UCieMMRvYsvm83RmQhesYgzQ, and "The Witch's Archive, which can be found at https://www.youtube.com/channel/UCieMMRvYsvm83RmQhesYgzQ. His Twitch Channel can be found at https://www.twitch.tv/xjustemi. I do not know his real name or address, but he is a member of the Twitch Affiliate Program, so his name and address is on file with Youtube (so he can get paid for his videos), and so I plan to request that information from Youtube when we get

to discovery in this case.

6.      John Doe #3 is a Youtuber who owns and operates the Youtube channel "SidAlpha," which can be found here: https://www.youtube.com/c/SidAlpha. I do not know his real name and address, but he is a member of the Youtube Partner Program, so his name and address is on file with Youtube (so he can get paid for his videos). I plan to obtain his name and address from Youtube when this case progresses to discovery.

7.      John Doe #4 is a Youtuber who does not have any videos on Youtube that I know of. He goes by the alias "Bibi Faizi." He has provided his real name and address to Youtube when issuing a DMCA Takedown request, so I plan to obtain his name and address from Youtube when this case progresses to discovery.

8.      John Doe #5 is a Youtuber who goes by the online psuedonym "Rogue, Internet Man." I do not know his real name and address, but he is a member of the Youtube Partner Program, so his name and address is on file with Youtube (so he can get paid for his videos). I plan to obtain his name and address from Youtube when this case progresses to discovery.

9.      Karl Polano is a resident of Switzerland who goes by the online psuedonym "SofiannP." His Youtube and Twitch channels can be found at www.youtube.com/sofiannp and www.twitch.tv/sofiannp, respectively. While I do have his address, he would have to be served via the Hague Convention because he is in Switzerland, and he has an established history of willfully and maliciously evading service of process. As a result, I will move for leave to serve him with process via email.

10.     Shira Perlmutter is the current Register of Copyrights with the United States Copyright Office (USCO). I wish to include her as a nominal defendant on the issue of registerability, pursuant to my rights under the second and third sentences of **17 USC § 411(a)**, for some of my copyrighted works.

11.     Alphabet, Inc. is the parent company of Youtube, LLC, which is itself the owner and operator of the eponymous website, Youtube.com, the largest video-sharing website in the world. Both can be served with process at the following registered agent:

Corporation Service Company

2710 Gateway Oaks Dr., Suite 150N

Sacramento, CA 95833

12.     Discord, Inc. is a social media website and app that allows people to set up custom chat rooms called "Servers," where they can discuss various topics and even exchange files of 8MB or less with each other. They can be served with process at the following registered agent:

Ruth Chang

444 De Haro St, Suite 200

San Francisco, CA 94107

13.     Twitch Interactive, Inc. is the owner and operator of the eponymous website, Twitch.tv, the largest live-streaming website in the world. It can be served with process at the following registered agent:

Corporation Service Company

2710 Gateway Oaks Dr., Suite 150N

Sacramento, CA 95833

## II: JURISDICTION AND VENUE

14.     This court has subject-matter jurisdiction to hear claims of copyright infringement. This jurisdiction is axiomatic.

15.     This court has personal jurisdiction over all four corporate defendants (Alphabet, Youtube, Discord, and Twitch) because they are all headquartered in the Northern District of California.

16.     This Court has personal jurisdiction over Emily Rebolo because she consented to the jurisdiction of the Northern District of California when she issued her DMCA Takedown Notice.

17.     This Court has long-arm jurisdiction over all other defendants because they all cooperated and colluded together to ruin my career as a Youtuber and Twitch Streamer out of pure hatred, malice, and spite. Therefore, this Court has long-arm jurisdiction over all other defendants for the same reason it has long-arm jurisdiction over Frederick Allison in Case 4:21-cv-04184-JSW Stebbins v. Polano.

### III: FACTS OF THE CASE

18.     The following facts are necessary to understand the case.

### III-1: Plaintiff's Copyrighted Works

19.     The following is a list of works whose copyrights are owned in whole or in part by me. This is not a comprehensive list of all works that are copyrighted by me, just the ones that are relevant to this case.

### III-1-A: APRIL 10, 2021 LIVESTREAM

20.     First, there was a livestream I did on April 10, 2021. I accidentally turned my livestream software on without realizing I had done it, and so for approximately 1 hour and 43 minutes, my viewers could see me engaging in such mundane activities as walking around my apartment, eating some hot dogs, and watching some Youtube videos for my own personal amusement.

21.     I registered this stream with USCO on May 26, 2021, and registration was subsequently granted. The registration number is PA0002305616.

22.     At one point in the video, you could hear some strange noises which sounded like a dog barking and snarling. These strange noises constitute the most interesting part of an otherwise boring video, and therefore constitute the "heart" of that work.

23.     I did not wear a shirt for this livestream. It was the only video or livestream I have ever done without a shirt on, which means that any time anyone else depicts me without a shirt, it necessarily comes from that stream.

24.     There was one time during the stream when you could hear me saying "I will kill you." I do not remember saying this, so I cannot tell you what I was thinking at the time or why I said this. However, I was alone at the time, so I could not possibly have been issuing a genuine threat, since my words had no intended audience. Despite this lack of criminality, many people see it as evidence that I am homicidal and psychotic.

25.     I transferred this livestream to my Youtube channel and restricted viewing it only to those who paid my channel $20 per month. As of the time of this writing, nobody has paid that fee. Also, there is no way to download directly from Twitch (where the stream was originally broadcast). This means that the only way anyone could possibly have seen any portions of that

stream is by illegally downloading it.

### III-1-B: APRIL 18, 2021 LIVESTREAM

26.     On April 18, 2021, I did a collaborative livestream with Karl Polano on Twitch. Polano and I are co-authors of this stream, meaning that, while Polano may distribute this, and grant other people permission to distribute this, without my permission, if he does so, I am entitled to 50% of the revenue incurred from said distribution.

27.     I registered this stream with USCO on September 14, 2021, and registration was subsequently granted. The registration number is PA0002315628.

### III-1-C: NOVEMBER 24, 2021 VIDEO

28.     On November 24, 2021, I published a 50-second video on my Youtube channel called "Corrections" Series is Cancelled, and Here's Why - #Shorts. I am the sole owner of the copyright to this video. I registered this video with USCO on December 11, 2021, and registration was subsequently granted. The registration number is PA0002333752.

### III-1-D: OCTOBER 13, 2019 VIDEO

29.     On October 13, 2019, I published a video to my Youtube channel called Fallout: New Vegas Retrospective. I am the sole copyright holder to that video. It used footage of the video game "Fallout: New Vegas," but I do so in order to review and critique it, so I believe it falls under fair use, if Bethesda Softworks (the owner of the copyright to that game) ever wanted to sue me for copyright infringement.

30.     I registered this video with USCO on December 17, 2021, and registration was subsequently granted. The registration number is PA0002335063. Because my registration of my copyright occurred more than 3 months after publication, and because the infringements predate the registration, this is the one copyrighted work which I cannot recover statutory damages.

### III-1-E: DECEMBER 18, 2021 STREAM

31.     On December 18, 2021, I did a livestream debate with a guest star who went by the online psuedonym "Skibbidy Dibbity." The title of this livestream was "Fallout: New Vegas Sucks, and Here's Why (Livestream Debate)." I believe I am the sole copyright holder of this video, although Skibbidy Dibbity would consider himself a co-author. If Skibbidy were to ever

wish to sue me for recognition as a co-author, he would have to make his true identity known and cannot hide behind the anonymity of the Internet.

32.     I registered this stream with USCO on December 22, 2021, and registration was subsequently granted. The registration number is PA0002336336.

<u>III-1-F: CHANNEL ART, ICON, AND 8 WATERMARKS</u>

33.     On December 9, 2021, I applied for registration of ten different 2D images. Those images were titled as follows:

(a)     Acerthorn Channel Art 2022

(b)     Acerthorn Channel Icon 2022

(c)     Acerthorn Watermark 2022 - 5-Pointed Star

(d)     Acerthorn Watermark 2022 - 6-Pointed Star

(e)     Acerthorn Watermark 2022 - Abnormal Shape #1

(f)     Acerthorn Watermark 2022 – Diamond

(g)     Acerthorn Watermark 2022 – Hexagon

(h)     Acerthorn Watermark 2022 – Octagon

(i)     Acerthorn Watermark 2022 – Pentagon

(j)     Acerthorn Watermark 2022 - Square

34.     At the time I applied for the registration, all ten of these 2D images were unpublished, so I was well within my rights to register up to ten of them at once. The Channel Art and Channel Icon were both shown to members of my Discord server on December 12, 2021, but that was three days after I applied for registration. The eight watermarks have since been published, but on different dates.

35.     All ten of these 2D images are comprised predominately of a blue honeycomb background with text overlaying it. The blue honeycomb consisted of high blue hexagons, with space in between the hexagons filled by a gradient. This gradient starts as the "polynesian" shade of blue on either side, slowly morphing into "periwinkle" blue in the center before morphing back to "polynesian" blue on the other side.

36.     This honeycomb background was created entirely by me. I made this background from

whole cloth, using MS Paint and NCH VideoPad (my personal favorite video and image editing software). It is not a stock image.

37.     While all of these 2D images use the aforementioned blue honeycomb background, the "Acerthorn Channel Icon" contains an additional splash of creativity on my end: The hexagons are actually partially stretched out. The reason for this is because, since the channel icon is supposed to be ciruclar, I applied a "fish-eye" filter to the honeycomb background in order to create the illusion that it is wrapped about a ball.

38.     Because of the facts mentioned in ¶¶ 35-37, I believe these 2D images satisfy the "human authorship" and "minimum creative spark" elements to be eligible for copyright protection.

39.     Despite being eligible, USCO refused to register the copyright, claiming that it lacked sufficient creativity. For this reason, I seek to challenge USCO's decision in this case, while also suing for the infringement of these images.

<u>III-1-G: SEE ATTACHED CHART</u>

40.     All of these copyrighted works may sound confusing. So to assist the Court and the Defendants in navigating all of these copyrighted works, please find, attached to this Complaint, **Exhibit A**, a chart I created which lays out all the different copyrighted works, their dates of first publication, the dates in which I applied for registration, whether their registrations were granted or refused by USCO, and if registration was granted, what the registration number is.

**III-2: The Sister Case**

41.      There is another currently pending before this Court. It is 4:21-cv-04184-JSW Stebbins v. Polano. The judge in that case has already see fit to relate this case to that one. See **Doc. 9**. I will refer to that case as "the sister case" from now on.

42.     The outcome of that case will likely have a great impact on the outcome of this case. For example, the question of whether my April 10, 2021 stream is even protectable by copyright in the first instance, and the question of whether the individual defendants have harassed and doxxed me, and if so, whether they have acted with sufficient actual malice as to nullify any potential claim, are all likely to be adjudicated in that case. If they are so adjudicated, they would create *res judicata*, which would prevent those same issues from being re-litigated in the instant

case.

### III-3: Harassment, Doxxing, and Dogpiling Against Me

43.     In addition to copyright infringement, the individual defendants (with the exception of Shira Perlmutter) have joined together to engage in a longstanding and widespread pattern of harassment, doxxing, and dogpiling against me. Some joined the hate campaign later than others, but they are all guilty of contributing to the harassment in one form or another.

44.     Please understand that I will not be outlining every single instance of harassment right here in the Complaint. Since I am not suing for the harassment in itself, there is no need for me to state the underlying facts with any specificity. Instead, I am only seeking to use this harassment to nullify any potential claim to fair use (to the extent that said defense is even available in the first instance). While I will eventually be required to substantiate these allegations with evidence, I do not feel that listing out specific acts with specific dates should be required at this stage. For the copyright infringement and DMCA Fraud claims, I will indeed allege specific acts, specific actors, specific URLs, specific dates, and (to the extent I know them) specific times.

### III-3-A: Harassment I've Already Discussed in the Sister Case

45.     First, there is the harassment and doxxing I have already discussed in the sister case (Stebbins v. Polano). As of **Doc. 9**, this case is being overseen by Judge Jeffrey White, the same judge as in that case. As a result, he is likely to be intimately familiar with the harassment, doxxing, and dogpiling I have endured in that case, so there is no need for me to discuss that harassment in intimidate detail. But for the sake of being thorough, I hereby incorporate by reference the contents of that case.

### III-3-B: "Acerthorn Pinata Bashing" Thread

46.     Defendant Creetosis owns a Discord server called "The Owl Server," which you can access here: https://discord.gg/ZbyY2Vf. In that server, there used to be a thread called "Acerthorn Pinata Bashing," or APB for short. As the name would suggest, this thread is dedicated exclusively to harassing, doxxing, and dogpiling me out of pure malice and spite. Those participating in APB were constantly searching my entire life's worth of personal history

and sharing it with each other (an act known as "doxxing" in Internet terms), including my medical records, information regarding a crime I was charged with over a decade ago where I wasn't even convicted, and even finding numerous porn websites and dating websites where users have psuedonyms similar to my own so they can speculate as to what sort of "kinky" stuff I may or may not be into in the bedroom. They are also constantly monitoring my social media activities like vultures, looking for anything they can find, literally any sentence I might say or a single twitch of my eyebrows that I might do on camera, that would give them more ammunition to use in their never-ending effort to harass, dox, and dogpile me. There is no legitimate motive for anyone who participates in APB, just pure hatred, pure malice, pure spite.

47.    Karl Polano and Frederick Allison (two of the three individual defendants in the sister case) have joined APB since late November of 2021. Prior to them participating in APB, it was primarily dedicated to criticizing my Youtube videos, but nothing more. However, once Polano and Allison came in, they began circulating numerous bits of my personal information, such as the content described above. Once they began doing that, many other people joined in (an Internet phenomenon known as "dogpiling") until it ceased to be about legitimate criticism of my Youtube videos and became nothing but harassment and doxxing against me.

48.    The individual defendants in the instant case participate regularly in APB. Admittedly, Trysten Burger participates less frequently than Emily Rebôlo, but both are regular participants. As a result, I believe their actions should constitute bad faith and malice, which should nullify any affirmative defenses (including fair use) they may have to copyright infringement, according to the legal doctrines of "abuse of rights" and "unclean hands."

   III-3-C: Harassment on Twitter, Youtube, Discord, Twitch, Email, and Others

49.    In addition to the Acerthorn Pinata Bashing thread, I have also been subject to widespread harassment, doxxing, and dogpiling across many different websites, as well over my private contacts, such as my email address and phone number.

50.    I have received numerous tweets on my Twitter account cussing me out, calling me various insults, and publicly sharing my personal information.

51.    I have had people call my phone number and threaten to bomb my house if I do not stop

issuing DMCA takedowns which they disagree with.

52.     I have had people create numerous Youtube videos and Twitch streams that are dedicated almost exclusively to revealing my personal information.

53.     I have had people contact me over email and either hurl insults at me or show me various pieces of my personal information (such as porn accounts or dating profiles) that they claim to have found about me and demand that I justify the existence of.

54.     In short, I have been through hell the past few months.

### III-4: Infringements by Emily Rebolo

55.     Defendant Emily Rebolo has infringed on my copyright in the following ways:

<u>Infringement #01: Illegally viewing the April 10, 2021 livestream</u>

56.     While participating in APB, Rebolo received a clip from Karl Polano that was from my April 10, 2021 livestream. This clip depicted the "strange noises" section of the livestream.

57.     She knew or should have known that Polano and I were in active litigation with one another over his unauthorized distribution of this very clip. As a result, she knew or should have known that viewing that clip would be considered by me to be an infringement of my copyright.

<u>Infringement #02: Illegally viewing the April 18, 2021 livestream</u>
<u>without me being paid 50% of the revenue</u>

58.     While participating in APB, Rebolo received a clip from Karl Polano that was from our April 18, 2021 livestream. Because I am a co-author, I am entitled to half of the revenue generated from Polano's distribution of that clip. I did not receive this revenue. As a result, Polano's sharing of the clip was an infringement of my copyright. Because Rebolo was a willing audience (as opposed to a captive audience) for this infringement, she is just as liable for the infringement as the sender. See Capitol Records, Inc. v. Thomas-Rasset, 680 F. Supp. 2D 1045 (2010) (finding the person who downloaded songs to be just as guilty of copyright infringement as the people she got the songs from, even if the latter parties could not be properly identified and/or brought before the court).

<u>Infringement #03: Distribution of my December 18, 2021 Stream</u>

59.     Rebolo admits to having recorded my December 18, 2021 stream: "Fallout: New Vegas

Sucks, And Here's Why (Livestream Debate)." While this, by itself, is allowed pursuant to the precedent of Sony Corp. of America v. Universal City Studios, Inc., 464 US 417 (1984) (provided that she used *timeshifting* methods, and did not simply download it, which is what she most likely did, since downloading is physically much easier than timeshifting on the Internet and thus offers the path of least resistance), the only thing that Sony v. Universal permits is the *recording* of that video, and the subsequent viewing thereof within one's own home. However, after recording the stream (which may or may not have been timeshifting), Rebolo proceeded to share this copy across various websites such as Discord. These distributions constitute infringement. You can play a timeshifted copy for house guests, but only if they are physically in the home with you. You do not have the right to distribute that recording outside of the home unless the distribution is subject to the "First Sale" rule. The First Sale rule can *never* apply to Internet transactions, because an essential element of the first sale defense is that the seller must forfeit possession of his copy once the sale is complete. When you transfer computer files from one computer to the next, the sender always retains his copy of the file on his computer, which is necessarily fatal to a "First Sale" defense.

60.     In addition to that, on January 17, 2021, Emily Rebôlo uploaded a video to her Youtube channel. If that video were still up, it could be found here: http://www.youtube.com/watch?v=o08YPDNQ2yk. At one point during the video, Rebolo used a clip from my December 18, 2021 stream. She did not provide any substantial commentary or criticism of that clip, however. Instead, she merely *described*, in purely factual terms, what happened in that clip before playing the clip itself. Her commentary or criticism is entirely redundant of viewing the clip without the commentary. This is not transformative. See Los Angeles News Service v. KCAL-TV Channel 9, 108 F. 3d 1119, 1122 (9th Cir. 1997) ("Although KCAL apparently ran its own voice-over, it does not appear to have added anything new or transformative to what made the LANS work valuable — a clear, visual recording of the beating itself"). See also Seltzer v. Green Day, Inc., 725 F. 3d 1170, 1176 (9th Cir. 2013) (an infringing work is only transformative when it results "in the creation of new information, new aesthetics, new insights and understandings").

61.     I issued a DMCA Takedown Notice against this video, and Youtube took the video down.

Rebolo issued a DMCA Counter-Notification against the takedown, prompting me to file this lawsuit. However, on March 8, 2022, Youtube nonetheless reinstated the video anyway. Therefore, Youtube has lost its safe harbor and is vicariously liable for the infringement.

<u>Infringement #04: Using my channel icon during the video</u>

62.     At multiple points in the aforementioned video, Rebolo shared the "Acerthorn Channel Icon 2022," despite not commenting on or criticizing these images these in any way. She did not even so much as give a purely factual description, like she did with the clip from the December 18, 2021 stream.

63.     Youtube is vicariously liable for this infringement for the same reason it is vicariously liable for Infringement #03. See ¶ 61.

<u>Infringement #05: Using my channel art during the video</u>

64.     At one point in the aforementioned video, Rebolo shared the "Acerthorn Channel Art 2022," despite not commenting on or criticizing these images these in any way. She did not even so much as give a purely factual description, like she did with the clip from the December 18, 2021 stream.

65.     Youtube is vicariously liable for this infringement for the same reason it is vicariously liable for Infringement #03. See ¶ 61.

<u>Infringement #06: Using my octagon watermark during the video</u>

66.     At multiple points in the aforementioned video, Rebolo shared the "Acerthorn Watermark 2022 - Octagon," despite not commenting on or criticizing these images these in any way. She did not even so much as give a purely factual description, like she did with the clip from the December 18, 2021 stream.

67.     Youtube is vicariously liable for this infringement for the same reason it is vicariously liable for Infringement #03. See ¶ 61.

<u>Infringement #07: Using my Pentagon watermark during the video</u>

68.     At one point in the aforementioned video, Rebolo shared the "Acerthorn Watermark 2022 - Pentagon," despite not commenting on or criticizing these images these in any way. She did not even so much as give a purely factual description, like she did with the clip from the December

18, 2021 stream.

69.     Youtube is vicariously liable for this infringement for the same reason it is vicariously liable for Infringement #03. See ¶ 61.

Infringement #08: Using my "5-Point Star" watermark during the video

70.     At one point in the aforementioned video, Rebolo shared the "Acerthorn Watermark 2022 - 5-Point Star," despite not commenting on or criticizing these images these in any way. She did not even so much as give a purely factual description, like she did with the clip from the December 18, 2021 stream.

71.     Youtube is vicariously liable for this infringement for the same reason it is vicariously liable for Infringement #03. See ¶ 61.

Infringement #09: Using my "Abnormal Shape" watermark during the video

72.     At one point in the aforementioned video, Rebolo shared the "Acerthorn Watermark 2022 - Abnormal Shape #1," despite not commenting on or criticizing these images these in any way. She did not even so much as give a purely factual description, like she did with the clip from the December 18, 2021 stream.

73.     Youtube is vicariously liable for this infringement for the same reason it is vicariously liable for Infringement #03. See ¶ 61.

Infringement #10: Using my Diamond watermark during the video

74.     At one point in the aforementioned video, Rebolo shared the "Acerthorn Watermark 2022 - Diamond," despite not commenting on or criticizing these images these in any way. She did not even so much as give a purely factual description, like she did with the clip from the December 18, 2021 stream.

75.     Youtube is vicariously liable for this infringement for the same reason it is vicariously liable for Infringement #03. See ¶ 61.

Infringement #11: Using my Square watermark during the video

76.     At one point in the aforementioned video, Rebolo shared the "Acerthorn Watermark 2022 - Square," despite not commenting on or criticizing these images these in any way. She did not even so much as give a purely factual description, like she did with the clip from the December

18, 2021 stream.

77.     Youtube is vicariously liable for this infringement for the same reason it is vicariously liable for Infringement #03. See ¶ 61.

### III-5: Infringements by Trysten Burge

78.     The following infringements were committed by Trysten Burge:

<u>Infringement #12: Illegally viewing the April 10, 2021 livestream</u>

79.     While participating in APB, Burge received a clip from Karl Polano that was from my April 10, 2021 livestream. This clip depicted the "strange noises" section of the livestream.

80.     He knew or should have known that Polano and I were in active litigation with one another over his unauthorized distribution of this very clip. As a result, he knew or should have known that viewing that clip would be considered by me to be an infringement of my copyright.

<u>Infringement #13: Illegally viewing the April 18, 2021 livestream</u>
<u>without me being paid 50% of the revenue</u>

81.     While participating in APB, Rebolo received a clip from Karl Polano that was from our April 18, 2021 livestream. Because I am a co-author, I am entitled to half of the revenue generated from Polano's distribution of that clip. I did not receive this revenue. As a result, Polano's sharing of the clip was an infringement of my copyright. Because Burge was a willing audience (as opposed to a captive audience) for this infringement, he is just as liable for the infringement as the sender. See Capitol Records, Inc. v. Thomas-Rasset, 680 F. Supp. 2D 1045 (2010) (finding the person who downloaded songs to be just as guilty of copyright infringement as the people she got the songs from, even if the latter parties could not be properly identified and/or brought before the court).

<u>Infringement #14: Using nearly all of my November 24, 2021 video</u>

82.     On January 5, 2021, Trysten Burge uploaded a video to his Youtube channel. If that video were still up, it could be found here: http://www.youtube.com/watch?v=o1vMcyI9B8M

83.     In that video, Burge used a great portion of my video "Corrections Series is Canceled, and Here's Why." He used the "heart" of that video. As a result, his video could serve as a market replacement to my own video. He also did very little to criticize that specific video. Instead, the

lion's share of his video was dedicated to discussing his frustrations with me responding to the comments I receive in my videos, which does not necessitate the use of any of my copyrighted content. For these reasons, I believe his video does not count as fair use, even if his claim for fair use survives my collateral attacks against it under "abuse of rights" and "unclean hands."

### III-6: Infringements by Creetosis

84.     The following infringements of my copyright were committed by John Doe #1, Creetosis:

<u>Infringements #15 & #16: STAG #6</u>

85.     On September 12, 2021 and September 15, 2021, Creetosis performed two livestreams, where he and some friends of his watched two of my Youtube videos in their entirety, literally every second of them. One of those videos – Fallout: New Vegas Retrospective – is registered with USCO. I issued DMCA Takedowns against these two streams, but Youtube refused to take them down. This means they are still publicly available, so the Court can see them now if it is so inclined. They can be found at the URLs of https://youtu.be/gagv7c-CD-U and https://youtu.be/iZMk6tzXpm4, respectively.

86.     As for the potential for fair use, I will freely admit this much: There is *ample* criticism and commentary about my Fallout: New Vegas Retrospective. Yes, I will freely admit that.

87.     HOWEVER, that is where his entire case for fair use begins and ends. Merely being transformative, even highly transformative, is not enough on its own to create fair use. See Dr. Seuss Enterprises, LP v. Comicmix LLC, 983 F. 3d 443, 452 (9th Cir. 2020) ("While the analysis of the first fair use factor may be guided by the examples given in the preamble to § 107, i.e. criticism, comment, news reporting, teaching, scholarship, and research, not even these works compel a per se finding of fair use") (citations & quotations omitted). See also Castle Rock Entertainment v. Carol Pub. Group, 955 F. Supp. 260, 268 (SD NY 1997) ("The Court's finding that SAT is a transformative work, though important, is not dispositive in defendant's favor").

88.     The video he responded to was highly creative, thus causing the 2nd Factor to weigh against fair use. The fact that he played the entirety of my video, literally every single second of it (albeit across two streams on two different sittings) means that the 3rd Factor will also weigh against fair use. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1155 (9th

Cir. 1986) ("although wholesale copying does not preclude fair use per se, the amount of copying that the Defendants did in this case still militates against a finding of fair use"). Meanwhile, because he used the entirety of the video, that means the 4th Factor will also weigh against fair use. See id at 1154 ("In fact, by copying all or substantially all of the copyrighted work, the distinction of function vanishes since whatever the intent of the copier, a verbatim reproduction will of necessity serve the function of the plaintiff's work as well as that of the defendant's") (quotations omitted).

89.     In addition to that, let's also take into consideration, not just the fact that he used the totality of the video, but also the manner in which he used it. At multiple points in the two streams, he would pause the playback of my video so he and his friends could provide commentary and criticism on it. There was never a point in either of the two streams when the video was playing and Creetosis & Co. were talking over it. The playing of the video was entirely compartmentalized away from the commentary and criticism on it. This means that you could take out every second where Creetosis & Co. were talking, and you would be left with an exact copy of my video, with no auditory or visual obstructions or modifications whatsoever.

90.     In other words, Creetosis's metaphorical driver's license serves a market replacement for my metaphorical state ID. That sort of market replacement is fine when you are discussing state identification, but it is not okay when you are infringing on someone else's copyright.

91.     This total usurpation of market has been held by the Supreme Court to singlehandedly be grounds for negating fair use, to the exclusion of all other factors. See Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539, 568 (1985) ("to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work ... If the defendant's work adversely affects the value of any of the rights in the copyrighted work, ... the use is not fair").

92.     So all in all, I believe (and I am hopeful that the Court will agree) that Creetosis's two streams do not amount to fair use overall, even if he might have started off hot by having a highly transformative work.

<u>Infringement #17: Illegally viewing the April 10, 2021 livestream</u>

93.    While participating in APB, Creetosis received a clip from Karl Polano that was from my April 10, 2021 livestream. This clip depicted the "strange noises" section of the livestream.

94.    He knew or should have known that Polano and I were in active litigation with one another over his unauthorized distribution of this very clip. As a result, he knew or should have known that viewing that clip would be considered by me to be an infringement of my copyright.

<u>Infringement #18:  Illegally viewing the April 18, 2021 livestream</u>
<u>without me being paid 50% of the revenue</u>

95.    While participating in APB, Creetosis received a clip from Karl Polano that was from our April 18, 2021 livestream. Because I am a co-author, I am entitled to half of the revenue generated from Polano's distribution of that clip. I did not receive this revenue. As a result, Polano's sharing of the clip was an infringement of my copyright. Because Creetosis was a willing audience (as opposed to a captive audience) for this infringement, he is just as liable for the infringement as the sender. See Capitol Records, Inc. v. Thomas-Rasset, 680 F. Supp. 2D 1045 (2010) (finding the person who downloaded songs to be just as guilty of copyright infringement as the people she got the songs from, even if the latter parties could not be properly identified and/or brought before the court).

<u>Infringement #19: STAG #22</u>

96.    On December 29, 2021, Creetosis did a stream called "STAG #22: huh...I just realized it's Monday. Are we doing the STAG today or tomorrow?" I issued a DMCA takedown against that video, but Youtube refused to take the content down. Because it is still up, the Court can see it by going to the following URL: https://youtu.be/KvZgrqsrNlw.

97.    At one point in the video, Creetosis shared a meme. This meme depicted the background of my April 10, 2021 livestream. I know it is from that stream because my bed is visible in the background, and my pillow and blanket were layed out in exactly the same pattern as they could be found in my April 10, 2021 stream.

98.    Because of the factual allegations given in ¶ 25, the only way he could have acquired this background image is by illegally downloading it through illegal file-sharing, such as Infringement #17. For this reason, I believe that it should automatically not qualify for fair use,

even if that same meme could be considered fair use under otherwise identical circumstances.

### III-7: Infringements by Just Emi

99.     The following infringements were committed by John Doe #2, Just Emi.

#### Infringement #20: Downloading and Distributing the April 10, 2021 Stream

100.    Just Emi has downloaded and distributed the April 10, 2021 stream. He has publicly admitted to doing so. On February 6, 2022, he posted the "strange noises" section of the April 10 livestream with no alterations or modifications whatsoever. I issued a DMCA takedown against that video, and Youtube took it down.

101.    However, when that happened, Just Emi made another video where he publicly announced his Discord ID (Alt Emi#0340), and then invited everyone to contact him on Discord to receive direct copies of the clip that was taken down. In the description of the video,  In the description of this video, he even said "[I] won't erase the MP4 I have, and have psoted everywhere. lol, lmao." I issued a DMCA takedown against this video, but Youtube refused to take it down. Because it is still up, the Court can see it by going to the URL of https://www.youtube.com/watch?v=k7eUc3YVAlE.

102.    Although he has infringed on this copyright multiple times, I can only recover statutory damages against him for one infringement. See Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., 658 F.3d 936, 946 (9th Cir. 2011) (statutory damages are only applied once per defendant, per copyrighted work, regardless of how many times the work was infringed by that defendant). So going over multiple instances of infringement would be a waste of time.

103.    However, Just Emi has also infringed on another one of my copyrights on Twitch. This leads me to …

#### Infringement #21A: Infringement of "Acerthorn Channel Icon 2022"

104.    On February 13, 2022, he attempted to do a simulcast of one of my Twitch livestreams. I have not yet registered this Twitch livestream. In doing so, he also shared my copyrighted channel icon without commenting on or criticizing it in any way.

105.    This is, admittedly, a de minimus infringement. The Court may even find it to be petty. However, please keep in mind that …

<u>More Infringements May Come</u>

106.     You may notice that the previous act of infringement is not simply called Infringement #21. It is called #21A. This is the only act of infringement which I have given a letter-based subdivision to. The reason for this is because I plan to include additional acts of infringement against Just Emi. However, I have not yet been granted registration on these copyrights. Since I do not qualify for a § 411(c) exemption[1], I must wait until registration is either granted or refused by USCO before I can file suit. See Fourth Estate Public Corp v. Wall-Street. com, LLC, 139 S. Ct. 881 (2019).

107.     Once registration is either granted or refused, I plan to include these copyrighted works as Infringements #21B, #21C, and #21D. By numbering them in this way, I can squeeze these infringements into the middle of this Complaint without having to re-adjust the numbers on all the subsequent counts of infringement.

108.     My primary reason for including Infringement #21A is so that I have an excuse to include Twitch Interactive, Inc. as a nominal defendant in this case. That way, I can proceed to request Just Emi's real name and address from them once discovery commences, without having to wait for the other registrations to happen.

### III-8: Infringements by SidAlpha

109.     The following infringements were perpetrated by John Doe #3, SidAlpha:

<u>Infringement #22: Downloading the April 10, 2021 Stream</u>

110.     During January of 2022, SidAlpha received, from Karl Polano, a copy of the April 10, 2021 stream, which he then voluntarily accepted. I know he did this because he proceeded to make a video that included this clip (see Infringement #23). His use of the clip necessarily means he *acquired possession* of that clip (because duh). However, because he did not pay me the $20 per month needed to access it through authorized means, that means he necessarily acquired it through unauthorized means.

<u>Infringement #23: Distributing the April 10, 2021 Stream</u>

111.     In ¶ 102 of this video, I mentioned that multiple infringements of the same copyrighted

---

1   Mostly because I did not provide at least 48 hours of advance notice of when the stream would occur, as is required by § 411(c)(1)

work by the same defendant cannot result in duplicate statutory damages. Furthermore, if SidAlpha is found guilty of Infringement #22, then undoing this infringement will be part of the injunctive relief I should receive in connection with Infringement #22 (since it is axiomatic that he would not have been able to commit this infringement if Infringement #22 had never occurred). However, for reasons that will soon become apparent, I believe this particular act of infringement warrants special consideration.

112.    On February 12, 2021, SidAlpha published a video where he heavily criticized me for my use of the DMCA to protect my copyrights. The video can be found at https://www.youtube.com/watch?v=WB-Xd1qDKIY. For the most part, the Court may find the video overall to be fair use. However, at timestamp 52:16, SidAlpha proceeded to use the "strange noises" clip from the April 10, 2021 stream. Even if we ignore "unclean hands" as a counter-defense to fair use, I believe his use of my clip in this case still falls short of the bar.

113.    While his playing of the clip begins at 52:16, he begins talking about it slightly before then. At timestamp 52:13, he describes the behavior as "odd." That's it. That is where the totality of his "criticism" and "commentary" of this clip begins and ends.

114.    After he uses the word "odd" to describe the clip, he then plays the "heart" of the work, without any visual or auditory obstructions whatsoever, and therefore, just like Creetosis's videos ¶¶ 88-89 of this Complaint, serving as a market replacement for the original. Once he had played the clip, he then abandoned all discussion of the clip itself and recommenced his previous discussion of my usage of the DMCA takedown system, which he believed to be abusive.

115.    His use of the clip is accompanied by de minimus transformative value, so it fails the first test for fair use. He used the "heart" of the work, so it fails the third factor for fair use, and because it contains no visual or auditory obstructions, nor any changes whatsoever to the clip, it serves as a market replacement.

116.    You could have removed the contents of 52:13 – 53:09 of that video completely, and the rest of the video would still have made perfect sense. The excerpt found at 52:13 – 53:09 is entirely unnecessary for the rest of the video. It is clear that his only ambition with that excerpt was not to comment on or criticize the clip, but rather, just to *share* the clip for its own sake.

117.    Therefore, whether he acted with unclean hands or because his use of the clip simply fails the Four Factors Test, his use of the clip in this case is not fair use.

118.    Normally, his subsequent sharing of the clip would be redundant of his illegal acquisition of the clip, for the reasons I stated ¶¶ 102 & 111 of this Complaint. However, if the Court agrees with my assessment in ¶¶ 111-117 of this Complaint, then this may be one of the few instances where actual damages may be greater than the maximum allowed statutory damages.

119.    With Infringements #16 & #17, I am limited to actual damages. But in all other instances, I can choose between actual or statutory damages. If Infringement #23 is found to be fair use, then I may still be entitled to an injunction to have it taken down for reasons I discussed in ¶ 111 of this Complaint. But if it is not found to be fair use, then I would be entitled to actual damages of $20 per view that this video has received before being taken down.

120.    As of the time of this writing, that video has received over 45,000 views. This means that over forty-five thousand people were able to see that clip without paying me one red cent for the privilege of viewing it. I have lost revenues of $20 for each of those views. This means that, as of the time of this writing, I have suffered actual damages of approximately $919,200.

121.    I issued a DMCA takedown against this video, but so far, Youtube has failed to take it down. Therefore, they have forfeited their safe harbor and can be held vicariously liable for this act of infringement.

### III-9: Infringement by Rogue, Internet Man

122.    The following infringements were perpetrated by John Doe #4, Rogue Internet Man:

Infringement #24: Downloading the April 10, 2021 Stream

123.    On January 15, 2022, Rogue Internet Man publicly posted a tweet on his Twitter feed. You can view this tweet by going to the URL of https://twitter.com/RogueManYT/status/1482481430378819587. As the Court can clearly see, he admits to possessing (and having already viewed) the April 10, 2021 stream.

124.    Because of the factual allegations of ¶ 25 of this Complaint, he necessarily acquired possession of this video by illegally downloading it, most likely from Karl Polano. Therefore, he is liable to me for infringing on my copyright.

### III-10: Infringements by Non-Defendants

125.    In addition to the infringements mentioned up to this point, there are a few acts of infringement which were perpetrated by people who I have not listed as defendants in this action. This is because I have no reason to believe that any of the corporate defendants have these people's real names or addresses on file, so my prospects of finding them and bringing them before the Court are slim. However, with both of these infringements, Youtube has failed to take the infringing content down despite me issuing DMCA Takedowns against them. Therefore, Youtube LLC can be held vicariously liable for these infringements.

#### Infringement #25: Infringement by MothPerson

126.    On February 16, 2022, a Youtuber by the name of MothPerson posted a video called "Acerthorn Goes Super Saiyan." You can view the video here: https://www.youtube.com/watch?v=7gxD3dC04h4

127.    As you can see from that video, MothPerson merely superimposed some footage from the Japanese cartoon "Dragon Ball Z" onto the audio of the "strange noises" clip from the April 10, 2021 livestream. This is not fair use. "[T]he addition of new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative." See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 453 (9th Cir. 2020). His use of this Dragon Ball Z footage fails to comment, criticize, or otherwise transform the audio clip from the April 10 stream in any way, shape, or form. See *id* at 454 ("While *Boldly* may have altered *Star Trek* by sending Captain Kirk and his crew to a strange new world, that world, the world of *Go!,* remains intact"). Therefore, his video fails utterly to qualify as fair use.

#### Infringement #26: Infringement by an imposter Acerthorn

128.    There is currently a Youtube channel which goes by the name "Acerthorn's Good Clone." You can find that channel by going to this URL: https://www.youtube.com/watch?v=k7eUc3YVAlE. He has not yet made any public videos (let alone any that infringe on my copyright), but his channel icon is a picture of my face, taken from the April 10 stream. I know it comes from that stream because I am not wearing a shirt in this image, which, as I explain in ¶ 23 of this Complaint, necessarily means that it came from that stream.

129.    This imposter Acerthorn has made absolutely no effort whatsoever to comment on, criticize, or in any way transform this image. He has done absolutely nothing that could even remotely be considered fair use. He has simply stolen an image from one of my copyrighted streams without even the pretense of or attempt at legitimacy.

130.    Despite the complete and utter lack of fair use, Youtube has not taken the image down despite me issuing a valid DMCA takedown against it. Therefore, Youtube is vicariously liable for this infringement.

### III-11: Fraudulent DMCA Takedowns by Bibi Faizi

131.    After SidAlpha made his smear video about me (which forms the basis for Infringement #23), many people began harassing me, both on and off Youtube. One person, however, did so in a way that provided me a means of tracking him down and holding him liable.

132.    On February 13, 2022, I received three emails from Youtube stating that some of my videos have been taken down due to DMCA Takedown Notices issued by a Youtuber who goes by the psuedonym "Bibi Faizi." This person had issued DMCA takedowns against ten of my videos on Youtube. I issued DMCA Counter-Notifications against these takedowns, and the videos were subsequently reinstated on March 1, 2022.

133.    In the meantime, however, the videos remained taken down, and I was unable to obtain views, watch time, or ad revenue for these videos, because access to them was disabled. In addition to that, because I had received three or more copyright strikes, my channel was locked for the duration of these Counter-Notifications, and I was unable to upload any new videos to my channel until these strikes were taken off.

134.    Every single one of these DMCA Takedowns were entirely fraudulent. None of them contained even a single frame of any content which Bibi Faizi owns the copyright to. Literally all of them contained content that was either copyrighted by me (such as footage from my own webcam), was in the public domain, or which I had obtained permission from the copyright owner to use.

135.    One of the worst examples of a video he had taken down was a video of mine called "The REAL Reason Behind the "You Didn't Play Enough" Excuse (Livestream Highlight)." The audio

for this video was comprised exclusively of my own voice, and nothing else. The visuals of that video consisted almost exclusively of the blue honeycomb which forms the background for the "Acerthorn Channel Art 2022" copyrighted 2D image, which means that it was created by me and I own 100% of the copyright to it. In addition to that blue honeycomb background, the majority of the visuals of the video consisted of text overlays which I created from whole cloth, and a few screenshots of news articles, my use of which falls squarely within fair use guidelines.

136.    Put simply, at no point in any of the ten videos that Bibi Faizi had taken down using the DMCA Takedown did I ever use even a single frame of any content which he owns the copyright to.

137.    Instead, it is far more likely that Bibi Faizi issued these false DMCA Takedowns in order to retaliate against me for my own usage of the DMCA takedown, which he perceived to be abusive. It's clear that he just wanted to give me a taste of *what he considered to be* my own medicine. This, however, is a blatant violation of § 512(f)(1).

### III-12: Inducement by Karl Polano

138.    All of the acts of infringement and harassment mentioned so far in this complaint were personally induced by Karl Polano. He is the one who reached out to the likes of Creetosis and SidAlpha and asked them to assist him in harassing and doxxing me as punishment for having filed suit against him in the case of Stebbins v. Polano. Had he never reached out to them and asked for them to publicly attack me, none of them would have done so.

139.    As a result, I believe that Karl Polano should be held liable for contributory infringement.

### IV: ARGUMENT & LAW

140.    The following laws are relevant to this Complaint:

### IV-1: Prima Facie Copyright Infringement

141.     "[T]here are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant." See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1151 (9th Cir. 1986).

142.    In all instances of copyright infringement, I have clearly alleged the second element of copyright infringement. However, there are two sets of copyrighted works where the first

element (ownership of the copyright by the Plaintiff) is in dispute.

### IV-2: Eligibility for Copyright Protection

143.    To be eligible for copyright protection, a work must (A) be original, (B) be the result of human authorship, (C) have a minimal creative spark, and (D) be fixed into a tangible medium of expression. The minimal creative spark is an exceptionally low burden to clear, but it does require more than purely factual works (such as phone books or databases) and the work must be more than basic geometric shapes.

144.    There are two works which I assert copyright ownership over in this case, where my ownership of said copyright is likely to be disputed: The April 10 livestream and the 2D images which I sought to register on December 9, 2021.

### IV-2-A: Copyrightability of the April 10, 2021 livestream

145.    Before I continue, I want to point out that, much like fair use, the defendants hold the burden of proof on this issue. I have the registration for the copyright in this case. This means that I hold a presumption that my copyright is valid. I do not have to provide any further proof (beyond just the registration) that my copyright is valid. They have to prove that it is not valid.

146.    That being said, in his video about me, SidAlpha offers two legal theories upon which my copyright ownership of the April 10, 2021 livestream may be invalidated: First, that I cannot claim ownership of the "strange noises" section of the clip unless I confess to having made the noises myself, and second, that accidental livestreams are "factual," and therefore are not subject to copyright.

147.    Both of these are legally frivolous. While it is true that I cannot claim the copyright of naturally occurring noises, I can indeed claim the copyright for *my recording of* those naturally occurring noises. The noises were recorded using my microphone, plugged into my computer, with my streaming software installed on it, which was linked to my Twitch account. I am clearly the author of that recording.

148.    If I am walking down the street and I see a cop harassing someone else, and I take out my smartphone and record the encounter, I own the copyright to that recording, even though the encounter would have existed independently of my recording of it. Likewise, anyone else who

owns records their own footage of the encounter from a different angle will own the copyright to *that* recording, but anyone who simply uses my recording is guilty of prima facie copyright infringement.

149.    Even if he were correct in his argument that I cannot claim copyright of the recordings of any noises I did not make myself, that still does the defendants only minimal good. SidAlpha argues that I have placed myself in a lose-lose situation, whereby in order to have a copyright to even enforce, I must admit to having made the noises myself, which in turn means I must publicly admit to being deranged. It is actually the other way around. Because I have the registration for the copyright, that means I hold the presumption of copyright validity. To overcome this presumption, the defendants would have to insist that I did not make these noises, and once they do that, they have just admitted to defaming me when they called me deranged! So instead, it is actually the defendants, not myself, who have placed themselves in a lose-lose situation by embracing this legal theory for invalidating my copyright!

150.    His claim that I cannot claim a copyright on this recording because it was accidental is equally frivolous. His logic rests on the assumption that (A) because it was accidental, it must be factual, and (B) factual works are not subject to copyright protection.

151.    Put simply, this is not the law. Factual works are copyrighted by their authors all the time. Biographies … documentaries … textbooks … these are all examples of factual works that are still subject to copyright protection. Rather, the law states that *purely factual* works, with no creativity or expression in them whatsoever (such as phone books or databases) are not subject to copyright. The only requirement for copyright protection is that the work must demonstrate a "minimum creative spark." This is an exceptionally low burden to meet (which, in turn, means that it is an exceptionally high burden for the defendants to prove if they are to allege that my copyright is invalid).

152.    Even if the strange noises themselves are not my own individual and personal expression (and further assuming that this actually does weigh against my claim to copyright the recording thereof), the April 10, 2021 livestream still contains plenty of expression that is unquestionably my own, even if I never intended for that expression to escape the privacy of my home. ¶ 24 of

this Complaint shows just one example of my personal expression. Meanwhile, when the court is reviewing Infringement #26 (which uses a frame taken from that stream), you can see that I am making a facial expression that is very … well … *expressive*. There are plenty of other instances besides this.

153.    Any one of these instances should be more than sufficient to satisfy the "minimum creative spark" necessary to be entitled to copyright protection, and there is no indication anywhere in the law that I lose my copyright protection simply because the *affixation* into a tangible medium of expression was not done on purpose but was instead the result of a single errant keystroke on my keyboard. While automated computer processes are not subject to copyright protection (seeing as they lack human authorship), there is no indication that me accidentally pressing the key on my keyboard to turn on the streaming software lacks sufficient human authorship, simply because I didn't mean to do it.

154.    Now, somebody (such as an attorney representing one of these defendants, if not the defendants themselves) may allege that, because it was an accident, it is lacking in "human authorship." For example, the copyright office does not accept works that are created entirely by automated processes. See https://www.copyright.gov/comp3/chap300/ch300-copyrightable-authorship.pdf, Page 21-22 ("the Office will not register works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author").

155.    However, my streaming software – which is called "OBS Studio" – cannot turn itself on automatically. In the case of Stebbins v. Polano, I said that my streaming software came on without me realizing it, but I never meant to state that it came on entirely of its own own accord, because OBS Studio is not programmed to do that. Instead, I merely meant that I pressed the key on my keyboard to turn on OBS Studio without me realizing I had done it. While that is an accident, it still constitutes "intervention from a human author." There is no indication, anywhere in copyright law, that accidental human authorship is insufficient.

156.    Therefore, the defendants are highly unlikely to prove that my copyright of the April 10 livestream is invalid.

First Amended Complaint

IV-2-B: Copyrightability of the 2D Images

157.    Unlike the April 10 stream, I hold the burden of proof on this issue of fact, seeing as I do not, at present, have a copyright registration. However, I still believe I can easily clear that burden.

158.    USCO justified its decision to not register my copyrights of my ten at-the-time-unpublished 2D works of art, on the grounds that they lack sufficient human authorship and/or minimum creativity. Both of these are factually incorrect.

159.    First of all, this is entirely a work of human creation. I created the blue honeycomb background entirely from whole cloth using the "MS Paint" and "NCH VideoPad" computer applications. Furthermore, unlike the April 10 stream, this time, I did it on purpose. So the "human authorship" requirement is unquestionably met in this case.

160.    As for the minimum creative spark, I have also met this requirement. "To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice." See Feist Publications, Inc. v. Rural Telephone Service Co., 499 US 340, 345 (1991).

161.    In the case of my 2D images which I attempted to register on December 9, 2021, my creation of the blue honeycomb background constituted the lion's share of my personal creativity. My choice of "pure" blue for the hexagons, as well as a gradient combination of periwinkle and polynesian blue for the spaces in between the hexagons, is a creative choice I made when deciding how to draw the honeycomb backgrounds. While USCO states that it does not register "basic geometric shapes," the key word there is "basic." A single hexagon may be a "basic" geometric shape, but me putting these hexagons into a honeycomb pattern with a gradiant color scheme in between was a creative choice on my part.

162.    If that alone were not enough, my works titled "Acerthorn Channel Icon 2022" and "Acerthorn Watermark 2022 – Abnormal Shape #1" both possess *additional* creative sparks on my end. For abnormal shape watermark, remember that, as the name would imply, the image is an *abnormal* shape, not a basic one. My choice to use that shape for the watermark constitutes a minimum creative spark in its own right.

163.    Meanwhile, for "Acerthorn Channel Icon 2022," remember that, as I explained in ¶ 37 of

297b44a2932e2410

this Complaint, I applied a fish-eye effect to the honeycomb background, stretching some parts of the honeycomb and compressing other parts, in order to create the illusion that the honeycomb was wrapped around a ball. That alone constitutes a stand-alone minimum creative spark, even if the honeycomb background itself does not.

164.    For these reasons, I am entitled to ownership of the copyright of all ten of these 2D images. At the very least, the "Acerthorn Channel Icon 2022" and "Acerthorn Watermark 2022 – Abnormal Shape #1" should be registered.

165.    Because I have demonstrated that I own the copyright to all of these works, that means I have created a prima facie showing of copyright infringement.

### IV-3: Vicarious Liability

166.    For Infringements #15, #16, #19, #23, #25, and #26, Youtube and Alphabet have refused to take down the infringing content, despite me issuing statutorily-compliant DMCA Takedown Notices. This means that Youtube has forfeited their safe harbor.

167.    There are two legal theories upon which an ISP who does not have safe harbor can be held liable for the copyright infringement of another: Contributory infringement and vicarious infringement. "A party engages in contributory copyright infringement when it (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." See Erickson Productions, Inc. v. Kast, 921 F. 3d 822, 831 (9th Cir. 2019). "To prevail on a vicarious liability claim, [plaintiff] must prove [defendant] has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." See id at 829.

168.    Defendants Youtube and Alphabet have not committed contributory infringement, but they have indeed committed vicarious infringement. The defendants had the right to supervise what videos would be allowed on its platform. Nobody in their right mind would deny that. They also had the ability to supervise the infringing conduct. If they did not have the ability initially, they certainly had that ability once I filed the DMCA takedown notice which they chose to ignore.

### IV-4: "Abuse of Rights" and "Unclean Hands"

169.    In addition to the aforementioned reasons why I believe that each infringement does not qualify for fair use, I also believe that, in all aforementioned cases of infringement, fair use should be precluded due to the counter-defenses of "abuse of rights" and "unclean hands." Although the case of Google LLC v. Oracle America, Inc., 141 S. Ct. 1183, 1205 (2021) casts doubt as to the role of bad faith per se in a fair use determination, that is only dicta, and even barring that, the Court gives no consideration (and therefore implicitly leaves the option open) of the possibility of fair use being attacked collaterally through counter-defenses that exist at common law.

170.    First, there is the common law doctrine of "abuse of rights." This is a doctrine which "refers to the concept that the malicious or antisocial exercise of otherwise legitimate rights can give rise to civil liability." See https://definitions.uslegal.com/a/abuse-of-rights/. Since most of the defendants (and especially the likes of Just Emi, Creetosis, and Rogue Internet Man) have made it abundantly clear that "the predominant motive for exercising [fair use] is to cause harm," that "no serious or legitimate motive exists for exercising the right," and that "the exercise of the right is against moral rules, good faith, or elementary fairness," (all of which are listed in the aforementioned citation as grounds to invoke the "abuse of rights" doctrine), they should be held liable, even if those same videos could be considered fair use under otherwise identical circumstances.

171.    Next, there is "unclean hands." Whereas abuse of rights typically requires actual malice, unclean hands can be used to preclude a party's claim if they have acted with *any* inequitable conduct in relation to the pending claim, not just actual malice[2]. Abuse of rights can apply either at law or in equity, but unclean hands only applies to cases in equity. But in exchange for that limitation of the types of cases it can apply to, it can apply to a much wider range of personal behavior. See Precision Co. v. Automotive Co., 324 US 806, 815 (1945) ("Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of

---

2   One example of a type of non-malicious behavior that was found to constitute unclean hands is the concealment of relevant facts. See Keystone Driller Co. v. General Excavator Co., 290 US 240, 244 (1933) ("before a complainant can have a standing in court he must ... come into court with clean hands. He must be frank and fair with the court, nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matters in controversy should be placed before the court").

conduct is sufficient cause for the invocation of the maxim by the [judge]").

172.    So even if the corporate defendants can successfully allege that fair use no longer requires good faith in its own right, I still have two more legal theories that the corporate defendants have not even attempted to refute.

### IV-6: DMCA Misrepresentation

173.    To state a claim for DMCA misrepresentation, I must allege (A) the defendant issued a DMCA takedown against one or more of my online submissions, (B) the takedown contained materially false statements by the issuer, (C) the issuer *knew* the statements in question were false, and (D) the ISP (in this case, Youtube) relied on those misrepresentations when removing the online content to my detriment.

174.    ¶ 132 of this Complaint satisfies the first and fourth elements. ¶¶ 124-127 adequately allege the second and third elements. Therefore, I have plausibly stated a claim for DMCA Misrepresentation, and that defendant Bibi Faizi acted with actual malice.

### V: RELIEF REQUESTED

175.    I request the following relief from the defendants:

### V-1: Prospective Injunctive Relief against Perlmutter

176.    First, I request an injunction against Shira Perlmutter to register my copyright for my ten 2D images, with December 9, 2021 as the effective date of registration.

### V-2: Prospective Injunctive Relief Against All Other Individual Defendants

177.    Next, I ask that all the individual defendants be ordered to …

(a)    Remove any instances of copyright infringement from their social media accounts and cloud storage accounts;

(b)    Submit all of their computers and smartphones for impounding to a third party, so that their devices may be cleansed of any instances of unauthorized infringements of my copyright, pursuant to **17 USC § 503**;

(c)    To cease and desist any infringement of my copyright; and

(d)    To remove, from any website, any instances of my copyright that would not have existed, but for their infringement.

### V-3: Damages

178.    I have alleged 26 different infringements of my copyright. For two of those infringements (#16 and #17), I am limited to actual damages. For one of those infringements (Infringement #23), I may opt for actual damages. This leaves a total of 23 other acts of infringement where I am eligible for statutory damages.

179.    I request statutory damages of $150,000 for each count of infringement. Karl Polano should be held contributorily liable for each of these counts of infringement, whereas all other defendants should only be held liable for the infringements they themselves committed (or in the case of Youtube, which they intentionally permitted to remain on their platform). This makes for a grand total of $3,450,000 across the various defendants.

180.    For Infringements #16 and #17, and #23, I request to be compensated all of the profits (however much that may be) that Creetosis earned from their streams which infringed on my content.

181.    For Infringement #23, I request actual damages of $20 for every view that SidAlpha's video about me earns before it is taken down.

### V-4: Prospective Injunctive Relief against corporate defendants

182.    Even if the corporate defendants have safe harbor for everything else (such as Discord or Twitch), I can still obtain limited prospective injunctive relief against them pursuant to **17 USC § 512(j)**.

183.    Pursuant to this subsection, I ask that Youtube LLC, Alphabet Inc., Discord Inc., and Twitch Interactive Inc. all be ordered to …

(a)    Remove any infringements of my copyright that have not already been removed, pursuant to **§ 512(j)(1)(A)(i)**;

(b)    Permanently terminate the accounts owned by the individual defendants that have not already been terminated, pursuant to **§ 512(j)(1)(A)(ii)**; and

(c)    Take reasonable measures, pursuant to **§ 512(j)(1)(A)(iii)**, to prevent any of the individual defendants from creating any new accounts.

184.

## VI: CONCLUSION

185.

*/s/ David Stebbins*
David Stebbins
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com
