David Stebbins (pro se Plaintiff)
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                         PLAINTIFF

VS.                          Case 3:21-cv-04184-JSW

KARL POLANO, et al                                      DEFENDANTS

## OPPOSITION TO MOTION TO DISMISS  OR IN THE ALTERNATIVE SUPPLEMENT IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Opposition to the Corporate Defendants' Motion to Dismiss. I will only address the parts which the corporate defendants insist on pushing: The validity of my copyright. If the Court grants the motion to strike (Dkt. 130), and therefore does not consider the contents of the motion to dismiss, then this opposition should be treated as a supplementary brief to the motion for default judgment.

## TABLE OF CONTENTS

| Chapter | Page # |
|---|---|
| 1. TABLE OF CONTENTS | 1 |
| 2. TABLE OF AUTHORITIES | 2 |
| 3. FACTS OF THE CASE | 4 |
| 4. SUMMARY OF ARGUMENT | 7 |
| 5. ARGUMENT & LAW | 8 |
| (a) Defendant's hyper-literal interpretation of the contents of my complaint. | 8 |
| i.  Standards for Motion to Dismiss | 10 |

   & Pre-Service IFP Screening

 (b) Registration, Presumption, and § 411(b)     11

  i.  Mere lack of disclosure does     13

   not satisfy § 411(b)(1)(A)

  ii.  § 411(b)(1) is exclusive.     13

 (c) Work of Authorship     15

  i.  Human Creation     15

  ii.  Minimum Creativity     16

 (d) Tangible Medium of Expression     17

 (e) "Under the Authority" of the author     18

  i.  Mere metaphysical doubt     18

  ii.  "Under the Authority" of the author, cont.     19

1.  RELIEF REQUESTED     21

2.  CONCLUSION     22

## TABLE OF AUTHORITIES

**Statutes & Rules**     **Page #**

- 17 USC § 101     18
- 17 USC § 102(a)     15,18
- 17 USC § 410(c)     11
- 17 USC § 410(d)     11
- 17 USC § 411(b)(1)     11,12,13
- 17 USC § 411(b)(1)(B)     14
- 17 USC § 411(b)(1)(A)     13,14,15

**Case Law**     **Page #**

- Alfred Bell & Co. v. Catalda Fine Arts,     17

191 F. 2d 99 (2nd Cir. 1951)

- Baltimore Orioles v.                                                    20
  Major League Baseball Players,
  805 F. 2d 663, 675 n. 22 (7th Cir. 1986)
- Fleet v. CBS, INC., 50 Cal. App.                                       20
  4Th 1911, 1920 n. 5 (1996)
- Foman v. Davis, 371 US 178 (1962)                                      11
- Hosseinzadeh v. Klein, 276 F. Supp.                                    9
  3d 34 (SD NY 2017)
- Matsushita Elec. Industrial Co.                                        19
  v. Zenith Radio Corp., 475 US 574 (1986)
- Unicolors, Inc. v. H&M Hennes & Mauritz, LP                            12
- Zacchini v. Scripps-Howard                                             20
  Broadcasting Co., 433 US 562 (1977)

## FACTS OF THE CASE

1.     I am a Youtuber and Twitch streamer who trades under the psuedonym "Acerthorn." On April 10, 2021, my streaming software (OBS Studio) came on without me realizing it. The exact reason it came on appears to be lost to history. Maybe I accidentally pressed the key on my keyboard to turn it on. Maybe it was a glitch. We may never know.

2.     I registered the copyright with the United States Copyright Office (or USCO, for short) on May 26, 2021, within three months of publication. Registration was granted and was given the registration number of PA0002305616.

3.     The Court can take judicial notice of the fact that, while filling out the application for copyright registration, there is no space provided whereby the applicant can concede that the work was created by accident. However, the title of the April 10 stream, as it appears in the Public Catalog of registered copyrights, literally contains the word "Accidental," so USCO almost certainly realized that it was created by accident, and still chose to grant registration nonetheless.

4.     The stream is supposed to be gated behind a paywall. If I were to provide a link to the stream in this brief, it would become public record, which means that anybody could legally access it without paying me for it. To safeguard against this, I will send an email to the judge's chambers, providing the court with a copy of the work, so it will not be public record.

5.     In any event, because of this accidental turning on of my streaming software, my viewers could see me engaging in my daily activities without me realizing they could see it. At timestamp 40:02, you can see me taking a bite of hot dog before getting up and walking off camera. Almost immediately after I go off frame, you can hear strange noises that sound like barking and snarling. It is disputed whether or not I personally made these noises.

6.     There are plenty of other moments in the stream when I did indeed engage in acts of individual expression, where I unquestionably am the human author thereof. The primary source of me engaging in acts of personal expression are the facial expressions I make when viewing Youtube videos. A non-exhaustive list of representative examples include, but are not limited to the following timestamps:

OPPOSITION TO MOTION TO DISMISS

(a)    1:25:33 - 1:25:39

(b)    1:27:50 - 1:27:54

(c)    1:32:16 - 1:32:21

(d)    1:33:57 - 1:34:00

(e)    1:35:46 - 1:35:53

(f)    1:36:52 - 1:37:04

(g)    1:38:10 - 1:38:15

7.    If I were taking a selfie, any one of those faces would be singularly sufficient individual creative expression to be entitled to copyright protection. Now, whether these expressions constitute sufficient commentary or criticism of the videos I was watching as to entitle me to a fair use defense for the infringement of those videos is another story, but since nobody with legal standing to sue me for that has yet to do so, that is not an issue we need adjudicate here.

8.    In addition to that, there is the events which occur at timestamp 32:39 – 32:41, where you can hear me saying the words "kill you." Who exactly am I threatening to kill? *Am I even* threatening to kill anyone at all, or was I just thinking out loud? Most likely the latter, but it is ultimately immaterial.

9.    These acts of personal expression, although scarce and de minimus, are nonetheless sufficient to create the minimum amount of creativity needed for copyright protection, even on their own, much less when combined together into one livestream.

10.    The individual defendants were all served with process in this case, and were all entered in default. I then filed a motion for default judgment. I voluntarily dismissed the corporate defendants from this case, but when I did, they proceeded to file an improper motion to dismiss anyway, despite knowing full well that they had no right to file that motion after they had already been dismissed. I filed a motion to strike that motion to dismiss, and the corporate defendants pleaded for the court to still consider the arguments contained therein, including the validity of the plaintiff's copyright, despite the Court having no authority or discretion to entertain any pleadings filed by parties after they had been voluntarily dismissed. I then filed a reply to the motion to dismiss, advising the Court that it *absolutely must* strike the motion to dismiss in

totality, as to do otherwise would undermine my absolute right to nonsuit the corporate defendants.

11.     However, just to show that I am not actually afraid of the arguments contained therein, I hereby offer this Opposition/Response to the defendant's Motion to Dismiss, just to show that my copyright is indeed valid. If the Court insists on considering the corporate defendants' arguments, I ask that it also consider these arguments as well.

## SUMMARY OF ARGUMENT

12.     The Defendants' claims that my copyright on the April 10 livestream is invalid are patently frivolous. Because my copyright is registered, the defendants hold the burden of proof on this issue, since I hold a presumption that the copyright is valid.

13.     The defendants' hyper-literal interpretation of the language of the Second Amended Complaint – that the stream was "contentless" and that the stream "turned on of its own accord" - are erroneous interpretations of statements that were clearly meant to be taken figuratively and hyperbolically. They cannot be used to invalidate the copyright solely based on my admissions alone.

14.     The Defendants' odds of being able to prove this are one in a million, and so we should not waste discovery and precious judicial resources giving the defendants the chance to chase a ghost. The only way the Defendants could attack the validity of the copyright is by alleging that I knowingly lied about some material fact in my application for copyright registration. Precious few alternative avenues for challenging the validity of copyright exist. But because the defendants obviously cannot prove that I ever misrepresented any material fact in my copyright application, let alone did so knowingly, their avenues for invalidating my copyright are very limited.

15.     By alleging that the copyright is invalid because it was "accidental," the defendants are essentially challenging the validity of the affixation of the stream into a tangible medium of expression. Specifically, they would have to allege that the stream was the result of purely autonomous processes. However, in order to prove that the stream was entirely autonomous without any human intervention whatsoever, they would need metadata from my computer from that date that, in all likelihood, no longer exists. Because of this, the odds of the Defendants being able to successfully prove that the work was the result of purely autonomous processes is one in a million. For this reason, the Court should go ahead and enter summary judgment, since

**ARGUMENT & LAW**

16.     For the reasons set forth below, my copyright should be presumed valid.

**Defendant's hyper-literal interpretation of the contents of my complaint.**

17.     The defendants' primary means of attacking the copyrightability of the April 10 stream comes from my own statements made during the Second Amended Complaint. Namely, they rely on my statements that "my livestream software turned on of its own accord" and the fact that, without the strange noises, the livestream was otherwise "contentless." To invalidate my copyright just on these admissions alone, the Court must construe these statements in a hyper-literal manner that was clearly not intended.

18.     It is often the job of the courts to determine which statements are meant to be literal and which are meant to be figurative. If you cannot tell the difference between the two, you have no business practicing law, because that is, very often, a deciding factor in many aspects of the law.

19.     First, when I said the streaming software "turned on of its own accord," that is clearly meant to be taken figuratively, not literally. It is, essentially, the same as if I said that some machine "only works when it feels like it." Everyone knows that machines don't work "when they feel like it" in the literal sense, owing to the simple fact that they *don't have feelings*, because they are just inanimate objects.

20.     Likewise, my statement that the streaming software turned on "of its own accord" was not meant to be taken literally, but figuratively, in order to convey that *I don't know how* the streaming software turned on!

21.     In fact, this interpretation of my Second Amended Complaint is the only one that holds up to scrutiny, given the full context. Remember: The whole point of ¶¶ 22-23 of the Second Amended Complaint was the emphasize that the stream happened by accident. As such, any reasonable person would quickly ascertain that I *didn't know* how it happened, and that any efforts by me to guess as to how it happened are just that: A guess, not based on personal knowledge. If I actually *knew* what had caused the stream that would imply that I had enough wherewithal at the time the stream began to take a note of what caused it to happen. But if I had done that, then the stream would not have been an accident in the first place!

22.     Therefore, my statement that the stream came on "of its own accord" is clearly meant to be a figurative, not literal, statement. It therefore cannot be used to singlehandedly invalidate the copyright. If the defendants want to challenge the validity of my copyright, they must actually engage in discovery and litigation as outlined below.

23.     The defendants' reliance on the words "boring and contentless" is equally hyper-literal. It is just as hyper-literal as Matt Hosseinzadeh's interpretation of Ethan and Hila Klein's statement that "several months passed [and] nothing happen[ed]." See Hosseinzadeh v. Klein, 276 F. Supp. 3d 34 (SD NY 2017):

> "The only other allegedly defamatory statement explicitly identified by plaintiff is Ethan Klein's assertion that 'several months passed [and] nothing happen[ed]' prior to plaintiff's first settlement offer and threat of litigation … a statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced. Here, plaintiff argues that Ethan Klein's failure to mention that plaintiff sent a warning e-mail on August 2, 2016 makes Ethan Klein's statement that 'nothing happen[ed]' false and defamatory.
> …
> [V]iewing the Lawsuit video as a whole, the clear import of Ethan Klein's statement that 'nothing happen[ed]' is that defendants were surprised and disappointed by plaintiff's decision to file a lawsuit months after the Klein video was first posted on YouTube. Plaintiff's objection to the word 'nothing' is hyper-literal and based on a strained and unsupported interpretation of the Lawsuit video … Ethan Klein's statement that 'nothing happen[ed]' could easily refer to the fact that no action was filed in the intervening months, not that the parties had no communication." See *id* at 47-48 (citations and quotations omitted).

24.     When I said that the stream was "contentless," I merely meant that the content contained therein would not have been sufficient, in my personal judgment, to compel me to do a stream on purpose just for this content alone. The content in that stream was like rainfall in the desert. Geographers define a "desert" as a region with less than 4 inches of rainfall per year, but that still allows for *some* rainfall. Likewise, under the current copyright law, there is still sufficient creativity in the April 10 stream for there to be copyright protection in the first instance, even if I, personally, would not have chosen to make that work of my own accord.

25.     The facts listed in ¶¶ 6-8 demonstrate that at least *some* things happened in the stream,

and those things, minimal as they are (akin to rainfall in the desert, but still greater than zero, which copyright law says is all that is required) still show that my earlier statement that the stream was "contentless" was not meant to be taken literally.

26.     Put simply, the defendants' insistence that the contents of my second amended complaint be treated as confessions as to the invalidity of the copyright are hyper-literal, unsupported by the evidence, and even unsupported by the total context in which those statements even appear. The second amended complaint is simply not dispositive in this instance.

<u>Standards for Motion to Dismiss & Pre-Service IFP Screening</u>

27.     If the Court needs one final argument in favor of ¶¶ 22-23 of the SAC being meant figuratively rather than literally, consider this: Before the defendants were served with process, this Court conducted its own, sua sponte review of the First Amended Complaint, pursuant to the in forma pauperis statute. The corresponding section of that complaint contained identical language to that contained in the Second Amended Complaint. See **Dkt. 11, ¶ 22** ("On April 10, 2021, my livestream software turned on of its own accord without me realizing it"). See also **Dkt. 11, ¶ 23** ("these strange noises constituted the only interesting and memorable part of this otherwise boring and contentless livestream").

28.     These are the same statements that the defendants rely on to justify invalidating my copyright. Despite this, the Court nonetheless found that I had stated a claim upon which relief can be granted with respect to the copyright infringement claims. See **Dkt. 21**.

29.     Although this order is not dispositive on a motion to dismiss, it is relevant here in the sense that it is evidence of how an impartial, disinterested party is likely to view these factual allegations as being meant figuratively rather than literally. The fact that Court initially interpreted that section of the Complaint as figurative is circumstantial evidence that random people on the street would likewise interpret it that way if questioned about it, which in turn increases the likelihood that it was the original intended meaning, if one were to set aside their litigatory bias and tendency to interpret everything I say in the most negative light possible.

30.     Remember that a motion to dismiss for failure to state a claim, and a pre-service review by the Courts under the in forma pauperis statute, are both subject to the same levels of scrutiny:

The Court must view the factual allegations in the complaint as true, and *in a light most favorable to the Plaintiff.*

31.     That latter part tends to get overlooked a lot, but it is paramount here. It means that, if a figurative interpretation of this section of the Complaint is at all plausible, I am entitled to that benefit of the doubt at the pleadings stage. The fact that the Court initially interpreted this language as figurative is certainly evidence that a figurative interpretation is plausible. Therefore, I am entitled to that benefit of the doubt. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Foman v. Davis, 371 US 178, 181-82 (1962).

**Registration, Presumption, and § 411(b)**

32.     First, the April 10 stream is registered. The Court can see the registration by searching the Public Catalog for the registration number PA0002305616. "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." See **17 USC § 410(c)**. The court can take judicial notice that the date of publication is listed as April 10, 2021 and the effective date of registration (as defined by **17 USC § 410(d)**) is May 26, 2021, well within five years of publication. Therefore, I am entitled to a presumption of validity.

33.     **17 USC § 411(b)(1)** provides a limited means for the defendant to challenge the validity of the copyright registration. However, defendants seeking to invoke this defense carry an exceptional burden. To invalidate the registration under 17 USC § 411(b)(1), the defendants must prove three things:

    (a)     At least one statement in the registration was false,

    (b)     The applicant (that's me) knew that the statement was false at the time he made it, and

    (c)     If I had told the truth, USCO would have refused to grant registration.

34.     The second element is often the one that trips up most defendants. "The Copyright Act provides that a certificate of registration is valid, even though it contains inaccurate information,

as long as the copyright holder lacked 'knowledge that it was inaccurate.'" See Unicolors, Inc. v.
H&M Hennes & Mauritz, LP (publication pending; delivered on February 24, 2022). In fact, in
that case, the Supreme Court made it harder, not easier, for defendants to invoke this defense by
holding that even errors of law – so long as those errors were made in good faith by the applicant
– are not sufficient to invalidate a copyright registration.

35.      The defendants in this case have not alleged sufficient facts that I knowingly lied about
the accidental status of the stream. In fact, they literally *can't* allege that. The Court can take
judicial notice of the fact that at no point in the copyright registration application am I ever
directly asked whether the work was created on purpose or not. Unlike publication status (which
was the focus of the Unicolors case), there is no point in the application where I even *could* lie
about something like that.

36.      By contrast, note that the *title* of the registered work is "Accidental Livestream from
April 10, 2021." The word "accidental" appears in the title. This means that I still found a way to
notify USCO that the stream was … well … accidental, even when the application did not
normally provide a means for me to do so.

37.      Furthermore, the Court can take judicial notice that USCO does not accept applications
for copyright registration until the applicant either uploads or mails in a tangible copy of the
work. It is axiomatic that USCO would manually review the tangible copy provided before
granting registration to make sure it complies with the legal requirements to be eligible for
copyright registration. Upon reviewing that stream (identical to the one described in ¶ 4 of this
Memorandum, which was sent to the judge's chambers via email), it would be abundantly clear
to any reasonable person – as long as that person was mentally competent enough to qualify for
employment with USCO in the first place – that I did not realize that my streaming software was
on.

38.      Despite the notices described in ¶¶ 32 & 33 above, USCO nonetheless chose to grant the
registration. Therefore, it is undisputed that I did not lie about the accidental nature of the stream
at any point in the registration process, let alone that I did so knowingly. This means that any
hopes that the Defendants may have of invalidating the copyright pursuant to 17 USC § 411(b)

(1) are dead in the water.

39.     Because I never lied about the accidental status of the livestream (and, for that matter, never *could* have lied, since I was never asked about it), and because the Copyright Office obviously had the opportunity to review the livestream itself and confirm whether or not it had any original content in it, the Court should fall back on its usual policy of "ordinarily defer[ing] to the judgment of the Copyright Office." See Lamps Plus v. Seattle Lighting Fixture Co., 345 F. 3d 1140, 1145 (9th Cir. 2003).

Mere lack of disclosure does not satisfy § 411(b)(1)(A)

40.     The defendants attempt to satisfy the requirements of 17 USC § 411(b)(1)(A) by claiming that I simply did not disclose the fact. But there is nothing in the law stating that a mere failure to voluntarily disclose something when I was never prompted to disclose it is tantamount to lying about it. The statute clearly calls for "inaccurate information." That is to say, some information must actually be on the application, and it must be inaccurate, in order for the criteria of § 411(b) (1)(A) to be met.

41.     What's even better is that, in order for § 411(b)(1)(A) to be satisfied, it is not enough that inaccurate information simply be provided. They must prove that I *knew* the statements to be inaccurate. Meanwhile, the recent 2022 Supreme Court case of Unicolors, Inc. v. H&M Hennes & Mauritz, LP (publication pending; delivered on February 24, 2022) has held that even errors of law, not just errors of fact, are excusable as long as they were made in a good faith belief that they were true. For example, the applicant in that case did not disclose that some (but not all) of the copyrighted works they sought to register were shown to a limited number of customers before being released to the public. However, because the plaintiff did not know that this would cause them to be considered "published" for purposes of copyright law, their nondisclosure of this fact was excused.

42.     Likewise, even if I should have disclosed in some way that the stream was accidental, and even if me including the word "accidental" in the title did not suffice this requirement, my registration is still valid unless the defendants can prove that I *knew* that I was misleading the copyright office by not disclosing that the stream was accidental.

§ 411(b)(1) is exclusive.

43.     17 USC § 411(b)(1) provides for the exclusive means of declaring a copyright invalid once it has been successfully registered within five years of original publication. There is no basis in the law for invalidating a copyright where USCO erroneously granted registration despite the applicant being honest at every stage of the application.

44.     In fact, reading § 411(b)(1) as the exclusive means of challenging the validity of a timely-registered copyright is the only way to interpret that subsection that does not nullify the subsection entirely! Think about it: If a defendant could have standing to argue that a timely-registered copyright is nonetheless invalid solely on grounds that USCO erred in granting an otherwise truthful application, then that would effectively open the floodgates for the validity of copyright to be challenged solely because of the provisions of 17 USC § 411(b)(1)(B). If a copyright can be invalidated *solely* because USCO – through no fault of the applicant's – failed to recognize a deficiency in the copyrightability of the work, and that USCO, had they noticed that deficiency for what it was, would have refused registration, then you are effectively invalidating a copyright solely on the grounds mentioned in 17 USC § 411(b)(1)(B) without the circumstances of 17 USC § 411(b)(1)(A) needing to be proven. The "knowingly false statements" requirement of 17 USC § 411(b)(1)(A) would be rendered entirely unnecessary, at which point, why even have that be in the statute at all?

45.     In Fourth Estate Public Corp v. Wall-Street. com, LLC, 139 S. Ct. 881 (2019), the Supreme Court unanimously rejected an interpretation of 17 USC §411(a), in part on the grounds that a contrary interpretation would render § 411(a)'s second and third sentences "superfluous" and "negated." See *id* at 885. In other words, the Supreme Court held that, if there is only one interpretation of a statute that does not render various portions of said statute entirely meaningless, then that is the interpretation that Courts must use. The Court should apply the same logic to interpreting subsection (b) of that same statute.

46.     Therefore, if there ever could be any other grounds for attacking the validity of a copyright besides § 411(b)(1), it would have to be based on circumstances entirely independent of what USCO considers when it grants or refuses registration. Any grounds for invalidating a

copyright that is effectively based on 17 USC § 411(b)(1)(B) alone must be accompanied by corresponding evidence under 17 USC § 411(b)(1)(A).

47.     For this reason, because the defendants cannot defeat the validity of the copyright under the limited grounds for challenge outlined in § 411(b)(1), and because no other avenues for challenging the copyright exist as a matter of law, the Court must reject the defendants' contentions that the copyright is invalid.

**Work of Authorship**

48.     In the event that the Court insists on reviewing the defendants' challenges to the validity of my copyright, the defendants still cannot prevail.

49.     To be eligible for copyright protection, a work must satisfy two requirements: It must be a "work of authorship" and it must be "fixed into a tangible medium of expression." See 17 USC § 102(a). To be considered a "work of authorship," two sub-criteria must be met: The expression must be created by a human being, and it must possess a minimum amount of creativity.

<u>Human Creation</u>

50.     Copyright law in the United States does not give protection to works of art that are not created by human beings. Things such as a "photograph taken by a monkey," a "mural painted by an elephant," or a "claim based on driftwood that has been shaped and smoothed by the ocean," are not eligible for copyright protection. Similarly, "works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author" is likewise not eligible for copyright protection. See https://www.copyright.gov/comp3/chap300/ch300-copyrightable-authorship.pdf (pp. 21-22).

51.     It is upon this theory that the defendants seek to invalidate my copyright. But it is important to understand just what is being stated. The law does not state that the recording equipment coming on by mistake invalidates a copyright. It states that the *creation being recorded* must be made by a human. "For example, if an artist draws a faithful reproduction of a flower, she probably won't be able to prevent another artist from creating a very similar drawing of a flower since the flower belongs in the public domain." See https://www.findlaw.com/smallbusiness/intellectual-property/using-design-patents-and-

copyrights-to-protect-nature-art.html. In this example, the drawing itself was done by a human, but the thing being drawn – a 1 to 1 recreation of a flower – is naturally occurring, and therefore not subject to copyright protection.

52.     In the instant case, the facial expressions mentioned in ¶¶ 6-8 of this memorandum were unquestionably created by a human, even if I never intended for these expressions to ever escape the privacy of my home. As a result, the "human authorship" requirement is satisfied.

Minimum Creativity

53.     To be eligible for copyright protection, at least a minimum amount of creativity must be part of the work. Works that are purely factual in nature, with no creativity behind them whatsoever (such as phone books or databases) are not subject to copyright protection. See Feist Publications, Inc. v. Rural Telephone Service Co., 499 US 340 (1991). However, "the requisite level of creativity is extremely low; even a slight amount will suffice." See *id* at 345.

54.     The acts of expression mentioned in ¶¶ 6-8 of this Memorandum suffice to create the minimum creativity requirement. They may be scarce and minimal, but the law makes it clear that "minimal" is all that is required.

55.     The individual defendants claim that I am not entitled to copyright protection on the grounds that, because the stream was an accident, it is a "factual" work, and factual works are not eligible for copyright. This is not the law. Biographies, documentaries, and textbooks are just three examples of predominately factual works that are still eligible for copyright protection. "Simply because a [work] documents an event does not turn a [visual] representation into a factual recitation." See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177 (9th Cir. 2012). Rather, works that are *purely* factual in nature, with no creativity whatsoever, are not eligible for copyright protection. See Feist, supra. But only a small amount of creativity can overcome that restriction, and I have demonstrated that.

56.     Think about it this way: Are livestream vlogs copyrightable? If a streamer were to take his phone, go out in public, and go about his daily activities the same way he did any other day, but streaming the whole thing, would that be copyrightable? If so, then that vlog would have the same amount of "creativity" and "author expression" as the accidental stream had. The only

difference is that the stream was turned on by accident.

57.     Now, if the individual defendants wanted to raise the affirmative defense of fair use, then you could make the argument that the second factor of fair use weighs in their favor. But even then, the second factor is typically considered the least important factor in a fair use determination, so it still barely does the individual defendants any favors at all.

58.     Put simply, there is nothing in the law even remotely suggesting that an accidental stream cannot be copyrighted, as long as it otherwise contains sufficient elements for copyright protection, which is human authorship and a minimal creative spark, just because the streaming software turned on by mistake. In fact, there is some precedent stating the opposite! It isn't from the Ninth Circuit, and it even predates the modern Copyright Act of 1976, but it is still there. I am referring to the case of Alfred Bell & Co. v. Catalda Fine Arts, 191 F. 2d 99 (2nd Cir. 1951), which stated that, while the original intent of the author was to create a faithful, 1-to-1 recreation of a public domain work (which would not be entitled to renewed copyright protection), he nonetheless made slight variations in the performance of the paintings. Despite these variations being accidental, they were nonetheless held by the second circuit to be sufficient grounds for an independent copyright, holding that "even if their substantial departures from the paintings were inadvertent, the copyrights would be valid. A copyist's bad eyesight or defective musculature, or a shock caused by a clap of thunder, may yield sufficiently distinguishable variations. Having hit upon such a variation unintentionally, the 'author' may adopt it as his and copyright it." See *id* at 105.

59.     So there is indeed some precedent that accidental works are still subject to copyright protection. However, there is one additional element for copyright protection that needs to be addressed.

**Tangible Medium of Expression**

60.     This is where the "accident" actually happened. When I say the stream was an "accidental livestream," this is the part that I am referring to: Not any of the behavior that I exhibited during that livestream, but the fact that my stream was even turned on in the first place. Therefore, if the defendants wish to attack the validity of my copyright solely on the grounds that

it was accidental, this is the part they need to attack.

61.     To be eligible for copyright, the work must be "fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." See 17 USC § 102(a). "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." See 17 USC § 101.

62.     The most important phrase in that definition, to the extent it matters in this case, is "by or under the authority of the author."

63.     So this begs the question: When I say that the stream was *accidental*, what exactly does that mean? Obviously, it does not mean that I turned on the stream software manually and deliberately. But if that is not what happened, then how did it come on?

64.     There are two possible explanations for how exactly the stream came on:

- **Method #1**: I had accidentally pressed the key on my keyboard to turn the stream on without realizing I had done it.

- **Method #2**: The stream software came on entirely of its own accord, without any input from me, accidental or otherwise.

65.     Method #1 is the more likely explanation, because if you look at the very start of the accidental stream, you can see that I am clearly sitting at my computer and typing at the keyboard. This makes it highly likely that the stream came on as a result of a single, errant keystroke.

66.     But if that is what happened, then the fixation into a tangible medium of expression was still done *by the author*, just without the author realizing he had done it.

### "Under the Authority" of the author

67.     This leaves Method #2 as the individual defendant's last bastion of hope for claiming that the stream was not "fixed" within the definition of the statute, and therefore invalidating my copyright.

<u>Mere metaphysical doubt</u>

68.     Now before I continue, I want to make this perfectly clear: Even if the Court disagrees with my upcoming argument, that does not save the defendants, or even necessarily reprieve them. In this section, I am not going to argue that Method #2 is not what happened; I am going to argue that, even if Method #2 is what happened, it is legally immaterial because my copyright is still valid nonetheless. Remember that this copyright is registered with the US Copyright Office. This means my copyright is presumed valid. While this presumption can be overcome with evidence, it is the defendants' burden to produce said evidence. I don't have to prove that my copyright is valid (although I am accepting that burden for the purposes of this motion); they have to prove that it is invalid.

69.     So even if the Court disagrees with my upcoming argument that Method #2 is legally irrelevant, that alone does not save the defendants. Even then, they still have to *prove* that Method #2 is, in fact, what actually happened. They will almost certainly not be able to prove this, as the metadata needed to prove the origins of that specific stream (A) most likely no longer exist, (B) may never have existed in the first place, and (C) would be stored in my computer's logs anyway (which are not accessible to the public), and since I had no reason to believe that those logs would be relevant to this case until months later, I most likely would have purged them when I performed regular maintenance on this computer because I had no reason to think to keep them.

70.     Because the defendants have a one in a million chance of proving these facts even if they could legally exonerate them, the Court should still grant me judgment as a matter of law, because their odds of prevailing are just that: One in a million. "The issue of fact must be genuine. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." See Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 US 574, 586 (1986) (citations and quotations omitted).

71.     So even if Method #2 could potentially exonerate the defendants, the Court should still grant me judgment in my favor unless the individual defendants can show that they have a

reasonable likelihood of proving that if they had discovery. Anyway, let's now discuss …

<u>"Under the Authority" of the author, cont.</u>

72.     There is, not surprisingly, very little precedent on this matter. The closest case law I was able to dig up was the 1977 Supreme Court case of Zacchini v. Scripps-Howard Broadcasting Co., 433 US 562 (1977). However, even this case law is troublesome, seeing as it is not even a copyright case; it is a *right of publicity* case! However, several cases from the appellate courts have referenced this case while discussing the scope of the "by or under the authority of the author" clause of the Copyright Act, so there is at least a small amount of precedential value we can salvage from this case.

73.     In Zacchini, the plaintiff had not consented to having his daredevil act video-taped by the defendant (who was a news media outlet), and sued for a violation of his right of publicity. Copyright cases that have referenced this case use this as an example of how a work, although fixed into a tangible medium of expression, was not done "by or under the authority of" the plaintiff, and therefore is not eligible for copyright protection. See Fleet v. CBS, INC., 50 Cal. App. 4Th 1911, 1920 n. 5 (1996); see also Baltimore Orioles v. Major League Baseball Players, 805 F. 2d 663, 675 n. 22 (7th Cir. 1986).

74.     From this, we can piece together a rough guiding principle that "under the authority of the author" means that the author *consents* to having his work fixed into a tangible medium of expression. In other words, author consent creates author authority. So, with that being said, let's apply this legal standard to the case at hand. Did I *consent* to streaming that day?

75.     So, it all comes to this: Can an author's consent to being recorded (and therefore, authority to be fixed into a tangible medium of expression, and therefore giving the author a valid copyright) ever be *retroactively* given? If Zacchini had *retroactively* consented to the recording of his act in exchange for some consideration (e.g. royalties), would that have given Scripps-Howard a valid and legally enforceable copyright?

76.     Because if the answer is "yes," then it is axiomatic that I have retroactively consented to the existence of that recording, provided that I am the copyright owner thereof. The very fact that I am currently litigating *this very case* demonstrates that I have retroactively given my consent.

77.     Because I have retroactively given my consent, then the fixation into a tangible medium of expression is likewise retroactively said to be done "under" my "authority," which in turn makes my copyright valid, assuming it was ever invalid to begin with.

78.     There is nothing in the copyright statute even remotely suggesting that retroactive consent from the author is any less valid for purposes of the fixation requirement than any other type of consent. Retroactive consent is upheld as legally valid by courts all the time, in all kinds of cases stretching across all aspects of law. The Copyright Act certainly gives no indication that it intends to have  stricter definition of "consent" than is found in any other aspect of law. Therefore, by all accounts, retroactive consent to the recording satisfies the "fixation" requirement, plain and simple.

79.     Even if the Court disagrees with that assessment, the Defendants still find themselves in a pickle. As I explain in ¶¶ 65-66, it is actually far more likely that I accidentally pressed the start button to stream without realizing I had done it, which means that the fixation was still done "by" the author, and as I explain in ¶¶ 68-71, even if my retroactive consent to the fixation does not satisfy the statutory definition, the defendants still have to *prove* that the stream happened in the first instance entirely independent of my input, which is something they almost certainly will be utterly incapable of proving. Therefore, I am still entitled to judgment as a matter of law under the Matsushita precedent.

## RELIEF REQUESTED

80.      So as you can clearly see, I have, beyond genuine dispute, met all of the criteria to be eligible for my April 10 stream to be protected by copyright. It contains a sufficient amount of individual personal expression, that expression is man-made, and it is fixed (accidentally or otherwise) into a tangible medium of expression, either by the author, or under the retroactive authority of the author. Either one satisfies the statutory definition. Put simply, the mere fact that the stream was an accident is not grounds to invalidate the copyright.

81.     I therefore ask the Court to issue a declaration that the copyright of my April 10, 2021 stream is indeed valid, and to dismiss with prejudice the defendants' claims that the copyright is invalid.

**CONCLUSION**

82.     In conclusion, the defendants' attempts to twist my words into a confession that wasn't there in an attempt to invalidate my copyright is patently frivolous. Their arguments depend on the contents of the corresponding section of the complaint being hyper-literal, which was clearly not the original intention nor a way that a reasonable, disinterested person would interpret the sentences.

83.     Even barring that, the defendants have not (and cannot) point to any inaccurate statement I made in the application. The sentences which the defendants so heavily rely on were clearly meant to be taken figuratively, not literally.

84.     They attempt to rely on my supposed failure to disclose certain facts to the Copyright Office to justify their attacks on the validity of my copyright. However, (A) mere non-disclosure is not the same thing as making a knowingly false statement (B) nowhere in the copyright application was I ever *prompted* to say anything of the sort, so my failure to disclose it cannot be held against me, (C) the fact that I called it an "accidental" stream means I did, sort of, disclose this content to the copyright office, and (D) the fact that the copyright office reviewed the footage before granting copyright itself nullifies any potential harm that any nondisclosure about the alleged lack of creativity could possibly have caused.

85.     There was indeed a minimum creative spark, caused by a human author, and while the exact method of the affixation might be lost to history, that just means the defendants cannot prove it was done by a machine (unless they rely on an asinine, hyper-literal interpretation of my complaint that was clearly never intended and does not hold up to scrutiny if you look at the full context), which means my presumption of copyright validity can never be overcome.

86.     Wherefore, premises considered, I respectfully pray that the Court issue partial summary judgment in my favor on the issue of whether my April 10, 2021 stream is validly copyrighted, award costs incurred, and any other relief to which I may be entitled.

So requested on this, the 12th day of April, 2022.

*/s/ David Stebbins*
David Stebbins
123 W. Ridge Ave.,

APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com

OPPOSITION TO MOTION TO DISMISS