David Stebbins (pro se Plaintiff)
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                                    PLAINTIFF

VS.                          Case 3:22-cv-00546-JSW

EMILY REBÔLO, D.B.A. "ENCLAVE EMILY,"
TRYSTEN BURGE, D.B.A. "ECHO WILDER,"
JOHN DOE #1, D.B.A. "CREETOSIS"
JOHN DOE #2, D.B.A. "VIROZA" (FORMERLY KNOWN AS "JUST EMI")
JOHN DOE #3, D.B.A. "SIDALPHA"
JOHN DOE #4, D.B.A. "BIBI FAIZI"                         DEFENDANTS
JOHN DOE #5, D.B.A. "ROGUE, INTERNET MAN"
SHIRA PERLMUTTER
YOUTUBE LLC,
DISCORD INC., AND
TWITCH INTERACTIVE INC.

## SECOND AMENDED COMPLAINT

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Amended
Complaint in the above-styled action.

### I: IDENTITIES OF THE PARTIES

1.      I am a Youtube channel owner and a Twitch streamer who operates under the psuedonym
"Acerthorn." My Youtube channel can be found at www.youtube.com/acerthorn, and my Twitch
channel can be found at www.twitch.tv/acerthorn.

2.      Emily ReboloYoutuber who owns and operates two separate Youtube channels, one
called "Enclave Emily," which can be found at  https://www.youtube.com/c/EnclaveEmily, and
another called "Freak," which can be found at
https://www.youtube.com/channel/UCRro1gfrlNZO5dlox02icpQ. She has the email address of

enclavemily@gmail.com and can be served with process at the following address:

Rua da Ilha, 10

3000-214 Coimbra

Portugal

3.        Trysten Burge (whose last name I had previously erroneously spelled as "Burger" (with an extra R at the end) in the original complaint) is another Youtuber who owns the Youtube channel "Echo Wilder," which can be found at https://www.youtube.com/c/EnclaveEmily. He can be served with process at the following address:

214 4th Ave, Apt. 7

International Falls, MN 56649

4.        John Doe #1 is another Youtuber who owns and operates the Youtube channel "Creetosis," which can be found here: https://www.youtube.com/@Creetosis. He also runs a server on Discord called "The Owl Server," which can be found at https://discord.gg/rf4FRAnAqp. His person Discord account is Creetosis#0001.I do not know his real name and address, but he is a member of the Youtube Partner Program, so his name and address is on file with Youtube (so he can get paid for his videos). I plan to obtain his name and address from Youtube when this case progresses to discovery.

5.        John Doe #2 is a Youtuber and Twitch Streamer who owns and operates a Youtube channels and formerly operated a Twitch channel. The Youtube channel is called "Viroza," formerly known as "Just Emi," which can be found at www.youtube.com/@VirozaTheWitch. His Twitch Channel used to be found at https://www.twitch.tv/xjustemi, but he deleted that channel after I filed the First Amended Complaint in this case. I do not know his real name or address, but he used to be a member of the Twitch Affiliate Program before deleting his channel, so his name and address is on file with Youtube (so he can get paid for his videos), and so I plan to request that information from Youtube when we get to discovery in this case.

6.        John Doe #3 is a Youtuber who owns and operates the Youtube channel "SidAlpha," which can be found here: https://www.youtube.com/@SidAlpha. I do not know his real name and address, but he is a member of the Youtube Partner Program, so his name and address is on

file with Youtube (so he can get paid for his videos). I plan to obtain his name and address from Youtube when this case progresses to discovery.

7.     John Doe #4 is a Youtuber who does not have any videos on Youtube that I know of. He goes by the alias "Bibi Faizi." He has provided his real name and address to Youtube when issuing a DMCA Takedown request, so I plan to obtain his name and address from Youtube when this case progresses to discovery.

8.     John Doe #5 is a Youtuber who goes by the online psuedonym "Rogue, Internet Man." I do not know his real name and address, but he used to be a member of the Youtube Partner Program before he deleted his channel just like Viroza deleted his Twitch channel, so his name and address is on file with Youtube (so he can get paid for his videos). I plan to obtain his name and address from Youtube when this case progresses to discovery.

9.     Shira Perlmutter is the current Register of Copyrights with the United States Copyright Office (USCO). I wish to include her as a nominal defendant on the issue of registerability, pursuant to my rights under the second and third sentences of **17 USC § 411(a)**, for some of my copyrighted works.

10.    Alphabet, Inc. is the parent company of Youtube, LLC, which is itself the owner and operator of the eponymous website, Youtube.com, the largest video-sharing website in the world. Both can be served with process at the following registered agent:

Corporation Service Company

2710 Gateway Oaks Dr., Suite 150N

Sacramento, CA 95833

11.    Discord, Inc. is a social media website and app that allows people to set up custom chat rooms called "Servers," where they can discuss various topics and even exchange files of 8MB or less with each other. They can be served with process at the following registered agent:

Ruth Chang

444 De Haro St, Suite 200

San Francisco, CA 94107

12.    Twitch Interactive, Inc. is the owner and operator of the eponymous website, Twitch.tv,

the largest live-streaming website in the world. It can be served with process at the following registered agent:

Corporation Service Company

2710 Gateway Oaks Dr., Suite 150N

Sacramento, CA 95833

## II: JURISDICTION AND VENUE

13.     This court has subject-matter jurisdiction to hear claims of copyright infringement. This jurisdiction is axiomatic.

14.     This court has personal jurisdiction over all four corporate defendants (Alphabet, Youtube, Discord, and Twitch) because they are all headquartered in the Northern District of California.

15.     This Court has personal jurisdiction over Emily Rebolo because she consented to the jurisdiction of the Northern District of California when she issued her DMCA Takedown Notice.

16.     This Court has long-arm jurisdiction over all other defendants because they all cooperated and colluded together to ruin my career as a Youtuber and Twitch Streamer out of pure hatred, malice, and spite. Therefore, this Court has long-arm jurisdiction over all other defendants for the same reason it has long-arm jurisdiction over Frederick Allison in Case 4:21-cv-04184-JSW Stebbins v. Polano.

## III: FACTS OF THE CASE

17.     The following facts are necessary to understand the case.

### III-1: Plaintiff's Copyrighted Works

18.      The following is a list of works whose copyrights are owned in whole or in part by me. This is not a comprehensive list of all works that are copyrighted by me, just the ones that are relevant to this case.

### III-1-A: APRIL 10, 2021 LIVESTREAM[1]

19.   First, there was a livestream I did on April 10, 2021. I accidentally turned my livestream software on without realizing I had done it, and so for approximately 1 hour and 43 minutes, my viewers could see me engaging in such mundane activities as walking around my apartment, eating some hot dogs, and watching some Youtube videos for my own personal amusement.

20.   I registered this stream with USCO on May 26, 2021, and registration was subsequently granted. The registration number is PA0002305616.

21.   At one point in the video, you could hear some strange noises which sounded like a dog barking and snarling. These strange noises constitute the most interesting part of an otherwise boring video, and therefore constitute the "heart" of that work.

22.   I did not wear a shirt for this livestream. It was the only video or livestream I have ever done without a shirt on, which means that any time anyone else depicts me without a shirt, it necessarily comes from that stream.

23.   There was one time during the stream when you could hear me saying "I will kill you." I do not remember saying this, so I cannot tell you what I was thinking at the time or why I said this. However, I was alone at the time, so I could not possibly have been issuing a genuine threat, since my words had no intended audience. Despite this lack of criminality, many people see it as evidence that I am homicidal and psychotic.

24.   I transferred this livestream to my Youtube channel and restricted viewing it only to those who paid my channel $20 per month. As of the time of this writing, nobody has paid that fee. Also, there is no way to download directly from Twitch (where the stream was originally broadcast). This means that the only way anyone could possibly have seen any portions of that stream is by illegally downloading it.

---

1   Although the Court has ordered me not to attempt to justify this copyrighted work in this Complaint, I still wish to preserve it for appeal. This requires that I include it in this Complaint, because amended complaints replace the old complaints in their entirety, so any claims not preserved in amended complaints are presumed abandoned.

To assist the Court in overlooking this parts of the Complaint for the time-being, any portions of the Complaint that concern this copyrighted work will be highlighted in gray. While reviewing this Complaint in the interim, the Court can skip over the gray-highlighted sections of this Complaint, and will only need to review them if the judgment in the Polano case gets overturned.

<u>III-1-B: APRIL 18, 2021 LIVESTREAM</u>

25.     On April 18, 2021, I did a collaborative livestream with Karl Polano on Twitch. Polano and I are co-authors of this stream, meaning that, while Polano may distribute this, and grant other people permission to distribute this, without my permission, if he does so, I am entitled to 50% of the revenue incurred from said distribution.

26.     Pursuant to this Court's order in Dkt. 30, p.3 line 28 through p. 4 line 1, here is a brief statement of how this livestream meets the "minimal creativity" requirement to be eligible for copyright protection:

27.     This stream has minimal creativity because I repeatedly cracked jokes, made wisecracks, and displayed my personality and charisma for the audience's entertainment. I do not wish to share the video publicly at this point in time, and a url linking the Court to the video - even an unlisted video - would only enable others to see it, which I do not wish to do. However, the Court can still see a fair and accurate representationn of the kind of jokes, wisecracks, and personality that was on display in this stream, simply by turning to other streams of mine. The Court can see representative examples of this kind of creativity by going to my "Acerthorn Moments" playlist, which it can find here: https://www.youtube.com/playlist?list=PLpL3n7W6QqgDGty20sBgzGGYvMZWg-7Uf

28.     As you can see, these moments – which are highly similar to the personality I showed in the April 18, 2021 livestream – are absolutely creative and highly expressive. When I get around to showing the stream to this Court under seal, I have no doubt that the Court will agree with me that my personality and expressiveness in that stream is on par with what you can see in that publicly-available playlist. Therefore, the April 18 stream has plenty of creativity and originality to it.

29.     I registered this stream with USCO on September 14, 2021, and registration was subsequently granted. The registration number is PA0002315628.

<u>III-1-C: NOVEMBER 24, 2021 VIDEO</u>

30.     On November 24, 2021, I published a 50-second video on my Youtube channel called "Corrections" Series is Cancelled, and Here's Why - #Shorts. I am the sole owner of the

copyright to this video. You can see the video by going to the following url:

https://youtube.com/shorts/QNP4K1nviFA

31.     Pursuant to this Court's order (Dkt. 30), this video contains the legally-required threshold for creativity because, among other things, ...

   (a)     I used creative video editing, including a shot of a screaming woman at the start of the video as an illustration of the anger and hostility I sought to address in that video.

   (b)     My personality shines through with the tone and inflection of my commentary in these videos. Examples include …

      i.     My tone and inflections at timestamp 0:11, when I said "People STILL <expletive> all over me," or at timestamp 0:16, when I sarcastically read off someone else's comment with a snarky tone ("having made the mistake in the first place"), conveying my opinion that the criticism was frivolous.

      ii.     Also, at timestamp 0:32, I make an extremely snarky comment, stating that my hostile viewers are "just butthurt" about my opinions about video games.

      iii.     Also, at timestamp 0:36, I pronounce the word "mistake" in an extremely snarky tone.

32.     Bear in mind that this video is only 49 seconds long, so there is not much opportunity for me to have much creativity. But also remember that "even a slight amount [of creativity] will suffice ... no matter how crude, humble or obvious" See Feist Publications, Inc. v. Rural Telephone Service Co., 499 US 340, 345 (1991).

33.     I registered this video with USCO on December 11, 2021, and registration was subsequently granted. The registration number is PA0002333752.

<u>III-1-D: OCTOBER 13, 2019 VIDEO</u>

34.     On October 13, 2019, I published a video to my Youtube channel called "Fallout: New Vegas Retrospective." I am the sole copyright holder to that video. It used footage of the video game "Fallout: New Vegas," but I do so in order to review and critique it, so I believe it falls under fair use, if Bethesda Softworks (the owner of the copyright to that game) ever wanted to sue me for copyright infringement. You can see the video by going to the following url:

https://www.youtube.com/watch?v=T6Xp-Audx3w

35.     Pursuant to this Court's order (Dkt. 30), here is a brief statement of how this livestream meets the "minimal creativity" requirement to be eligible for copyright protection:

36.     First, this video is an hour and a half of me giving various opinions about the game, including extensive use of in-game clips to illustrate my points. This constitutes creativity becuase opinions are themselves inherently creative.

37.     Even barring that, many of my opinions are colorfully worded, and therefore constitute minimal creativity. Examples include …

    (a)     At timestamp 3:40 - 3:45, when I say "The introduction to the game is ... absolutely ... five ... star." My inflections and emphasis on various words are personal expression and are creative choices in themselves.

    (b)     At timestamp 15:50 - 16:10, when I say "Frankly, I enjoyed Vault 22 as a dungeon, not because the dungeon itself had any interesting enemies, puzzles, or told an interesting story, but simply because the green foliage made it aesthetically stand out in a game world that appears to have been designed by a scat fetishist!" In addition to my tone and inflections, my unique choice of colorfurl words (including the final two words in that sentence) are themselves creative.

    (c)     At timestamp 1:17:36 - 1:17:50, when I say "So this game - which is so often praised for not being just the same old same old still has to fall back on Fallout 3's plot of having the Enclave be the bad guys! Wonderful!" Along with my creative inflections with the word "wonderful," I also included an image of Matt Hardy, a professional wrestler who often uses "wonderful" as one of his catch phrases, which is itself a creative choice on my end.

    (d)     At timestamp 1:28:44 - 1:28:58, when I say "All over the internet, no matter where you go, nearly any content you find regarding New Vegas will consist almost exclusively of New Vegas fanboys constantly sucking the game's <expletive>." In this case, the last four words of that sentence are extremely colorful words that have provoked passionate responses from some of this games' more radical fans, so it definitely qualifies as "minimally creative."

38.     I registered this video with USCO on December 17, 2021, and registration was

subsequently granted. The registration number is PA0002335063. Because my registration of my copyright occurred more than 3 months after publication, and because the infringements predate the registration, this is the one copyrighted work which I cannot recover statutory damages.

<u>III-1-E: DECEMBER 18, 2021 STREAM</u>

39.     On December 18, 2021, I did a livestream debate with a guest star who went by the online psuedonym "Skibbidy Dibbity." The title of this livestream was "Fallout: New Vegas Sucks, and Here's Why (Livestream Debate)." You can see the video by going to the following url: https://www.youtube.com/watch?v=o08YPDNQ2yk

40.     I believe I am the sole copyright holder of this video, although Skibbidy Dibbity would consider himself a co-author. If Skibbidy were to ever wish to sue me for recognition as a co-author, he would have to make his true identity known and cannot hide behind the anonymity of the Internet.

41.     Pursuant to this Court's order, here is a brief statement of how this livestream meets the "minimal creativity" requirement to be eligible for copyright protection:

42.     This is seven and a half hours of opinions being exchanged about the video game "Fallout: New Vegas." Just like last time, the opinions are themselves inherently creative, and just like last time, my colorful word choices add extra creativity and flavor to my already inherently creative opinions. Examples include ...

(a)     At timestamp 42:20 - 42:28, when I say …

"Good for you! I don't have a problem with brown; I just prefer if my games' graphics have a nice variety of colors."

(b)     At timestamp 1:27:21 - 1:27:31, when I say …

"I'm sure some people could throw out some heavily convoluted reason to touch the pod, to open the pod that Sheogorath would tip his hat to."

i.     In case the Court does not already know, Sheogorath is a fictional character in the "Elder Scrolls" series of video games. He is the Prince of Madness, meaning his entire shtick is that his actions make no sense and are more designed for the audience to laugh at than they are to advance the plot in any meaningful way.

(c)     At timestamp 1:59:32 - 2:02:53, when I say …

"Well here's the thing: Let me just get this off my chest. I did a full, complete playthrough, from opening cutscene to end credits, and if that still isn't good enough for you for me to have a valid opinion on this game, then basically what you're saying is, in order to have a valid opinion, I have to do all the branches, do all the side quests, do all the dialogue options, talk to every NPC. Basically I have to play this game like a person who has already fallen head over heels in love with the game. Because I got news for you: Nobody in their right mind is going to play that much of a game that they hate. Nobody who even thinks the game is 'okay' is going to play that much of it. So the only thing ... this is basically just a thinly veiled attempt to silence negative criticism about the game.

Now earlier now, a few weeks ago, I was on PatricianTV's Discord server and I gave that argument. I pointed out that ... that because of this requirement that I should have to have played every bit of the game before I review it, that that means that every review of the game is necessarily going to be one of three things: either it's going to be (1) positive, (2) invalid, or (3) insane, because insane is the only way I would play 100% of a game that I hate.

And I <expletive> you not, somebody actually responded to that comment and said 'Well, there's also option D: Just don't make the video!'

Do you have any idea what you just admitted to? You literally just admitted outright that this isn't even about me giving the game a fair shake; it's about silencing negative criticism of the game!

Like, for example, right now, in real life politics, there's currently an issue going around where the Republican Party is trying to pass these highly oppressive voter laws where you have to jump through about 10 different hoops to be able to register to vote and a lot of people are thinking that there's always going to be that 'Option D' of 'just don't vote,' which a lot of people - mostly Democrats - believe that that's actually what the Republican Party is trying to do with the poor voters (the people who are likely to vote Democrat). They want those people to just not vote so that the election is skewered in favor of the Republican Party.

And here, the fact that they insist that I play every bit of the game before I review? It's a nakedly transparent attempt to just silence negative criticism of this game under the thinly veiled pretense of me giving the game 'a chance,' and I'm sorry, but that is bull<expletive>, and at this point, you're just admitting that it's bull<expletive>!"

(d)    At timestamp 2:14:57 - 2:15:03, when I say …

"So when you're saying that you wish there was more of that in there, you're basically saying 'More of me kissing this game's <expletive>.'"

    i.    Again, the last four words of this sentence are especially colorful and designed to invoke emotional responses from the audience.

(e)    At timestamp 4:02:30 - 4:02:35, when I say …

"Let's bear in mind that, at that point, I was in full-on '<expletive> this game' mode."

    i.    The last four words are a term I coined to describe my attitude in the last few hours of playing Fallout: New Vegas.

(f)    At timestamp 6:04:40 - 6:04:55, when I say …

"You wanna know how I got it? How I initially believed that Ulessus was a member of the Enclave? Because ... on the missile he was preparing to launch, it looked like it had the Enclave flag on it."

    i.    In this case, it is not my colorful choice of words or my inflection, but rather, my lack of inflection, which constitutes the minimal creativity in this sentence. Specifically, it is my deadpan recollection of my thoughts while playing the game that were meant to convey creative expression in this instance.

43.    I registered this stream with USCO on December 22, 2021, and registration was subsequently granted. The registration number is PA0002336336.

<u>III-1-F: CHANNEL ART, ICON, AND 8 WATERMARKS</u>

44.    On December 9, 2021, I applied for registration of ten different 2D images. Those images were titled as follows:

(a)    Acerthorn Channel Art 2022

(b)    Acerthorn Channel Icon 2022

(c)    Acerthorn Watermark 2022 - 5-Pointed Star

(d)    Acerthorn Watermark 2022 - 6-Pointed Star

(e)    Acerthorn Watermark 2022 - Abnormal Shape #1

(f)      Acerthorn Watermark 2022 – Diamond

(g)      Acerthorn Watermark 2022 – Hexagon

(h)      Acerthorn Watermark 2022 – Octagon

(i)      Acerthorn Watermark 2022 – Pentagon

(j)      Acerthorn Watermark 2022 - Square

45.     At the time I applied for the registration, all ten of these 2D images were unpublished, so I was well within my rights to register up to ten of them at once. The Channel Art and Channel Icon were both shown to members of my Discord server on December 12, 2021, but that was three days after I applied for registration. The eight watermarks have since been published, but on different dates.

46.     All ten of these 2D images are comprised predominately of a blue honeycomb background with text overlaying it. The honeycomb consisted of "high blue" hexagons, with space in between the hexagons filled by a gradient. This gradient starts as the "polynesian" shade of blue on either side, slowly morphing into "periwinkle" blue in the center before morphing back to "polynesian" blue on the other side.

47.     This honeycomb background was created entirely by me. I made this background from whole cloth, using MS Paint and NCH VideoPad (my personal favorite video and image editing software). It is not a stock image.

48.     While all of these 2D images use the aforementioned blue honeycomb background, the "Acerthorn Channel Icon" contains an additional splash of creativity on my end: The hexagons are actually partially stretched out. The reason for this is because, since the channel icon is supposed to be ciruclar, I applied a "fish-eye" filter to the honeycomb background in order to create the illusion that it is wrapped about a ball.

49.     My choices of the various shades of blue, as well as my choice to have the hexagons all be separated from one another, are all creative choices that I made, and therefore constitute "minimal creative spark," and are therefore eligible for copyright protection.

50.     Despite being eligible, USCO refused to register the copyright, claiming that it lacked sufficient creativity. For this reason, I seek to challenge USCO's decision in this case, while also

suing for the infringement of these images.

51.     After being denied registration, I sought legal advice from an attorney. He agreed with me that the artwork does indeed contain minimal creativity, and that the Copyright Office was indeed in error when it denied registration. I even recorded that phone call. Please do NOT get used to this practice, as I absolutely intend to protect my right to attorney-client privilege in 99.99% of cases. That being said, you can hear an attorney give me legal advice by going to the following url and listening to this call: https://youtu.be/TrjZ1MQd43o.

52.     Therefore, I insist that the images are indeed eligible for copyright protection, and so I seek a judicial declaration of same and an injunction against Shira Perlmutter, ordering her to grant me the registration to which I am entitled, with December 9, 2021 being the effective date of registration for purposes of 17 USC § 410(c), 17 USC § 412, and any other law where the effective date of registration is a relevant factor. This injunctive relief should apply, even if all the individual defendants' uses are found to be fair use, since an adverse ruling will permanently affect my legal rights going forward in all future cases.

### III-2: Harassment, Doxxing, and Dogpiling Against Me

53.     In addition to copyright infringement, the individual defendants (with the exception of Shira Perlmutter) have joined together to engage in a longstanding and widespread pattern of harassment, doxxing, and dogpiling against me. Some joined the hate campaign later than others, but they are all guilty of contributing to the harassment in one form or another.

54.     Please understand that I will not be outlining every single instance of harassment right here in the Complaint. Since the harassment has been ongoing for over two years now, it would be impossible for me to list every instance of it. Instead, I am only seeking to give the highlights so the Court can draw a general picture of what I have been through over the past few years.

55.     For the record, it is my belief that the harassment and doxxing I have endured nullifies any potential claim to fair use the defendants might have (to the extent that said defense is even available in the first instance), for the reasons I will discuss in-depth when I get to the legal arguments section of this Complaint. To this end, I will only provide enough allegations of harassment and doxxing to show the Court that my general allegations of harassment and

doxxing are indeed plausible, but that does not require I list every one specifically.

56.     For the copyright infringement and DMCA Fraud claims, I will indeed allege specific acts, specific actors, specific URLs, specific dates, and (to the extent I know them) specific times.

III-2-A: What is "harassment?"

57.     Before I continue, I feel it is important to set forth the definitions of the words I will be using, as the Defendants are sure to dispute whether their actions qualify as "harassment" and "doxxing," because they tend to focus far more on strict definitions of words, rather than the morality and ethics of their behavior. This is one of the biggest reasons why they insist that the addition of even a token amount of criticism automatically entitles them to fair use, to the exclusion of all other factors, and that anyone who even suggests otherwise is necessarily frivolous, retarded, and in need of a good hazing.

58.     Let's start with harassment. While "criticism" is generally considered transformative[2], harassment is not. Criticism is protected under the First Amendment, whereas harassment is a crime in every state. However, many malicious harassers, especially on the Internet, will vehemently insist that their harassment is just criticism, and that any of their victims who attempt to stand up to the harassment simply "can't take criticism." By contrast, there are indeed plenty of thin-skinned snowflakes who are so sensitive to criticism and rejection that they treat any/all criticism levied against them and/or their creative work to be harassment, and proceed to lash out against it accordingly. As such, it is critical that courts make a clear distinction between the two behaviors, especially in cases like fair use, where distinguishing the two is often critical to deciding who is legally in the right.

---

2   Note: I said that criticism is "transformative," not that it is "fair use." Obviously, the more criticism a secondary use provides, the more transformative that secondary use will be. But it's a spectrum. The mere fact that a secondary use contains a scintilla of criticism does not automatically mean that the first factor of fair use will necessarily weigh in favor of the defendant, let alone fair use in its entirety. Even with criticism itself, let alone the rest of fair use, it is a spectrum, not a binary factor. See Campbell v. Acuff-Rose Music, Inc., 510 US 569, 579 (1994) (Fair use asks "whether ***and to what extent*** the new work is transformative") (emphasis added).

However, if there is one thing we can definitively say about criticism, it is that it is inherently "transformative." You still need lots and lots of criticism in order to be considered "highly transformative," but even one sentence of criticism still has at least nominal "transformative" value.

59.     First, California (the state where YouTube is headquartered and, therefore, the state where all copyright infringement, harassment, doxxing, defamation, etc. that occurs on that site all occur) has a legal definition for "harassment." Both § 653.2 if the California Penal Code[3] and 527.6(b)(3) of the California Code of Civil Procedure[4] define harassment as having a few key elements, but the most important element between both definitions is that the underlying conduct must "serve no legitimate purpose." This is especially important when distinguishing harassment from other, constitutionally protected speech like criticism.

60.     My state – Arkansas – has a legal definition of harassment that also contains the "serves no legitimate purpose" language in its statute[5]. So to help illustrate the difference, here's a hypothetical example I often give to my local police whenever I am complaining about my unruly neighbors:

> "Suppose I'm a smoker (I'm not; this is just a hypothetical example), and I'm standing on the sidewalk, and I fire up my cigarette lighter and attempt to light a cigarette with it. A neighbor is standing next to me, and as it turns out, this woman has an irrational phobia of fire. So when she sees the flame coming out of the lighter, she freaks out and asks me to put it out.
>
> I am not required to oblige that request. We're on a public sidewalk, so she has no property rights to assert, and I am not required to stop engaging in my otherwise perfectly lawful behavior just because she personally feels harassed by it.
>
> On the other hand, if I *know* that she has a phobia of fire, and so I walk up to her with a crap-eating grin on my face and, just to get a reaction out of her, light up my cigarette lighter, point to it with my free hand, grin mischeviously, and wave it around in front of her face, THAT, ladies and gentlemen, is harassment!
>
> The difference is that, in the former scenario, I am, at worst, indifferent to her feelings, whereas in the latter scenario, I am doing it *to harass her.*"

61.     Here's another hypothetical example: Debt collection agencies. People who default on their debts and receive calls from debt collection agencies may indeed "feel harassed" by these repeated calls. But that alone isn't good enough. The callers still have a "legitimate purpose" for

---

3   See https://codes.findlaw.com/ca/penal-code/pen-sect-653-2.html
4   See https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=CCP&sectionNum=527.6.
5   See subsection (a)(5) of this statute: https://law.justia.com/codes/arkansas/2019/title-5/subtitle-6/chapter-71/subchapter-2/section-5-71-208/

making these calls: To collect the debt that the recipients rightfully owe. By contrast, suppose a far-right conservative obtains the phone number of a person he knows to be transgender, and then proceeds to call that person multiple times a day, every day, not to say anything substantial, but instead just to yell "You will never be a woman!" before immediately hanging up. That would be harassment, because there is no "legitimate purpose" behind that behavior. It is being done *solely to inflict pain*, and that is what makes it harassment.

<u>III-2-B: Criticism vs. Harassment</u>

62.     Of course, it's easy to identify the difference between debt collection and harassment. But what about the difference *criticism* and harassment? Well, there is a clear distinction between them, too.

63.     Just like with the above examples, the primary difference between criticism and harassment is the defendant's intent. Whereas criticism is designed to point out shortcomings in a creator's work, harassment is designed solely to inflict pain. Harassment is purely malicious, with no intention of helping the subject improve.

64.     The specific feedback given is critical to determining what the author's intent is. If the author is pointing out specific portions of an artists work that he believes falls short of the bar, articulating exactly why he feels it falls short of the bar, and explains what he believes is the objectively correct standard, that typically weighs in favor of calling it criticism.

65.     Of course, even that is no guarantee of criticism, as context is important. For example, earlier in this complaint, in ¶ 42(c), I gave an example of feedback I received on one of my videos that technically contains the three elements mentioned in ¶ 64. However, because the feedback I received called for objectively unreasonable standards, I determined that this so-called "criticism" was merely a pretext designed to prevent negative reviews of games they like. Again, context is very important.

66.     On the other hand, if the feedback consists of very little except insults, it is almost certainly harassment. If the feedback contains no actionable course of conduct for the artist, other than to kill himself and/or drop out of the creative fields entirely, it is almost certainly harassment. Content that is 99% insults and only 1% actionable criticism is most likely

harassment and should be treated as such.

67.    My interpretation of the two words is not arbitrary. There are many other third parties and experts in psychology who agree that this is the key difference between criticism and harassment. Here are just a few articles, backed by expert opinions, that corroborate my interpretation of the differences between criticism and harassment:

   (a)    https://lifehacker.com/how-to-tell-the-difference-between-constructive-critici-1844498083

   (b)    https://www.sor.org/getmedia/a029c580-1643-49b6-85df-477ceb58add2/constructive_criticism_or_bullying_document.pdf

   (c)    https://smallbusiness.chron.com/determine-difference-between-bullying-company-policy-37668.html

   (d)    https://www.yahoo.com/news/difference-between-constructive-criticism-bullying-213412667.html

   (e)    https://www.insidehighered.com/advice/2021/05/11/four-ways-determine-when-criticism-has-become-bullying-academe-opinion

   (f)    https://www.job-law.com/there-are-limits-to-criticism-in-the-office/

   (g)    https://www.harleytherapy.co.uk/counselling/honesty-criticism-or-verbal-abuse.htm

68.    In addition to that, there are a handful of overt behaviors that should be considered harassment per se, to the exclusion of all other facts. One such example is repeatedly creating new accounts in order to continue messaging the artist, even after he has blocked you (a practice known as "block-dodging" or "ban-dodging"). While you may have the right, under the First Amendment, to speak your mind about a particular person, you do not have the right to force that person to see or hear your insults. Such a practice is known as a "captive audience," and it is an exception to freedom of speech in the United States. See Rowan v. Post Office Dept., 397 U.S. 728 (1970).

69.    In other words, if you try to block-dodge *even one time*, then the content of your message immediately becomes harassment, even if that same content would handily be classified as "criticism" under otherwise identical circumstances. This, I believe, should be a bright-line rule

that serves as an absolute bar to your content being labeled as protected/fair use "criticism," to the exclusion of all other factors. You do not have the right to force the subject of your "criticism" to sit there and listen to it, period, and attempting to force them to do so is harassment in and of itself, even if the content itself isn't.

70.     As of the time of this writing, there is a case pending before the Supreme Court called Counterman v. Colorado. One of the issues to be litigated in that case is whether a person acts with malice per se when he creates multiple accounts to continue messaging his victim after he has already been blocked by her. See https://www.westword.com/news/supreme-court-colorado-social-media-case-bill-counterman-coles-whalen-16009703 ("Not only were the messages seemingly endless, but they continued through alias accounts, even after Whalen asked Counterman to stop contacting her and then blocked him. Each time, he would create a new profile and reconnect with her"). We'll definitely need to be keeping an eye on that case.

71.     In addition to that, there is another example of conduct that should be considered harassment per se: Extrajudicial punishment. If any behavior, done by a private citizen, is designed to subject its target to public humiliation as punishment for some perceived wrongdoing, then it is automatically harassment. To be harassment, the behavior must "serve no legitimate purpose." However, "taking the law into one's own hands" is not a legitimate purpose that the law recognizes.

72.     A limited exception to this rule can be applied when the would-be vigilante is severing ties with the target, rather than actively creating new ties. For example, an employer is allowed to fire an employee as punishment for something, a wife can divorce her husband over some wrong he alleged did, etc. However, that is because the right to assemble (and, by extension, the right *not* to assemble) is a constitutionally-protected right, whereas forcing the target of harassment to be a captive audience is *not* protected by the First Amendment. Any time you actively engage in conduct – rather than simply disengage the conduct you were previously engaging in – in order to punish someone outside of the judicial system, then you are taking the law into your own hands, which is not a legitimate purpose for your behavior and is therefore harassment.

<u>III-2-C: What is "doxxing?"</u>

73.　　Next, it is important that we establish a clear definition of the word "doxxing." In its simplest terms, to "dox" someone means "to publicly identify or publish private information about [that person] especially as a form of punishment or revenge." See https://www.merriam-webster.com/dictionary/dox. However, that definition is itself wanting, primarily because it does not specify what it means by "private information." The individual defendants in this case are sure to argue that any information that can be legally accessed on the Internet, no matter how personal or sensitive, is automatically not "private" information as defined in the Merriam-Webster definition of "dox." They believe that, as long as they acquire the information through literally any means, they have carte blanche to do whatever they want with it, no matter how harmful or malicious, and it is automatically not "doxxing," to the exclusion of all other factors.

74.　　This is absolutely not the case. First of all, merriam-webster.com has a page dedicated to listing the definitions of the word "private," and it does not support the individual defendant's definition. Over at the url of https://www.merriam-webster.com/dictionary/private, we can see that "private," as an adjective, has a lot of definitions, but they can all be grouped into four categories. Categories 2 and 4 are entirely inapposite here, so we can take those off the table summarily.

75.　　The first category contains such definitions as "intended for or restricted to the use of a particular person," "belonging to or concerning an individual person," and "restricted to the individual." If we apply this definition, then "private information" includes things such as my legal name and residential address. There is a 99.99999% chance that this is precisely the kind of information the Court was thinking about just a moment ago when it read the question "What is doxxing?"

76.　　However, the third category contains such definitions as "not known or intended to be known publicly." This is the "gotcha" that the individual defendants believe absolves them of culpability. They loudly (and often vulgarly) insist that sharing my personal information is not doxxing because the information was already publicly available online.

77.　　But even that does not fully exonerate their actions. Just because information "is"

available on the internet does not necessarily mean it is "intended to be" available on the Internet.

78.     Of course, this already-strained technicality doesn't even really matter, because the individual defendants are placing way too much importance on the word "private" in the definition of dox. Look back to the definition of dox. At the end, it contained the phrase "especially as a form of punishment or revenge."

79.     Bear in mind that the whole reason doxxing is considered an immoral and unethical practice in the first place is because it is a form of harassment. From there, we must consider the arguments made in subsections III-2-A and III-2-B: the difference between harassment and legitimate behavior is that harassment is done purely out of malice, and purely out of a desire to inflict harm. Likewise, the main difference between doxxing and the type of "news reporting" that is protected under both fair use and the First Amendment, is that doxxing is done *solely to inflict pain on the target*, entirely for its own sake, or in reckless disregard to the risk of doing so! That, ladies and gentlemen, is the true test for whether the sharing of someone's private information over the Internet is considered "doxxing" or not, regardless of whether you use the first or third category of definitions for "private."

80.     To help illustrate this point using a disconnected example, please allow me to present a clip from a famous country music song called "How Do You Like Me Now" by Toby Keith. You can view the music video at the following url: https://www.YouTube.com/watch?v=3umaLe37-LE. At timestamp 0:56 - 1:14 of that video, Toby talks about how he wrote his high school crush's phone number on the football field, followed by a sexually provocative message.

81.     If this happened on the Internet, it would be doxxing. Toby obviously broke no laws in *acquiring* her phone number (though he obviously committed a crime by breaking into the stadium, but that's a different law entirely that has nothing to do with doxxing someone). He probably got the number through the simple expedient of looking it up in the phone book.

82.     But that's not the point. The point is that he *used* this otherwise-lawfully-obtained information, not for any legitimate purpose, but in order to pull an extremely cruel and malicious prank on this girl! That, ladies and gentlemen, is what makes it doxxing, not simply whether or

not the information was publicly available to begin with!

83.     My interpretation is further corroborated by California law. Contrary to common misconception, the legality of doxxing is indeed codified under California law, and since the vast majority of the world's largest social media companies (where 99.99999% of doxxing typically occurs) are headquartered in California, that is the state whose laws are most directly applicable.

84.     Under California Penal Code § 653.2 (the same statute I provided earlier which provided the criminal definition for harassment in that state), in subsection (a), it says …

> "Every person who, with intent to place another person in reasonable fear for his or her safety, or the safety of the other person's immediate family, by means of an electronic communication device, and without consent of the other person, and for the purpose of imminently causing that other person unwanted physical contact, injury, or harassment, by a third party, electronically distributes, publishes, e-mails, hyperlinks, or makes available for downloading, ***personal identifying information***, including, but not limited to, a digital image of another person, or an electronic message of a harassing nature about another person, which would be likely to incite or produce that unlawful action, is guilty of a misdemeanor punishable by up to one year in a county jail, by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment." (emphasis added).

85.     There it is in black and white. Dictionaries are admissible primarily to ensure that all parties are on the same page when it comes to the use of potentially confusing terms, not to prove the truth of a certain statement. But statutorily codified definitions are legally binding and dispositive of the matter at hand, and California law unequivocally specifies that it is the first category of definitions for "private," not the third category, that is legally controlling in this state.

### III-3: Factual Allegations of Harassment

86.     So now that we've established the definitions for harassment and doxxing, let's take a minute to discuss all the harassment and doxxing I have suffered. Please understand that I cannot possibly list every instance of harassment I have suffered, because if I did, this Complaint would be five times as long as it already is. So I will simply list highlights.

### III-3-A: How it all started

87.     This all started in late February of 2021. I made a community post on my YouTube

channel, pointing out that I suspected that some people were intentionally and maliciously attempting to sabotage my YouTube channel with low-retention views. A troll by the alias InitiativeKookie responded and declared that he was the one solely responsible for the low retention views that sparked my suspicion.

88.     I proceeded to block InitiativeKookie from my YouTube channel.

89.     However, a few days alter, InitiativeKookie also responded to one of my posts on Reddit, stating "I don't know but your videos are pretty shitty. I hope you're enjoying the death of your channel." This is harassment, because, as I described above, no legitimate purpose was served by this communication. It was done solely to harass, and therefore qualifies as harassment under California law. Furthermore, once he made the second communication, that constituted a course of conduct[6].

90.     But even barring that, he sent me this second message *after I had blocked him*. As I explained in ¶¶ 68-70 above, this is harassment per se. Even if he was genuinely trying to be helpful (which he was not), the fact that he circumvented my blocking him was still harassment.

91.     This gets a subsection to itself because it is one of the most important factual allegations of this entire section. If InitiativeKookie had simply sent me the one message on YouTube, accepted that I had blocked him, and moved on with what little life he had, he would have broken no laws. But also, if he had done that, none of the events that I am about to describe (including the continued harassment, doxxing, and yes, even the copyright infringement) would never have happened. None of the other individuals would have joined in the harassment, none of the copyright infringement would have happened, and nobody would have doxxed me. If InitiativeKookie were to go back in time and stop himself from making these two statements, all the subsequent abuse I have suffered would cease to exist like a grandfather paradox.

92.     In other words, this harassment is the proximate cause for everything else that has happened in this entire controversy. I may have taken steps (some more drastic than others) to stand up for and protect myself, but only because InitaitiveKookie threw the first punch.

93.     The individual defendants all know this. They all know full well that this all started

---

6   See 18 USC § 2266(2), stating that only two acts are necessary in order to constitute a "course of conduct."

because InitiativeKookie block-dodged and continued to message me with harassing messages even after he had been blocked. They all know (and some of them even affirmatively admit) that, had InitiativeKookie not done this, none of this would have happened. Some of them don't care because they are just as evil and malicious as he is. Others have convinced themselves that it is in fact I, not InitiativeKookie, who figuratively "threw the first punch," because his behavior was not actually harassment, which in turn means that it did not count as a figurative punch being thrown, which in turn means that my extreme overreaction (which I'll discuss momentarily) to his half-rassment was itself the first act of aggression. Therefore, in their warped minds, I am the one who started it and therefore deserve all of the harassment and abuse I have gotten.

94.     However, the law clearly states that the actions in ¶¶ 87 & 89 are indeed harassment. They are a course of conduct (it may have only been two acts up to this point, but the law clearly says that's all I need to show a course of conduct) directed at a specific person, with the desire to harass, alarm, or seriously annoy that person, and serving no legitimate purpose. Therefore, it is harassment, period.

95.     But even barring that, for InitiativeKookie and the rest of the individual defendants to continue to harass me after this, simply because they feel (genuinely or otherwise) that I "deserve" it, is still harassment, for reasons discussed in ¶¶ 71 & 72.

96.     But regardless of how you view InitiativeKookie's initial actions, whether or not they were considered harassment as a matter of law, all parties unanimously agree that these were the actions which set this chain of events into motion in the first instance. As a matter of fact, that much is unanimously agreed upon.

<u>III-3-B: Harassment prior to filing the case of Stebbins v. Polano</u>

97.     After InitaitiveKookie continued to harass me after I blocked him, I posted a video asking for help in locating him so I could take him to court and enjoin his harassment. You cannot see the video anymore because I have set it to private, but if you could see it, it would be at this url: https://youtu.be/xReGFHcM8M0.

98.     Contrary to what the individual defendants claim, this video was not an attempt to dox InitiativeKookie. Rather, I was merely asking for exactly the same type of help that this woman

asked for in these two videos: https://www.youtube.com/playlist?
list=PLpL3n7W6QqgDavHIknoPUxa-eRP5LP67Y

99.     In my video (the one that is now private), I made it abundantly clear that I was only doing this because it was necessary to make him stop harassing me, and because there was no other way. I also made it clear that I had no intention of using this just to get revenge, or to take the law into my own hands. Rather, my intention was solely to use this information to avail myself of the civil and criminal courts to have him be held accountable and to enjoin his harassment.

100.    InitiativeKookie reported the video for violating YouTube's community guidelines. It was initially taken down. However, once I appealed the removal, the video was eventually reinstated, proving that I was doing this for a legitimate purpose.

101.    In retaliation for this, InitiativeKookie deleted his original Reddit and YouTube accounts, created new accounts, and then proceeded to harass me with those, both in the comments of my YouTube videos and in my DM's on Reddit. I would block him, and then he would just create more accounts. He also repeatedly created new Discord accounts in order to join my channel's Discord server, over and over and over again, constantly sending me harassing messages, constantly disrupting my Discord's chat, and even outright sabotaging my Discord server by infecting me with viruses, using deceptive tactics to get his fake accounts appointed to moderator status and then using his power as a mod to ban all of my members, and even writing code to have my Discord account completely sabotaged without even needing moderator status.

102.    This went on for several weeks, and he eventually recruited the likes of Karl Polano of Switzerland and Raul Mateas of the United Kingdom to join in the harassment, and with them, their Discord server called "Great Six."

103.    Whenever their harassment included instances of my copyrighted material, I of course issued DMCA Takedowns against them. In response to this, they began including some token amounts of alleged "criticism" in these videos. Many of these instances of so-called "criticism" were in fact just harassment, as described above in Section III-2-B, but they believed it was criticism. This, in their opinion, provided them with total immunity from DMCA Takedowns, rendered my DMCAs patently frivolous, and gave them unlimited right to use my copyrighted

material. Of course, that's not how fair use actually works, but they genuinely believed it.

104.    This ultimately culminated in Karl Polano issuing a DMCA Counter-Notification against me, forcing me to file suit in Case 3:21-cv-04184-JSW (Stebbins v. Polano) on June 2, 2021.

105.    This is important to establish because it demonstrates the true intentions of the defendants. They hide behind so-called "criticism" as a shield for their actions, but they have already made it clear that the criticism is not, and never was, the point of their actions. Since Day 1, this entire charade has been about harassing and doxxing me, nothing more, nothing less.

106.    Think about it this way: Imagine if this Court had an employment discrimination lawsuit before it. A new, white entrepreneur purchased an existing business with the intent of running it. Upon buying, however, he discovered that there was a black employee working there, so he promptly fired him. At first, he made no effort to hide the fact that he was firing the employee solely for being black, only to be in for a rude awakening when the EEOC steps in and forces him to reinstate the employee.

107.    So he does a token amount of research, and he reads something online that says that he can cover up his racism if he has a "pretextual excuse," so he comes up with a heavily strained, token pretextual excuse (similar to how InitiativeKookie, Karl Polano, and Raul Mateas came up with their excuse of providing criticism as a barrier to DMCA Takedowns), and then proceeds to rub in the employee's face that, now that he has this excuse, the employee can't do anything about it.

108.    If such a case were before this Court, the judge would not only side with the employee, but would openly laugh in the boss's face! Well, that is, essentially, what we have here, just with employment law substituted for copyright law.

<u>III-3-C: Harassment prior to filing the case of this case</u>

109.    After filing the case of Stebbins v. Polano, the individual defendants in that case doubled down on their harassment and doxxing of me, under the delusional belief that their harassment was criticism when, as I explained in Section III-2-B, it was absolutely harassment. This included a few times, when I was streaming on Twitch (once on September 12, 2021, and again on September 26, 2021), where InitiativeKookie proceeded to created literally a dozen accounts

per night, posting harassing messages in my livestream chat, getting banned, and then creating new accounts in a matter of minutes just to harass me again. He created literally a dozen accounts in the course of about an hour and a half, on two separate occasions, just to continue harassing me even after he was banned.

110.    On August 20, 2022, InitiativeKookie began talking to me on Discord without realizing that it was me. During this conversation, he confessed in writing that he had no legitimate motive for all the harassment and doxxing he was engaging in. He did it solely because he was a malicious bully. Bear in mind, this is not simply him failing to give any legitimate motive for his actions; he actively admitted to not having one!

111.    After a while, the defendants in the Polano case began spreading smear campaigns against me to anyone who would listen. They would lie by omission, lie outright, and make stuff up from whole cloth about me in order to paint me as a villain. Going back to the aforementioned analogy with employment discrimination, imagine if the racist boss, after his first attempt at a pretextual excuse for firing the black employee got exposed as pretextual due to how strained and delusional it was, he solicited a lot of other people to harass the black employee, both to try and get him to quit, and also as punishment for standing up for his rights. Perhaps he even hires a middle manager to fire the black employee on his behalf in an attempt to create some degree of separation between his racism and the termination. That is, essentially, what InitiativeKookie and company did here.

112.    One of the people who drank this kool-aid was John Doe #1, who goes by the alias Creetosis. Defendant Creetosis owns a Discord server called "The Owl Server," which you can access here: https://discord.gg/ZbyY2Vf. In that server, there used to be a thread called "Acerthorn Pinata Bashing," or APB for short. As the name would suggest, this thread is dedicated exclusively to harassing, doxxing, and dogpiling me out of pure malice and spite. Those participating in APB were constantly searching my entire life's worth of personal history and sharing it with each other (an act known as "doxxing" in Internet terms), including my medical records, information regarding a crime I was charged with over a decade ago where I wasn't even convicted, and even finding numerous porn websites and dating websites where

users have psuedonyms similar to my own so they can speculate as to what sort of "kinky" stuff I may or may not be into in the bedroom. They are also constantly monitoring my social media activities like vultures, looking for anything they can find, literally any sentence I might say or a single twitch of my eyebrows that I might do on camera, that would give them more ammunition to use in their never-ending effort to harass, dox, and dogpile me. There is no legitimate motive for anyone who participates in APB, just pure hatred, pure malice, pure spite.

113.    Defendants Emily Rebolo and Trysten Burge both participated extensively in APB. They were directly inspired to make the videos they made about me specifically because of the doxxing and harassment they were exposed to during their time in APB. In other words, their entire purpose for making their infringing videos was to contribute to the harassment and doxxing, and to spread it outside of APB's bubble. This ultimately resulted in them both issuing DMCA Takedowns against me, claiming that their videos were fair use "criticism" when they were absolutely meant as harassment.

114.    Again going back to discrimination as an analogy, imagine if the racist boss, after about a dozen attempts at coming up with convoluted excuses to justify firing the black employee, he eventually stumbled upon a pretext that sounded reasonable at first glance, one that might have gotten him off if he had used it from the outset. The problem, however, is that, by that point, the toothpaste is irreversibly out of the tube. His desire to fire the black employee, just for being black, was already out in the open, proven by the boss's *own admission*, so by this point, any excuse he comes up with, no matter how logical it may seem at first glance, is automatically presumed to be pretextual. Nobody in their right mind would be fooled by the boss's newfound fairness, because they already know (because he admitted to it out loud) what his real intentions are.

115.    The same can be said for all the flying monkeys[7] who are defendants in this case. Even if the defendants in this case might have made videos that, when taken in a vacuum, might have

---

7   A "flying monkey" is a person who harasses someone on behalf of another, either because the original harasser is legally foreclosed from harassing his target (e.g. due to a restraining order) or because, as is the case here, the original harasser is soliciting middle men in a thinly-veiled attempt to make the harassment pass off at least partially legitimate. See https://narcissistabusesupport.com/red-flags/use-flying-monkeys/.

passed for fair use[8], it is already too late. Their true intentions of simply harassing and doxxing me for its own sake have already long been exposed. All of the defendants' infringements fail fair use, not because their criticism does not justify the copying, but because *there is no criticism*! All they have is a bunch of purely malicious harassment and doxxing coated in an ultra-thin layer of iron pyrite (not even a thin layer of real gold) in a thinly-veiled attempt to make it pass for criticism to the uninitiated. But once the broader context is revealed, their true intentions are laid bare. See Fed.R.Evid 404(b)(2) (holding that evidence of prior – or in this case, concurrent – bad acts are admissible to prove such things as motive or intent).

<u>III-3-D: Harassment since filing this case</u>

116.     After filing the first Complaint in this case, the harassment and doxxing I was forced to endure went through the roof. I endured countless instances of harassment, many of which would be independently grounds for criminal prosecutions in their own right, much less as part of a widespread pattern of harassment.

117.     On February 12, 2022, defendant John Doe #3, who goes by the alias "SidAlpha," posted a video on his YouTube channel. This video was filled with lies, slander, harassment, and doxxing of me. I am currently suing him for defamation in Case 4:23-cv-00321-DMR. This guy was solicited by the other defendants because he actually has a very large YouTube channel (over 100,000 subscribers), and therefore would be able to distribute the harassment, doxxing, slander, and smear campaign to a much wider audience than any of them could.

118.     Their efforts worked, and once SidAlpha posted his smear video, the harassment I suffered went through the roof. Hundreds of people a day, every day, for several weeks, constantly bombarded me with harassment, both over the Internet and offline as well. Here are just a handful of examples of some of the worst things that happened to me in that time period. Bear in mind that this is only the highlights; the endured *literally thousands* of harassments during this time period.

   (a)     A complete stranger called me, using the phone number I had listed on my pleadings in the Polano case, and threatened to bomb my hometown if I did not agree to stop filing

---

8   For the record, I am NOT conceding that these videos would indeed pass for fair use otherwise, for reasons I will discuss when I start discussing the individual infringements themselves.

DMCA Takedowns.

(b)     On or around March 18, 2022, InitiativeKookie managed to steal the password to my YouTube channel, logged in, changed my password, and even changed all the various devices that were used to do two-factor authentication, so I would have much greater difficulty reversing this hacking and getting my channel back. I eventually got my channel back, but the crime still happened.

(c)     I received a package from UPS. It was sent to my home address, but it was addressed to the recipient "Nick Gers." If you say the name fast, you realize that it is meant to sound like the N-word, the racial slur against black people. To this day, I have not yet opened the package, but I still have it, with the label still sealed, so I can unbox it on webcam for the Court to reveal its contents. The odds are overwhelmingly that the box contained something that was meant to be harassing, such as literal feces.

(d)     In mid-April of 2022, a YouTuber who goes by the alias "Rogue, Internet Man" drove across country, hundreds of miles, and parked his car right outside my apartment. He then proceeded to harass me in-person by playing extremely loud music and shouting obscenities towards my apartment's door. This went on for about ten minutes before neighbors called the police to report his disorderly conduct.

(e)     On May 22, 2022, I received 101 emails from a person named Tim Burke. For all 101 of these emails, the subject was "important message." When the emails were opened, they all contained the same supposedly "important" message: "Fuck you." To be clear, I received *literally thousands* of harassing messages during this time period, both over email and in the comments of my YouTube videos. What makes this one stand out is the fact that he sent me this message *over one hundred times* in one day!

119.    All of this harassment, and the stress that resulted in it, ultimately culminated with me developing a life-threatening case of pneumonia, forcing me to be hospitalized for eight days and undergo surgery to save my life, because of all the harassment I have suffered. I complained about that in my defamation case against SidAlpha, Case 4:23-cv-00321-DMR, Dkt. 1, ¶¶ 133-142 for more details.

120.    At this point, it doesn't matter what I did. Unless I literally raped or killed someone, nothing else could possibly justify people taking the law into their own hands to this degree. Then again, even if I raped or killed someone, you would expect the police to get involved, meaning I would be entitled to due process of law. At that point, if I stand trial and am exonerate, the people would *still* be wholly unjustified in taking the law into their own hands.

### III-3-E: Why all of this harassment matters

121.    So why am I taking so much time to establish all this harassment in a case that is supposed to be about copyright infringement? Well, in addition to it constituting "unclean hands" (more on that when I discuss the legal arguments), it also proves that, as a matter of fact (not just a matter of law), it means there is virtually no actual criticism in any of the infringements I am about to discuss. It's *just* harassment made to look like criticism.

122.    Under Fed.R.Evid. 404(b)(2), evidence of prior (or, in this case, concurrent) bad acts is admissible to prove motive and intent, among other things. Here, the defendants' long standing pattern of behavior makes it perfectly clear that everything they say about me is designed to harass and dox me, not to criticize.

123.    Harassment is never criticism, and criticism is never harassment. Criticism has the potential to be transformative (though even that is not a slam-dunk case for fair use), but harassment is never transformative. Forget the Four Factors Test set forth in 17 USC § 107A(1)-(4); their case for fair use should be defeated at the *preamble* stage. The preamble of §107A, which lists examples of the various types of purposes for fair use, should preclude their case for fair use, because they aren't doing it for a "fair use purpose." They're just trying to pass their harassment off as criticism, but when the full context behind their actions is revealed, their true intentions are made clear.

### III-3-F: Defendants cannot bury their heads in the sand.

124.    Let me begin this subsection by emphasizing that, on multiple occasions, I attempted to speak with the individual defendants in this case and explain to them that they were contributing to the harassment. My attempts to show them the error of their ways repeatedly and consistently fell on deaf ears. As far as those last two sentences are concerned, I wish to respectfully remind

the Court that, when reviewing a Complaint for failure to state a claim, it must accept as true all factual allegations in the complaint (including those in the first two sentences of this paragraph) unless it can take judicial notice to the contrary. A limited exception applies to complaints filed in forma pauperis, but only when the factual allegations are "fanciful," "fantastic," or "delusional," or when they "rise to the level of the irrational or the wholly incredible." See Denton v. Hernandez, 504 US 25, 32-33 (1992). The first two sentences of this paragraph do not clear this exceptionally high bar, and so the Court must still accept them as true at this stage.

125.    That being said, the only way the defendants in this case could have a claim to good faith, and that they were not actively participating in the harassment themselves as flying monkeys, is if they could plausibly allege that they didn't know about all of the harassment that necessarily lead to where we are now, that they honestly and in good faith believed that I am merely a thin-skinned wus who is unable to take criticism.

126.    However, that denial can only take them so far. If I offer to explain to them all the harassment I have suffered that lead us to our current situation, they lose the privilege to bury their heads in the sand. At that point, they take on a duty (pursuant to the "Reasonable Person" common law doctrine) to hear me out with an open mind. An important key word in that last sentence is "open mind." Hearing me out with a closed mind doesn't count.

127.    At that point, one of four possible outcomes necessarily happens. Either …

(a)    **Outcome #1**: They refuse to hear me out, or refuse to have an open mind when hearing me out;

(b)    **Outcome #2**: They hear all the evidence in support of the allegations of Subsections III-3-A through III-3-D above, admitted that I was the victim all along, and then ceased and desisted their contributory harassment;

(c)    **Outcome #3**: They hear all the evidence in support of the allegations of Subsections III-3-A through III-3-D above, and either know full well that I am the victim, or simply don't care, and then persist with their contributory harassment with either actual knowledge that, or reckless disregard to the fact that, they are merely harassing me rather than criticizing me, simply because they are themselves spiteful, malicious, and vindictive bullies; or

(d)    **Outcome #4**: They hear all the evidence in support of the allegations of Subsections III-3-A through III-3-D above, but for whatever reason, believed that I am lying about the harassment, that I had substantially embellished the harassment to paint myself as more of the victim than I actually was. They then proceeded to continue their harassment under the guise of criticism, completely unabated.

128.    If Outcome #2 were what occurred, those people would not be defendants in the instant case. If Outcomes #1 or #3 were what happened, then they are absolutely malicious and deserve to be held just as liable as if they were personally conducting the original harassment with their own hands, even if the were coming in at the halfway point and contributing to the harassment as flying monkeys.

129.    This leaves Outcome #4 as the individual defendants' last bastion of hope for absolving themselves of culpability for being flying monkeys. However, in order to have this excuse, they have to have an ***objectively good reason*** for believing that I am lying about all the harassment I have endured and that they are contributing to. If they don't believe me simply because they had already made up their minds about me, that's not Outcome #4; that's just Outcome #1 (refusing to keep an open mind when hearing me out) in a different coat of paint.

130.    Nor should the defendants be allowed to escape liability in this case by insisting that their videos were *initially* designed with good intentions. First of all, I absolutely dispute that, but even if they manage to prove it, to argue that they should be excluded from contributing to the harassment as flying monkeys, simply because they didn't know, at the time that they made their respective videos (which, again, I heavily doubt) about all the harassment mentioned above, is the equivalent of a killer[9] arguing that he lacks mens rea, simply because, for one fleeting moment when he first commenced the homicidal act, he didn't know and had no way of knowing that his actions might result in someone getting killed, even though he quickly learned of the danger, had ample opportunity to stop what he was doing before death resulted, and made the conscious choice not to. If someone were to unironically make that argument in court, the judge would probably laugh in his face.

---

9   Murder is, obviously, a very extreme example. But this theory of culpability still holds even in personal injury tort cases, so the analogy is still a good one.

131.    Likewise, even if the defendants in this case could prove that they began their dogpiling videos without realizing that their videos were harassment rather than criticism (which I doubt they will be able to do), the fact that I did everything in my power to educate them of the reality of the situation, only for them to continue their courses of conduct even after a reasonable person would realize that their actions constituted harassment rather than criticism, means they deserve to lose this already paper-thin extenuating circumstance. Notification – especially written notification – necessarily strips a party of plausible deniability.

III-3-G: Defendants know the harm they are causing.

132.    At first glance, this may seem to be completely irrelevant, but please hear me out. It is admissible under Fed.R.Evid. 404(b)(2) as proof of motive and intent.

133.    On April 13, 2023, Trysten Burge uploaded a video to his "Echo Wilder" YouTube channel called "We need to talk about xArtemiswolf." You can find this video at the url of https://youtu.be/tqBmpZ0XbCM. For the record, xArtemiswolf (or just "Artemis" for short) is another YouTuber who has infringed on my copyright but who is not a defendant in this case because she did not issue any DMCA Counter-Notifications.

134.    During this video, Burge exposed Artemis as a zoophile. He also showed everyone Artemis's new YouTube name (even showing a screenshot thereof) so everyone would be able to find the new channel. At timestamp 4:58, he also said he would be "keeping an eye on" Artemis's new channel (in other words, he was going to cyberstalk her in violation of 18 USC § 2261A), that "we're" (aka multiple people) "not letting her be able to comeback" and that "zoophiles don't belong on this platform."

135.    Now, what does all of this have to do with my case? Well, it shows that the defendants genuinely and unironically consider themselves judge, jury, and executioner over those who they don't like. Look, I am not defending Artemis's zoophilia. I absolutely agree with Burge that it is morally abhorrent. But I *also* abhor taking the law into one's own hands. Artemis absolutely deserves jail time for her crimes. But that should be for the police and courts, not a vigilante mob, to impose onto her, in accordance with the laws of the land. Any attempts to find Artemis's real name and address should only be used to facilitate sending the police there to apprehend her,

not so anyone can show up at her house and harass her in person, like what happened to me in ¶ 118(d) above.

136.    In this video, Burge proudly announces that he intends to do to Artemis precisely what the defendants have set out to do to me: Be her judge, jury, and executioner, and to bombard her with overwhelming harassing messages in her Discord, Twitter, YouTube channel, and Twitch live chat, in the hopes of overwhelming her with so much harassment and death threats that she buckles and deletes her social media accounts just to make it stop, simply because he, in his almighty holiness, decided that she "deserves" it. Furthermore, he is actively encouraging others to do the same. Why else would he, at timestamp 5:15, show everyone a screenshot of her new channel? So everyone else could find her, that's why!

137.    This demonstrates that the individual defendants in this case are absolutely just as malicious and just as vindictive as I say they are. Think about it: At timestamp 2:05 – 3:02, Artemis has the audacity to defend her zoophilia. She honestly doesn't think she's done anything wrong. Well, in this entire video, Burge doesn't seem to think he's doing anything wrong by taking the law into his own hands and encouraging others to do the same. But that's also the problem: These people are too far gone and cannot be reasoned with. They are simply malicious people who feel justified in absolutely abhorrent behavior, as long as the victim "deserves" it.

138.    Also, at timestamp 1:58 – 2:12, he acknowledges that he is redacting his informant's name so he cannot be identified[10]. This shows that showing someone's personal information is, in itself, harassing, since doxxing them, even when you're not trying to harass them yourself, will still inevitably lead others to harass them, using the information they are given. This is precisely what I've been trying to tell everyone all along, about the harm that they are causing just by putting my personal information out there in any capacity, but they refused to listen. This video demonstrates that the individual defendants already know exactly what they're doing; they know

---

10 He claims he is just doing this because *Artemis* is a vindictive person, but that doesn't make any sense. Artemis obviously already knows exactly who that person is. The only way this redaction makes any sense is if he's doing it to protect the informant from *other people*.

Now, see what I just did there? Just like how I described Outcome #4 earlier, I gave objectively good reasons for why I believe Burge is lying about his true motives for redacting his informant's identity. I didn't decide not to believe him simply because I had already decided that he was a scumbag.

the harm they're causing, and they are going out of their way to inflict it.

139.    Keep all of this in mind when analyzing the defendants' action in this case.

140.    So now that we've taken this extremely long tangent, let's finally discuss the infringements themselves.

### III-4: Infringements by Emily Rebolo

141.    Defendant Emily Rebolo has infringed on my copyright in the following ways:

<u>Infringement #01: Illegally viewing the April 10, 2021 livestream</u>

142.    See Footnote #1 for why I am including this infringement.

143.    While participating in APB, Rebolo received a clip from Karl Polano that was from my April 10, 2021 livestream. This clip depicted the "strange noises" section of the livestream.

144.    She knew or should have known that Polano and I were in active litigation with one another over his unauthorized distribution of this very clip. As a result, she knew or should have known that viewing that clip would be considered by me to be an infringement of my copyright.

<u>Infringement #02: Illegally viewing the April 18, 2021 livestream</u>
<u>without me being paid 50% of the revenue</u>

145.    While participating in APB, Rebolo received a clip from Karl Polano that was from our April 18, 2021 livestream. Because I am a co-author, I am entitled to half of the revenue generated from Polano's distribution of that clip. I did not receive this revenue. As a result, Polano's sharing of the clip was an infringement of my copyright.

146.    Polano shared this clip, at least in part, in order to drive viewers to his Twitch channel and boost his own revenues therein, so this counts as a commercial exploitation of the clip. Even if that wasn't directly on Polano's mind (which is most likely was), it was still at least an ancillary benefit and therefore still counts as a commercial activity. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1152 (9th Cir. 1986) ("Falwell contends … that the appeal for money was ancillary … The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit"). As long as Polano received at least one extra view on his Twitch channel, resulting in a single ad impression, that he would not have gotten were it not for the sympathy he obtained from his smear campaign against

me, then he "profited" from sharing that clip, and even in the one-in-a-million chance that didn't happen, as long as it had a reasonable chance of happening, he still "stood to profit" from it. Therefore, I am entitled to 50% of the revenues he obtained from said channel growth, which I did not get.

147.    Because Rebolo was a willing audience (as opposed to a captive audience) for this infringement, she is just as liable for the infringement as the sender. See Capitol Records, Inc. v. Thomas-Rasset, 680 F. Supp. 2D 1045 (2010) (finding the person who downloaded songs to be just as guilty of copyright infringement as the people she got the songs from, even if the latter parties could not be properly identified and/or brought before the court).

<u>Infringement #03: Distribution of my December 18, 2021 Stream</u>

148.    Rebolo admits to having recorded my December 18, 2021 stream: "Fallout: New Vegas Sucks, And Here's Why (Livestream Debate)." While this, by itself, is allowed pursuant to the precedent of  Sony Corp. of America v. Universal City Studios, Inc., 464 US 417 (1984) (provided that she used *timeshifting* methods, and did not simply download it, which is what she most likely did, since downloading is physically much easier than timeshifting on the Internet and thus offers the path of least resistance), the only thing that Sony v. Universal permits is the *recording* of that video, and the subsequent viewing thereof within one's own home.

149.    However, after recording the stream (which may or may not have been timeshifting), Rebolo proceeded to share this copy across various websites such as Discord. These distributions constitute infringement. You can play a timeshifted copy for house guests, but only if they are physically in the home with you. You do not have the right to distribute that recording outside of the home unless the distribution is subject to the "First Sale" rule.  The First Sale rule can *never* apply to Internet transactions, because an essential element of the first sale defense is that the seller must forfeit possession of his copy once the sale is complete. When you transfer computer files from one computer to the next, the sender always retains his copy of the file on his computer, which is necessarily fatal to a "First Sale" defense.

150.    In addition to that, on January 17, 2021, Emily Rebôlo uploaded a video to her Youtube channel. At one point during the video, Rebolo used a clip from my December 18, 2021 stream.

Specifically, she showed a clip of me explaining that I was giving preferential treatment to my monetary supporters over those who are watching my videos for free (which, from a purely business standpoint, there is absolutely nothing illegal, or even unethical, about such a practice).

151.    She did not provide any substantial commentary or criticism of that clip, however. Instead, she merely *described*, in purely factual terms, what happened in that clip before playing the clip itself. Her commentary or criticism is entirely redundant of viewing the clip without the commentary. This is not transformative. See Los Angeles News Service v. KCAL-TV Channel 9, 108 F. 3d 1119, 1122 (9th Cir. 1997) ("Although KCAL apparently ran its own voice-over, it does not appear to have added anything new or transformative to what made the LANS work valuable — a clear, visual recording of the beating itself"). See also Seltzer v. Green Day, Inc., 725 F. 3d 1170, 1176 (9th Cir. 2013) (an infringing work is only transformative when it results "in the creation of new information, new aesthetics, new insights and understandings").

152.    I issued a DMCA Takedown Notice against this video, and Youtube took the video down. Rebolo issued a DMCA Counter-Notification against the takedown, prompting me to file this lawsuit.

153.    However, on March 8, 2022, Youtube nonetheless reinstated the video anyway. Therefore, Youtube has lost its safe harbor and is vicariously liable for the infringement.

### Infringement #04: Using my channel icon during the video

154.    At multiple points in the aforementioned aforementioned video, Rebolo shared the "Acerthorn Channel Icon 2022," despite not commenting on or criticizing these images these in any way. She did not even so much as give a purely factual description, like she did with the clip from the December 18, 2021 stream.

155.    Sharing this channel icon was not necessary to make any of her points. See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1179 (9th Cir. 2012) ("The inquiry under this factor is a flexible one, rather than a simple determination of the percentage of the copyrighted work used. But we should be clear, Maya copied 100 percent of the copyrighted photos at issue … While we do not discredit Maya's legitimate role as a news gatherer, its reporting purpose could have been served through publication of the couple's marriage certificate or other sources rather than

copyrighted photos. Even absent official documentation, one clear portrait depicting the newly married couple in wedding garb with the priest would certainly have suffced to verify the clandestine wedding. Maya used far more than was necessary to corroborate its story." See also Fisher v. Dees, 794 F. 2d 432, 439 (9th Cir. 1986) (holding that the availability of "viable alternatives" is a factor that weighs against fair use).

156.    There was no rhyme or reason for showing this icon. It was mostly there just to show everyone a screenshot of my channel, but there was no reason she needed to show the channel page. If I had to guess, my best guess would be that she showed this page just to introduce her audience to me personally. However, to the extent she wanted to show everyone my channel, she could just as easily have provided a link to my channel in the description of her video. I cannot copyright a web link. See https://youtube.com/clip/Ugkx00zKtySDc19qspJx2XeUoP72wX-ZfzX9. So if she did that, then there would have been no copyright infringement in the first instance, no fair use necessary. In fact, this would have been far *more* conducive to the alleged purpose of showing everyone my channel, because by clicking on that link, it ensures that they are necessarily going to the correct channel instead of a mockup. As it stands, however, her sharing of the channel icon was entirely superfluous, and therefore, her use of the channel icon cannot be considered fair use.

157.    Youtube is vicariously liable for this infringement for the same reason it is vicariously liable for Infringement #03. See ¶ 153.

Infringements #05-#11: Using my channel art, as well as the octagon, pentagon, 5-point star, abnormal shape, diamond, and square watermarks  during the video

158.    In the aforementioned video, at the time when she was sharing a screenshot of my channel, this screenshot also included the "Acerthorn Channel Art 2022," as well as the octagon, pentagon, 5-point star, abnormal shape, diamond, and square watermarks. Again, none of these images needed to be shared. She was merely providing a screenshot of the channel, but there was no need for her to provide a screenshot of the channel. A link to my channel in the description of her video would have suffced just fine. See Monge above (finding a lack of fair use, even for legitimate news reporting, when use of non-copyrighted materials would have suffced, and also

when they use more copyrighted photos than what are necessary).

159.    Just like with the channel icon, she did not comment on or criticize these images in any way. So her use of all six of these images were not fair use. In fact, there was even *less* reason to use these images than there was to use the channel icon. At least with the channel icon, it was necessarily part of the screenshot of my channel, even if the screenshot itself was unnecessary. But if she had to use the screenshot, there was no reason why she couldn't have simply cropped out the bottom of the screenshot, where these six images were visible.

160.    Youtube is vicariously liable for this infringement for the same reason it is vicariously liable for Infringement #03. See ¶ 153.

### III-5: Infringements by Trysten Burge

161.    The following infringements were committed by Trysten Burge:

Infringement #12: Illegally viewing the April 10, 2021 livestream

162.    See Footnote #1 above for why this is still being included.

163.    While participating in APB, Burge received a clip from Karl Polano that was from my April 10, 2021 livestream. This clip depicted the "strange noises" section of the livestream.

164.    He knew or should have known that Polano and I were in active litigation with one another over his unauthorized distribution of this very clip. As a result, he knew or should have known that viewing that clip would be considered by me to be an infringement of my copyright.

Infringement #13: Illegally viewing the April 18, 2021 livestream

without me being paid 50% of the revenue

165.    While participating in APB, Rebolo received a clip from Karl Polano that was from our April 18, 2021 livestream. Because I am a co-author, I am entitled to half of the revenue generated from Polano's distribution of that clip. I did not receive this revenue. As a result, Polano's sharing of the clip was an infringement of my copyright. This is a commercial infringement for the same reasons that Infringement #02 was a commercial infringement; see ¶ 146. Because Burge was a willing audience (as opposed to a captive audience) for this infringement, he is just as liable for the infringement as the sender. See Capitol Records, Inc. v. Thomas-Rasset, 680 F. Supp. 2D 1045 (2010) (finding the person who downloaded songs to be

just as guilty of copyright infringement as the people she got the songs from, even if the latter parties could not be properly identified and/or brought before the court).

<u>Infringement #14: Using nearly all of my November 24, 2021 video</u>

166.    On January 5, 2021, Trysten Burge uploaded a video to his Youtube channel called "The problems with Acerthorn."

167.    In that video, Burge used a great portion of my video "Corrections Series is Canceled, and Here's Why." He used the "heart" of that video. As a result, his video could serve as a market replacement to my own video. He also did very little to criticize that specific video. Instead, the lion's share of his video was dedicated to discussing his frustrations with me responding to the comments I receive in my videos, which does not necessitate the use of any of my video content. Just like with Rebolo using my copyrighted 2D images, Burge could just as easily have made the criticism by providing screenshots of the comments I left, not the video content. According to Monge, this defeats fair use, even if you have a legitimate fair use purpose, such as news reporting. For these reasons, I believe his video does not count as fair use, even if his claim for fair use survives my collateral attacks against it under "abuse of rights" and "unclean hands."

168.    I issued a DMCA Takedown Notice against this video, and Youtube took the video down. Rebolo issued a DMCA Counter-Notification against the takedown, prompting me to file this lawsuit.

169.    However, on August 2, 2022, Youtube nonetheless reinstated the video anyway. Therefore, Youtube has lost its safe harbor and is vicariously liable for the infringement.

### III-6: Infringements by Creetosis

170.    The following infringements of my copyright were committed by John Doe #1, Creetosis:

<u>Infringements #15 & #16: STAG #6</u>

171.    On September 12 and 15, 2021, Creetosis performed two livestreams, where he and some friends of his watched two of my Youtube videos in their entirety, literally every second of them. One of those videos – Fallout: New Vegas Retrospective – is registered with USCO. They can be found at the URLs of https://youtu.be/gagv7c-CD-U and https://youtu.be/iZMk6tzXpm4, respectively.

172.     On January 15, 2022, I issued DMCA Takedowns against both of these videos, but YouTube refused to take them down. This means that YouTube is now vicariously liable for the infringement.

173.     These streams were commercialized. On multiple occasions during the live broadcasts of these streams, Creetosis received "super chats" from the people watching the streams, aka chat messages where monetary donations were attached to the message. Therefore, it is a commercial use of my copyrighted material, which weighs against fair use.

174.     In these two videos, Creetosis provided what he *believed* was criticism. In fact, his statements and opinions about me were just harassment, for reasons discussed in Section III-2-B of this complaint. Take, for example, Stag #7 at timestamp 2:53:12 – 2:53:27, when he states that I am the reason why bleach bottles have warnings on them not to drink it. This is not a tangible point on any of my videos. There is no specific allegations of shortcomings and no course of action I can take to improve on anything, even if shortcomings were specifically alleged. Per the distinction made in Section III-2-B of this Complaint (supported by numerous authoritative sources provided in ¶ 67), this is harassment, not criticism.

175.     But even barring that, 99% of Creetosis's alleged commentary fails the legal definition of "transformative" for a variety of reasons. First, in order to qualify as transformative under fair use law, the new commentary must be specifically directed towards the work being copied. You cannot use one work to criticize or comment on another work. See

https://youtube.com/clip/Ugkxx3910ym04KPfKtaOeZWvc0xC_uavq7IU. See also Seuss v. Comicmix, 983 F. 3d 443, 454 (9th Cir. 2020 ("*Boldly*'s claim to transformative use rests on the fact that it has 'extensive new content.' But the addition of new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative"). Therefore, in the multitude of instances, in these two livestreams that total 20 hours in length, when Creetosis and his co-hosts go off on long tangents about unrelated topics[11], those tangential conversations

---

11  For example, I don't remember the timestamp, but I do remember one time where I could hear Creetosis talking about how someone (who I thought at the time was me) defending the actions of Bethesda (the publishers of Fallout: New Vegas) for allowing fan mods to fix their games' numerous glitches and intentionally not fixing them themselves. I posted in the live chat, asking them to clarify where, exactly, I said that, and Creetosis clarified that he was not talking about me; it was another creator, who goes by the alias "Oxhorn," who said that,

cannot be used to support his claim to transformative use. He certainly has the right, under the First Amendment, to have these conversations (provided they don't amount to harassment, which is still illegal). Unlike the commercial nature of his streams, or his egregious shortcomings in the other three factors of fair use (which I will discuss soon), these conversations do not actively *weigh against* fair use as long as they aren't harassment. But they don't bolster the transformative value of his streams, either.

176.    In addition to that, the multitude of times he talks about *the game itself* also cannot be considered transformative. There is no need to use my copyrighted content if he just wants to criticize or review the game. In order to be transformative, his criticism must be laser-focused on *my video*, and the commentary and criticism contained therein, and absolutely nothing else.

177.    This criterion to be considered transformative singlehandedly eliminates about 90% of his stream's run time from consideration. Instead of it being 20 hours worth of criticism and commentary (which sounds absolutely massive on paper), it instead is only about 1-2 hours of criticism, and that's just the first criterion to be considered "transformative."

178.    Another important criterion is that the alleged "criticism" must actually say something substantial about the original work. It must aid in "the creation of new information, new aesthetic, new insights and understanding." see Seltzer v. Green Day, Inc., 725 F. 3d 1170, 1176 (9th Cir. 2013). This means that, in the many, many instances where Creetosis and his co-hosts merely register their disagreement with my opinions stated in the original video[12], that fails to add any new insights, meanings, or understandings, and therefore is not transformative. See https://www.youtube.com/clip/UgkxQEcpXJQyQv1Z6Vps_k3eMjXM0RB9hPoC (opining that the commentary "is about as minimal as it gets"). At best, it should only be considered the bare minimum amount of criticism, meaning it should only nominally add to his "transformative"

---

and they were criticizing him for saying that.

12 For example, at one point in the original video, I criticized the game's downloadable content (or DLC, for short), I expressed the opinion that "The DLCs, more than anything else in the game, needs to be good because you paying extra for them." When watching that section of the video on his stream, Creetosis paused the video and said "So it's a good thing, then, that the DLCs for this game are fucking excellent."

That is nothing more than him disagreeing with my opinion, nothing more substantial than that. If that is transformative at all, it is only the bare minium. He's going to have to do better than that if he wants to be considered "highly transformative" and therefore be allowed a great deal of wiggle room in the other factors.

value and, therefore, should not be enough to overcome the other factors. See Monge v. Maya Magazines, 688 F. 3d 1164 (9th Cir. 2012) (making numerous references, throughout the opinion, to how the secondary use had "minimal" transformative value as a primary reason why fair use was wanting). See also Castle Rock Entertainment v. Carol Publishing Group, 150 F. 3d 132 (2nd 1998) (same). I will certainly be going into more detail on this issue in Section IV-3-A of this Complaint.

179.    For a prime example of how to criticize someone else's criticism (A) without reviewing the game itself, and (B) in a way that actually provides substantial new insights and understandings rather than simply registering your disagreement with someone else's opinion and moving on, you can see this video: https://youtu.be/dHP02JEC5H0?t=18038. That is part 1 of a 2-part review of the video game "The Elder Scrolls V: Skyrim" that totals 20 hours long across both parts. However, at timestamp 5:00:38 – 5:07:32 of that video, he plays a portion of another person's review of the game from 2014, who goes by the alias "MisterCaption" (or "Caption" for short), he then spends seven minutes arguing against this criticism. This is a much stronger case for being considered "highly transformative" because he doesn't simply register his disagreement with Caption's opinion and leave it at that. He goes into great detail explaining exactly why he believes Caption's criticism is unfair and arbitrary. This fits the definition of "highly trans-formative" to a tee (as opposed to Creetosis's "bare minimum" transformative value), because he is actually *providing new insights and understandings* when it comes to criticism of art, rather than simply saying "Your opinion is wrong and you're an idiot" over and over again with slight variations. Also, during this 7 minute excerpt where he criticizes MisterCaption's criticism, he only occasionally mentions anything from the game, and only when it's necessary to illustrate his rebuttal points, rather than simply using Caption's criticism as a jumping off point to facilitate his own review of the game itself. Of course, it also doesn't hurt that he wasn't simply looking to harass and dox MisterCaption under the thinly-veiled guise of criticism, just because he could.

180.    99% of Creetosis's original commentary can be stricken for one of these two reasons. If the Defendants insist on pushing their narrative that these streams are indeed transformative, they will have to sit through these streams themselves, going over every bit of the streams, one

sentence at a time (like picking individual grains of rice out of a swimming pool), and they will have to determine whether each individual sentence can truly qualify as transformative, taking into account both of the criteria discussed above. If, after filtering out all the content that does not clear the bar, they are left with only 7-8 minutes of truly transformative content (or 7-8 minutes of content that qualifies as "the bare minimum" as described above), then that heavily cuts into their case for fair use before we even get to the other factors.

181.    Speaking of the other factors, this is, honestly, where Creetosis stopped even *trying* to follow fair use guidelines. For the second factor, the original work was composed predominately of me expressing my opinions about the video game "Fallout: New Vegas," explaining why I held the opinions I did, and also recalling my personal experience playing the game for my YouTube channel and the frustration and disappointment I felt. This weighs against fair use the same as works of fiction do. See Cambridge University Press v. Patton, 769 F. 3d 1232, 1270 (11th Cir. 2014) ("[W]e find that the District Court erred in holding that the second factor favored fair use … Where the excerpts of Plaintiffs' works contained evaluative, analytical, or subjectively descriptive material … or derives from the author's experiences or opinions, the District Court should have held that the second factor … weighed against fair use in cases of excerpts that were dominated by such material").

182.    The third factor weighs egregiously against fair use. In his reaction video, Creetosis played the *entirety* of my Fallout: New Vegas Retrospective video, literally every single second of it. This is an egregious violation of the third factor of fair use. In fact, it used to be the precedent in the 9th Circuit that, whenever a secondary user copied the entirety of the original work, that precluded fair use in its entirety. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1155 (9th Cir. 1986). Although that is no longer the case, the 9th Circuit has nonetheless held that using the entirety of the original work still means that the third factor weighs against fair use as a matter of course. See Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F. 3d 1110, 1118 (9th Cir. 2000) (citing Hustler, supra at 1155).

183.    In Stag #7, at timestamp 5:02:21, Creetosis admitted that he had not actually watched the original video before doing this stream, because he felt it was "more fun" to give his original

reactions to the content of the video. This, however, does not save him. His personal preferences do not grant him a license to ignore fair use guidelines. If it did, it would be impossible not to get fair use. In order for the third factor to weigh in his favor, Creetosis would have to prove that using the entire original video is actually and genuinely *necessary* to provide the criticism, and personal preferences do not equate to necessity. If he really wanted to use this particular model, he should have reached out to me beforehand and gotten my permission. He made several hundred dollars just in public super chats alone when he did those streams, so he could easily have thrown a few hundred bucks my way in exchange for a license[13]. Instead, his extreme sense of self-entitlement caused His Majesty to see such things as "royalties" and "licenses" and "compromise" and "good faith" to be beneath him.

184.    Moving onto the fourth factor – "undoubtedly the single most important element of fair use" (see De Fontbrune v. Wofsy, 39 F. 4th 1214, 1226 (9th Cir. 2022) (citing Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539 (1985)) – the STAG streams once again fail miserably to clear the bar. Again, they played literally every second of my Fallout: New Vegas Retrospective video. People who watched his streams necessarily also saw my video, just without me getting any benefit from it. In fact, Creetosis didn't even talk over my video, thereby providing an obstruction in order to incentivize people to view my original video in its place, like with Mystery Science Theater 3000. Instead, he frequently paused the video to give his input. This means that, if you cut out all the parts where he is talking, you would have a verbatim copy of my video.

185.    This constitutes a market substitute, per se. See https://www.youtube.com/clip/UgkxDPeQBnbcZAewwjxh7tHyYQPpeMkYUrNS ("by showing those clips in full to the audience ... it's entirely possible that you might not watch the [original] videos because you saw, basically, the whole thing in [the defendant]'s videos"). See also Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1154 (9th Cir. 1986) ("[B]y copying all or substantially all of the copyrighted work, the distinction of function vanishes since whatever the intent of the copier, a

---

13 Just like what the producers of "Mystery Science Theater 3000" used to do. See https://youtu.be/1Jwo5qc78QU?t=1152 at timestamp 19:12 – 20:22 ("Mystery Science Theater was ... absolutely transformative, but they still licensed the movies ... because yeah, playing someone else's entire movie, just with wisecracks over it? Probably not fair use"). See also https://www.youtube.com/clip/Ugkxznh99XHVyjyPhyQKWiWE_n8XASNgbpxW.

verbatim reproduction will of necessity serve the function of the plaintiff's work as well as that of the defendant's"). See also Cambridge University Press v. Patton, 769 F. 3d 1232, 1271 (11th Cir. 2014) ("A book reviewer who copies snippets of a book is likely to increase the demand for the book, but were a book reviewer to quote the entire book in his review … he would be cutting into the publisher's market, and the defense of fair use would fail"). See also Consumers Union of US v. General Signal Corp., 724 F. 2d 1044, 1051 (2nd 1983) ("The fourth fair use factor will come into play if too much is copied or if the entire plot is revealed, thereby usurping the demand for the original work").

186.    This market substitute not only means that the fourth factor weighs against fair use, but it negates Creetosis' claim to fair use in its entirety, to the exclusion of all other factors. Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539, 568 (1985) ("[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work. If the defendant's work adversely affects the value of any of the rights in the copyrighted work, the use is not fair") (citations and quotations omitted). "Actual present harm need not be shown ... Nor is it necessary to show with certainty that future harm will result. What is necessary is a showing by a preponderance of the evidence that some meaningful likelihood of future harm exists." See Sony Corp. of America v. Universal City Studios, Inc., 464 US 417, 451 (1984).

187.    It is also worth noting that, at one point in the original video, I began comparing the game "Fallout: New Vegas" to professional wrestling, and using clips from WWE to illustrate my point. When Creetosis reacted to this part of the video, he blacked out the screen so that only the audio could be heard. He admitted on stream that he was doing this because WWE would likely enforce its copyright against them if they showed the clips unabated. This is smoking gun evidence of a guilty conscience, where he admits that his reaction streams are not the solid cases for fair use that he currently insists they are[14].

188.    So all in all, Creetosis's STAG streams are actually extremely weak cases for fair use. The one factor he made even the slightest attempt to qualify for – criticism – is actually pretty weak

---

14 See https://www.youtube.com/clip/UgkxM6NkQHVww8GVxRrivT5FRzMgjiNNZrDZ.

when you consider the benchmarks for transformative use, but even barring that, the multitude of factors that weigh against fair use (including commercialization, and the totality of the other three factors) significantly weigh against his already dwindling case for fair use. See Monge, supra at 1183 ("Because the minimal transformation occasioned by [the defendant]'s use is amply outweighed by its commercial use, the first factor does not support the magazine. And, even if it did, this factor does not dwarf the effect of the other factors"). But even barring all of that, we mustn't forget that criticism is not the same thing as harassment, and as I explain in Sections III-2-B and III-3 of this Complaint, the defendants are all engaging in harassment against me that they are simply attempting to pass off as criticism.

<u>Infringement #17: Illegally viewing the April 10, 2021 livestream</u>

189.    See Footnote #1 for why this is still being included.

190.    While participating in APB, Creetosis received a clip from Karl Polano that was from my April 10, 2021 livestream. This clip depicted the "strange noises" section of the livestream.

191.    He knew or should have known that Polano and I were in active litigation with one another over his unauthorized distribution of this very clip. As a result, he knew or should have known that viewing that clip would be considered by me to be an infringement of my copyright.

<u>Infringement #18:  Illegally viewing the April 18, 2021 livestream</u>
<u>without me being paid 50% of the revenue</u>

192.    While participating in APB, Creetosis received a clip from Karl Polano that was from our April 18, 2021 livestream. Because I am a co-author, I am entitled to half of the revenue generated from Polano's distribution of that clip. See ¶ 146 for more details. I did not receive this revenue. As a result, Polano's sharing of the clip was an infringement of my copyright. Because Creetosis was a willing audience (as opposed to a captive audience) for this infringement, he is just as liable for the infringement as the sender. See Capitol Records, Inc. v. Thomas-Rasset, 680 F. Supp. 2D 1045 (2010) (finding the person who downloaded songs to be just as guilty of copyright infringement as the people she got the songs from, even if the latter parties could not be properly identified and/or brought before the court).

### III-7: Infringements by Viroza

193.    The following infringements were committed by John Doe #2, Viroza.

<u>Infringement #19: Downloading and Distributing the April 10, 2021 Stream</u>

194.    See Footnote #1 for why this claim is still remaining in the case.

195.    Viroza has downloaded and distributed the April 10, 2021 stream. He has publicly admitted to doing so. On February 6, 2022, he posted the "strange noises" section of the April 10 livestream with no alterations or modifications whatsoever. I issued a DMCA takedown against that video, and Youtube took it down.

196.    However, when that happened, Viroza made another video where he publicly announced his Discord ID (Alt Emi#0340), and then invited everyone to contact him on Discord to receive direct copies of the clip that was taken down. In the description of the video,  In the description of this video, he even said "[I] won't erase the MP4 I have, and have psoted everywhere. lol, lmao." I issued a DMCA takedown against this video, but Youtube refused to take it down. Because it is still up, the Court can see it by going to the URL of https://www.youtube.com/watch?v=k7eUc3YVAlE.

197.    However, Viroza has also infringed on another one of my copyrights on Twitch. This leads me to …

<u>Infringement #20: Infringement of "Acerthorn Channel Icon 2022"</u>

198.    On February 13, 2022, he attempted to do a simulcast of one of my Twitch livestreams. In doing so, he also shared my copyrighted channel icon without commenting on or criticizing it in any way. Even if his reaction to my Twitch livestream would have been fair use, his showing of the channel icon was not necessary. He could easily have avoided showing that icon through the simple expedient of playing the livestream in full screen mode. Then, the channel icon (which is displayed below the stream itself on my channel's page) would not have been visible on his stream.

199.    It is also worth noting that he is a V-Tuber. That means that he uses an anime, cartoon picture in place of his own face whenever he makes videos. This means that, even without playing the stream in full screen, he could easily have avoided showing the icon through the

simple expedient of placing his V-Tuber character over the icon while he was reacting to my stream.

200.    Because there were many "viable alternatives," his showing of my channel icon is not fair use. See ¶ 155 of this Complaint.

### III-8: Infringements by SidAlpha

201.    The following infringements were perpetrated by John Doe #3, SidAlpha:

<u>Infringement #21: Downloading the April 10, 2021 Stream</u>

202.    See Footnote #1 for why this claim is still remaining in the case.

203.    During January of 2022, SidAlpha received, from Karl Polano, a copy of the April 10, 2021 stream, which he then voluntarily accepted. I know he did this because he proceeded to make a video that included this clip (see Infringement #22). His use of the clip necessarily means he *acquired possession* of that clip (because duh). However, because he did not pay me the $20 per month needed to access it through authorized means, that means he necessarily acquired it through unauthorized means.

<u>Infringement #22: Distributing the April 10, 2021 Stream</u>

204.    See Footnote #1 for why this claim is still remaining in the case.

205.    Multiple infringements of the same copyrighted work by the same defendant cannot result in duplicate statutory damages. Furthermore, if SidAlpha is found guilty of Infringement #21, then undoing this infringement will be part of the injunctive relief I should receive in connection with Infringement #21 (since it is axiomatic that he would not have been able to commit this infringement if Infringement #21 had never occurred). However, for reasons that will soon become apparent, I believe this particular act of infringement warrants special consideration.

206.    On February 12, 2021, SidAlpha published a video where he heavily harassed and doxxed me for my use of the DMCA to protect my copyrights. This is not "criticism" for the reasons I have already discussed in ¶¶ 91-96, ¶¶ 105-108, ¶¶ 114-115, and ¶¶ 121-123 of this Complaint. This all started because people wanted to harass me. SidAlpha defended their right to harass and dox me. Therefore, he is willingly a party to the harassment and doxxing. It's as

simple as that. It's not criticism. There is literally not one single solitary sentence of criticism in the entire smear video. The entirety of the video is nothing but harassment/wolf in criticism/sheep's clothing.

207.    At timestamp 52:16 of this smear video, SidAlpha proceeded to use the "strange noises" clip from the April 10, 2021 stream. Even if we ignore "unclean hands" as a counter-defense to fair use, his use of my clip in this case still falls short of the bar.

208.    While his playing of the clip begins at 52:16, he begins talking about it slightly before then. At timestamp 52:13, he describes the behavior as "odd." That's it. That is where the totality of his "criticism" and "commentary" of this clip begins and ends.

209.    After he uses the word "odd" to describe the clip, he then plays the "heart" of the work, without any visual or auditory obstructions whatsoever, and therefore, just like Creetosis's videos ¶¶ 89-90 of this Complaint, serving as a market replacement for the original. Once he had played the clip, he then abandoned all discussion of the clip itself and recommenced his previous discussion of my usage of the DMCA takedown system, which he believed to be abusive.

210.    His use of the clip is accompanied by de minimus transformative value, so it fails the first test for fair use. He used the "heart" of the work, so it fails the third factor for fair use, and because it contains no visual or auditory obstructions, nor any changes whatsoever to the clip, it serves as a market replacement.

211.    You could have removed the contents of 52:13 – 53:09 of that video completely, and the rest of the video would still have made perfect sense. The excerpt found at 52:13 – 53:09 is entirely unnecessary for the rest of the video. It is clear that his only ambition with that excerpt was not to comment on or criticize the clip, but rather, just to *share* the clip for its own sake.

212.    Therefore, whether he acted with unclean hands or because his use of the clip simply fails the Four Factors Test, his use of the clip in this case is not fair use.

213.    Normally, his subsequent sharing of the clip would be redundant of his illegal acquisition of the clip, for the reasons I stated ¶¶ 103 & 112 of this Complaint. However, if the Court agrees with my assessment in ¶¶ 112-118 of this Complaint, then this may be one of the few instances where actual damages may be greater than the maximum allowed statutory damages.

214.   With Infringements #15 & #16, I am limited to actual damages. But in all other instances, I can choose between actual or statutory damages. If Infringement #23 is found to be fair use, then I may still be entitled to an injunction to have it taken down for reasons I discussed in ¶ 112 of this Complaint. But if it is not found to be fair use, then I would be entitled to actual damages of $20 per view that this video has received before being taken down.

215.   I issued a DMCA takedown against this video, but so far, Youtube has failed to take it down. Therefore, they have forfeited their safe harbor and can be held vicariously liable for this act of infringement.

<u>Infringement #23: Use of "Acerthorn Channel Icon 2022" in the smear video</u>

216.   At timestamp 6:04 of the smear video, SidAlpha showed a screenshot of my channel, which included "Acerthorn Channel Icon 2022." This was a superfluous addition. There was no reason why he couldn't have simply provided a link to my channel in the description of his video. If he wanted to document my alleged DMCA abuses[15], he could have simply showed screenshots of the email notifications sent to the recipients of those DMCA takedowns. You cannot show parts of a work that are unrelated to your criticism and still call it transformative, and you certainly don't have the right to show 100% of a completely separate copyrighted work just to comment on or criticize an artist.

217.   Therefore, even barring the harassment, this infringement is still not fair use for the same reasons as Infringement #04 is not fair use. See ¶¶ 155 & 156.

**III-9: Infringement by Rogue, Internet Man**

218.   The following infringements were perpetrated by John Doe #4, Rogue Internet Man:

<u>Infringement #24: Downloading the April 10, 2021 Stream</u>

219.   See Footnote #1 for why this claim is still remaining in the case.

220.   On January 15, 2022, Rogue Internet Man publicly posted a tweet on his Twitter feed. You can view this tweet by going to the URL of https://twitter.com/RogueManYT/status/1482481430378819587. As the Court can clearly see, he admits to possessing (and having already viewed) the April 10, 2021 stream.

---

15  And I emphasize the word "alleged." See Case 4:23-cv-00321-DMR (Stebbins v. SidAlpha), Dkt. 1, ¶¶ 9-57 for more details.

221.   Because of the factual allegations of ¶ 25 of this Complaint, he necessarily acquired possession of this video by illegally downloading it, most likely from Karl Polano. Therefore, he is liable to me for infringing on my copyright.

### III-10: Infringements by Non-Defendants

222.   In addition to the infringements mentioned up to this point, there are a few acts of infringement which were perpetrated by people who I have not listed as defendants in this action. This is because I have no reason to believe that any of the corporate defendants have these people's real names or addresses on file, so my prospects of finding them and bringing them before the Court are slim. However, with both of these infringements, Youtube has failed to take the infringing content down despite me issuing DMCA Takedowns against them. Therefore, Youtube LLC can be held vicariously liable for these infringements.

### Infringement #25: Infringement by MothPerson

223.   See Footnote #1 for why this claim is still remaining in the case.

224.   On February 16, 2022, a Youtuber by the name of MothPerson posted a video called "Acerthorn Goes Super Saiyan." You can view the video here: https://www.youtube.com/watch?v=7gxD3dC04h4

225.   As you can see from that video, MothPerson merely superimposed some footage from the Japanese cartoon "Dragon Ball Z" onto the audio of the "strange noises" clip from the April 10, 2021 livestream. This is not fair use. "[T]he addition of new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative." See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 453 (9th Cir. 2020). His use of this Dragon Ball Z footage fails to comment, criticize, or otherwise transform the audio clip from the April 10 stream in any way, shape, or form. See id at 454 ("While Boldly may have altered Star Trek by sending Captain Kirk and his crew to a strange new world, that world, the world of Go!, remains intact"). Therefore, his video fails utterly to qualify as fair use.

### Infringement #26: Infringement by an imposter Acerthorn

226.   See Footnote #1 for why this claim is still remaining in the case.

227.   There is currently a Youtube channel which goes by the name "Acerthorn's Good Clone."

You can find that channel by going to this URL: https://www.youtube.com/watch?v=k7eUc3YVAlE. He has not yet made any public videos (let alone any that infringe on my copyright), but his channel icon is a picture of my face, taken from the April 10 stream. I know it comes from that stream because I am not wearing a shirt in this image, which, as I explain in ¶ 23 of this Complaint, necessarily means that it came from that stream.

228.    This imposter Acerthorn has made absolutely no effort whatsoever to comment on, criticize, or in any way transform this image. He has done absolutely nothing that could even remotely be considered fair use. He has simply stolen an image from one of my copyrighted streams without even the pretense of or attempt at legitimacy.

229.    Despite the complete and utter lack of fair use, Youtube has not taken the image down despite me issuing a valid DMCA takedown against it. Therefore, Youtube is vicariously liable for this infringement.

### III-11: Fraudulent DMCA Takedowns by Bibi Faizi

230.    After SidAlpha made his smear video about me (which forms the basis for Infringement #23), many people began harassing me, both on and off Youtube. One person, however, did so in a way that provided me a means of tracking him down and holding him liable.

231.    On February 13, 2022 (one day after SidAlpha's smear video about me was published), I received three emails from Youtube stating that some of my videos have been taken down due to DMCA Takedown Notices issued by a Youtuber who goes by the psuedonym "Bibi Faizi." This person had issued DMCA takedowns against ten of my videos on Youtube. I issued DMCA Counter-Notifications against these takedowns, and the videos were subsequently reinstated on March 1, 2022.

232.    In the meantime, however, the videos remained taken down, and I was unable to obtain views, watch time, or ad revenue for these videos, because access to them was disabled. In addition to that, because I had received three or more copyright strikes, my channel was locked for the duration of these Counter-Notifications, and I was unable to upload any new videos to my channel until these strikes were taken off.

233.    Every single one of these DMCA Takedowns were entirely fraudulent. None of them

contained even a single frame of any content which Bibi Faizi owns the copyright to. Literally all of them contained content that was either copyrighted by me (such as footage from my own webcam), was in the public domain, or which I had obtained permission from the copyright owner to use.

234.    Here is a breakdown of all ten videos which Bibi Faizi had taken down, their video titles, their video urls, and a brief explanation of how every piece of these videos were comprised exclusively of content that Bibi Faizi does not have even an arguable claim to.

| Video Title | Video URL | All Content Used |
|---|---|---|
| Creetosis is a Toxic, Lying Sack of Sh*t! | youtu.be/Nbl8fwIczFg | The audio is entirely my voice, with the background music being the song "Do Not Look Back" by Nihilor, which you can find here: https://youtu.be/0Zj5c8nVaTs<br><br>The video is almost exclusively footage of the video game Fallout: New Vegas, which is copyrighted by Zenimax, Inc. however, there is also a brief clip of Stag #7 (mentioned above), as well as a screenshot of a comment left by someone known as "Imperious Studios." Whether fair use or not, these are not Bibi Faizi's copyrights to enforce. |
| Corrections Series is Cancelled, and Here's Why - #Shorts | youtu.be/QNP4K1nviFA | Audio is, once again, nothing but my voice plus Nihilore's song.<br><br>The video consists primarily of screen-shots of other people's comments, as well as clips I pulled from the website of pixabay.com, which explicitly licenses their clips for commercial use, with no attribution required. If Bibi Faizi had any of his copyrighted clips used in this video, he either knew or should have known that he had permitted their use when he uploaded them to Pixabay. |
| I did it! - Acerthorn Moments - #Shorts | youtu.be/b-7mAYNJAgI | Footage consists entirely of the video game "Fall Guys," and of my face. |

| | | Meanwhile, audio consists entirely of that game's soundtrack, as well as my voice. |
|---|---|---|
| I will publicly respond to SidAlpha - Livestream Tomorrow at 3PM CST | youtu.be/hXpCc0wf1dY | Again, footage is exclusively gameplay footage of a game that Bibi Faizi does not own the copyright to (I believe it was Minecraft, but I do not remember exactly and the video has since been taken down), as the audio is exclusively my voice and Nihilore's song. |
| Can't Exit BIOS? Try This Before You Spend Money! #Shorts | youtu.be/sJIsGwDQML8 | Audio is entirely my voice. Not even any background music.<br><br>B-Roll footage is of the video game "Rocket League." Occasional screenshots were provided, but one of them was for a troubleshooting video, and another was a screenshot of the Windows installation system, which is copyrighted by Microsoft. Nothing that Bibi Faizi even arguably owns the copyright to. |
| Mantitties and Neck Strain - Acerthorn Moments - #Shorts | youtu.be/AIIsgKF4aEc | Bottom footage is gameplay of the video game "Fable Anniversary," which is owned by Microsoft. Top footage is my original facecam footage. Audio is a combination of the game's audio and my voice. No other content was even nominally used. |
| The REAL Reason Behind the "You Didn't Play Enough" Excuse (Livestream Highlight) | youtu.be/f7fwKDBnZ5Q | Audio is entirely my voice (specifically, it is the clip I used in ¶ 42(c) above to prove that the livestream had minimal creativity). The video is just the "Acerthorn Channel Art 2022." 2D image. In addition to that, the majority of the visuals of the video consisted of text overlays which I created all by myself, and a few screenshots of news articles. Even if my use of those news articles was not fair, they were not Bibi's copyright to enforce. |
| Livestream Archive | youtu.be/ykYYyJZHeYs | Audio and video are exclusively |

| | | |
|---|---|---|
| - Epic Stalwart Fight | | comprised of my voice, my facecam footage, and gameplay footage & audio from the video game "Final Fantasy X-2," (which is owned by Square Enix Holdings Co Ltd, as well as text overlays I created myself. |
| Playing Dead Rising for the First Time Ever (w/ Yung Bubby) | youtu.be/7EaGYFNlmgk | Footage is entirely of the video game "Dead Rising," which is owned by Capcom. Audio is exclusively the game's sound, plus my voice and the voice of a guest star I had on the stream. Regardless of overall legalities, Bibi Faizi has no copyright to enforce here. |
| Win Free Video Games! Introducing … the Secret Joke Contest! | youtu.be/HGwg6_jp7JM | Footage is exclusively from various video games. Audio is exclusively my voice, and various royalty-free songs, including "Do Not Look Back" by Nihilore and "Corruption" by Kevin MacLeod. |

235.    As you can see, none of these videos contained even a lick of content that is copyrighted by Bibi Faizi. The closest you can get to him even arguably owning the copyright to any content I used is when I used clips from pixabay.com, and even then, by uploading his clips to that site, he either knew or should have known that he was giving general permission to everyone on earth (including me) to use the clips in their own work and profit off of their use. Put simply, he couldn't possibly have legitimately believed that I had actually infringed on his copyright, even without "considering fair use."

236.    Instead, it is far more likely that Bibi Faizi issued these false DMCA Takedowns in order to retaliate against me for my own usage of the DMCA takedown privilege, which he perceived to be abusive. It's clear that he just wanted to give me a taste of *what he considered to be* my own medicine. This, however, is a blatant violation of § 512(f)(1). This is made even more obvious when you realize that these takedowns happened almost immediately after SidAlpha published his smear video about me, thereby giving Bibi an *incentive* to do this. The odds that the timing was coincidence is one in a million.

**IV: ARGUMENT & LAW**

237.    The following laws are relevant to this Complaint:

**IV-1: Prima Facie Copyright Infringement**

238.    "[T]here are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant." See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1151 (9th Cir. 1986).

<u>IV-1-A: Eligibility for Copyright Protection</u>

239.    As I explained when I established the existence of each copyright, each of these works contains, at the very least, the bare minimum of creativity and originality to be eligible for copyright protection. The closest you can get to lacking original creativity is the video "Corrections Series is Cancelled, and Here's Why," and only then, because the video is so short and therefore has fewer opportunities for my original personality and creativity to shine through. But even that video contains at least a few instances of original expression in my commentary and voice.

240.    As I pointed out when defending the copyrightability of the 2D images, a lawyer has agreed with me that these images do indeed have minimal creativity. In fact, as I pointed out, they contain even more creativity than his website's artwork, and he claims that webpage was granted registration without any trouble.

241.    For all other copyrighted works, we must remember that the Copyright Office granted registration to all of those other videos, without any difficulty. Remember that the Copyright Office will not accept an application for registration until you either upload or mail in a copy of the work you are attempting to register. They won't even put your application in the queue until you do that. Therefore, they obviously had the ability to view the underlying works when considering my applications. They obviously saw, with their own two eyes, the level of creativity and originality that went into those videos, and so they promptly granted registeration. Unless the Court is prepared to declare the employees at the Copyright Office are completely incompetent at their jobs and don't recognize minimal creativity when they see it (even though it is *literally their job* to notice these things), then their favorable decision on my behalf should at least be worth

*some deference* by the Court, even if I do not receive a statutory presumption of copyright validity as set forth in 17 USC § 410(c).

242.    All of these videos were obviously stitched together manually, and so they constitute works of human authorship. In all cases, the videos are in the form of mp4 computer files, which count as a tangible medium of expression. The 2D images, meanwhile, are all in the form of png computer files, which also count as a tangible medium of expression.

243.    Therefore, all of these works are eligible for copyright protection.

<u>IV-1-B: Copying by the Defendants</u>

244.    In all 26 instances of infringement, I have adequately alleged that the defendants all copied my copyrighted works. Whether it be showing my channel icon and a few of the watermarks, or more blatant cases of infringement like #15 and #16, each of these count as copying for purposes of copyright infringement. Therefore, I have sufficiently alleged prima face copyright infringement.

**IV-2: Vicarious Liability**

245.    Infringements #01, #02, #03, #12, #13, #17, and #18 all occurred on Discord. They have safe harbor, except for prospective injunctive relief under 17 USC § 512(j).

246.    Infringement #20 occurred on Twitch. They took the content down when I asked them to. Therefore, they also have safe harbor except for prospective injunctive relief.

247.    Infringements #04, #05, #06, #07, #08, #09, #10, #11, #14, #15, #16, #19, #22, #23, #25, and #26, however, all happened on YouTube. When I issued DMCA Takedowns, YouTube either refused to take them down (such as in the case of Infringements #15, #16, #22, #23, #25, and #26), or they reinstated the videos even after I had filed suit for them (such as with Infringements #01-#11 and #14). Therefore, they have lost their safe harbor and are vicariously liable for these infringements.

**IV-3: Unclean Hands**

248.    In each of the infringements listed above, I gave specific arguments as to why each infringement failed to constitute fair use. However, as I explained in Sections III-2 and III-3 of this Complaint, all of these videos were designed solely to harass and dox me out of pure malice

and spite. There actually was no criticism at all in any of these videos. Even the content that might be mistaken for criticism at first glance was just harassment/wolf in criticism/sheep's clothing. That is a factual argument, not a legal one.

249.    But even if the Court disagrees and insists that the underlying attacks against me are in fact criticism rather than harassment, there is still a very good reason why the harassment should negate fair use as a matter of law: The doctrine of unclean hands.

250.    When passing the 1976 statute that is the current applicable Copyright Law, "The House Report expressly stated that the fair use doctrine is an 'equitable rule of reason.'" See Sony Corp. of America v. Universal City Studios, Inc., 464 US 417, 448 n. 31 (1984). "From this … it would follow that unclean hands and all other equitable considerations are pertinent." See Leval, P. (1990). Toward a Fair Use Standard. Harvard Law Review, 103(5), 1105. doi: 10.2307/1341457.

251.    Leval would go onto admonish the judiciary for assuming that fair use is quitable, and explain how the history of fair use shows that it originated in law, not chancery. But guess what: That doesn't matter! Even if it was erroneous for the judiciary to slowly gravitate towards seeing fair use as an equitable rule, it doesn't matter what the courts of the 19th and early 20th centuries thought. As of the Copyright Act of 1976 (the current one), fair use's status as an equitable rule is, for better or worse, codified by Congress. Don't like it? Too bad. That's the law. Says who? Says Congress!

252.    And since fair use is now codified in law as being equitable, that means unclean hands is an exception to it. If anything, there needs to be a positive law stating that unclean hands *isn't* an exception to fair use, not a positive law stating that it *is* an exception, because the fact that fair use is equitable is all we need for unclean hands to necessarily be part of the package.

253.    In Google v. Oracle, 141 S. Ct. 1183 (2021), the Supreme Court recited a portion of Leval's treatise when it held that "[c]opyright is not a privilege reserved for the well-behaved." See id at 1204. However, this is actually of minimal value to the instant case for a variety of reasons. First, that was only dictum; in fact, the Supreme Court explicitly said it was dictum when they said "We have no occasion here to say whether good faith is as a general matter a helpful inquiry" immediately thereafter. Second, short of declaring the law unconstitutional

(which they have not done here), the Supreme Court cannot nullify the express Congressional intent[16] that fair use is meant to be an equitable rule.

254.   Third, if the Defendants insist on pushing this as binding precedent, the Court must also reject the defendants' assertion that I am just trying to silence criticism about me.

255.   What do I mean by that? Well, when the Supreme Court said that "copyright is not a privilege reserved for the well-behaved," they were reciting an excerpt from the aforementioned treatise "Toward a Fair Use Standard" by Pierre Leval. However, if you actually go and *read what he wrote*, you realize that he was actually going to bat for precisely the type of behavior that the Defendants have accused me of in this case: Suing for copyright infringement just to silence criticism! Rather, Leval's logic was that, if plaintiffs are allowed to do that, it's only fair that defendants get to claim fair use even when they act in bad faith. See id at 1127-28:

> "The temptation to determine fair use by reference to morality also can lead to examination of the conduct and intentions of the plaintiff copyright holder in bringing the suit. The secondary user may contend that the copyright holder is disingenuously invoking copyright remedies as a device to suppress criticism … Like a proprietor of land or an owner of contract rights, the copyright owner may sue to protect what he owns, regardless of his motivation."

256.   Therefore, according to the very logic upon which the defendants rely to make its case that their bad faith harassment and doxxing is irrelevant, they must likewise abandon the accusation that I am simply attempting to silence online criticism. According to the very precedent they defer to, either both are relevant or neither are relevant. It's only fair.

257.   If you disagree with Leval's logic entirely, then that just means we're back to square one, with fair use's status as an equitable rule being codified by Congress without any authority to contradict that.

258.   But one thing the defendants absolutely should not be allowed to argue is that the good faith requirement is only a one-way street, that plaintiffs have to act in good faith at all stages of the matter, but defendants do not. That would be the epitome of an unfair legal system.

259.   So no matter how you slice it, the defendants' clear bad faith and malice (as clearly

---

16  The legislative intent is generally considered to be second only to the "plain meaning rule" in terms of statutory construction, and the Committee Notes are indispensable in identifying legislative intent.

evidenced by their repeated actions over the past few years) are a counter-defense to fair use.

260.   Free speech would not be chilled if the Court were to adopt a policy in my favor on this issue. Even political speech – which typically occupies the absolute highest rung of First Amendment protection – is limited whenever people knowingly and maliciously publish false statements about government officers out of pure malice and spite. See New York Times Co. v. Sullivan, 376 U.S. 254 (1964).

261.   Those who are exercising their right to fair use in good faith would not be deterred from further exercise of their rights just because of this precedent. The only ones who would be chilled are those (like the defendants in this case) who view fair use as one of only two irreconcilable extremes: Either the mere addition of only a few words of token criticism provides total immunity from copyright law to the exclusion of all other factors, or fair use never applies to any copyright infringement, ever, under any circumstances, no in between. But aside from those extremely few (and extremely delusional) people, nobody in their right mind would look at a precedent stating that infringement done purely out of a desire to harass the target rather than criticize his work is not fair use, and think that would chill good faith criticism.

262.   For sure, Courts should be weary of borderline cases. They must be cautious to avoid labeling well-intended criticism as harassment simply due to less-than-ideal execution of said criticism. But where, as here, it is extraordinarily clear that the defendants have no ambition beyond simply inflicting as much pain on me as humanly possible, entirely for its own sake, while hiding behind an ultra-thin layer of token "criticism" as a shield for their blatantly malicious behavior, there is no risk of a chilling effect.

263.   But even if unclean hands, as a matter of law, is inapplicable as a counter-defense to fair use, there is still a compelling public policy reason why it should apply here.

### IV-3-A: This particular brand of unclean hands deserves to be a counter to fair use, more than any other type of unclean hands.

264.   Even if unclean hands, generally, is not a counter-defense to fair use, the defendants' harassment in this case should still nullify their case for fair use, for one simple reason: To apply fair use in this case would be egregiously counter productive to the very public policy that fair

use exists for in the first place. "The fair use doctrine thus permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." See Campbell v. Acuff-Rose Music, Inc., 510 US 569, 577 (1994). But in this case specifically, it is the defendants' harassment, not a "rigid application" of copyright law, which stifles creativity.

265.    Criticism is often considered transformative. In fact, it is often considered *quintessentially* transformative. The Supreme Court has correctly acknowledged that the constitutional imperative surrounding copyright law – to "promote the science and useful arts" – is generally enriched by transformative content such as criticism and parody. See Campbell, supra at 579. I do not seek to challenge this long-established principle. But this just begs the question: Why? Why does criticism enrich the science and useful arts? How exactly does it do that?

266.    The answer to that question is obvious if you think about it for even a few minutes: When art is criticized, its strengths and weaknesses are typically brought into focus. Although the work in question cannot be changed, since it is already published, all subsequent works of art can use the feedback from the previous works and incorporate that feedback into their designs, hopefully maximizing the strengths and minimizing the weaknesses of what came before it. Once finished, this new work will, itself, become subject to similar criticism and scrutiny, which future creators can take to heart when designing their future creations. Ideally, this "cycle of feedback" – assuming that both artists and reviewers alike participate in the cycle in good faith  – should result in art becoming better and higher quality over time. This long-term benefit to the creative arts is certainly worth a short-term bruising of individual artists' egos.

267.    That, however, also paints a perfect image as to why *harassment* should not be considered "transformative." Whereas criticism, when done correctly, aims to improve art over time, harassment does not have that same benefit. Rather than "promoting" the science and useful arts, harassment actively suppresses it. The whole point of copyright, and the legal monopolies created by it, is to entice artists to create by luring them in with the opportunity to profit from their creations, but harassment actively undermines the incentives to create by

discouraging would-be creators from getting into the fields they'd otherwise be interested in.

268.    Many would-be harassers insist that artists "have to learn to take criticism," otherwise they simply are not cut out for the creative fields. However, there is a big difference between professional reviewers, in highly-edited and proofread reviews, published in newspapers, periodicals, and/or TV shows, pointing out a movie's shortcomings and flaws and using specific examples from the movie to illustrate their criticisms, versus a bunch of untrained, undisciplined virgins in their parents' basements with nothing but a smartphone, an extreme sense of self-entitlement, and precisely zero critical thinking skills launching vile, toxic, vulgar, line-crossing personal insults designed solely to inflict pain towards anyone they don't like, while hiding behind the anonymity of the Internet, simply because they can. The latter is not the least bit conducive to the overall goals of promoting the science and useful arts. In fact, it actively suppresses it by discouraging potential creators from creating.

269.    In order for criticism to fulfill its legal role of promoting the science and useful arts, the feedback in question has to be specific, tangible, and actionable. It has to be something that creators can actually use in future works in order to guide and direct said works. This requires that the criticism in question be offered with a healthy regard to the distinctions I mentioned in Section III-2-B. Alleged "criticisms" such as calling me deranged, saying that I'm the reason why there are warnings on bleach not to drink it, or other vulgar insults, do not in any way, shape, or form help to improve art over time. Even relatively polite disagreements with my opinions still do not have this quality about them if they amount to little more than simply registering their disagreement with my opinion while offering nothing more. Such feedback, even if given relatively politely, fails to "add value" to the original, and therefore is not transformative.

270.    To be clear, I am not advocating that copyright law does, or should, create a positive right for creators to be absolutely free from any/all deterrence from entering the creative fields. For example, artists are not entitled to government subsidies should their art fail to turn a profit, so the threat of poverty and starvation may serve as a valid deterrent to those who may otherwise pursue artistic endeavors that may require they quit their day job in order to properly pursue. Also, the threat of being disowned by one's family is certainly a valid and lawful deterrent to

entering morally controversial creative fields such as pornography. But that does not mean that plaintiffs and courts are obliged to suffer in silence when wholly malicious defendants like these are going out of their way to engage in conduct that is *already illegal to begin with*[17], in order to actively create *more* deterrents to creativity than those which already occur naturally.

271.    The Defendants disagree with this argument. I understand that. They probably believe that even harassment should be considered fair use because, in their opinion, criticism's status as fair use is just as much "codified by Congress" as fair use's status as an equitable rule, as I explained above. From this assumption, it would follow that they would have the right to take a similar attitude towards me as the one I took in ¶ 251 above. But that assumption is dependent on an extremely narrow-minded, extremely self-entitled, and extremely inaccurate interpretation of how fair use actually works. The overwhelming legislative and judicial history of fair use utterly crushes the defendants' beliefs that this is how fair use works "whether Acerthorn likes it or not."

272.    Put simply, criticism is quintessentially transformative, not because "it just is," but because, when done right, it contributes to the cycle of feedback that improves art over time. By contrast, harassment is not transformative, not because "it just isn't," but because it actively sabotages and actively suppresses the science and useful arts through antagonism, aggression, and bullying while offering nothing of value in return, and there is no good public policy reason for the Court to hold otherwise.

273.    For this reason alone, the Court should hold that the defendants' harassment *in this case* negates their claim to fair use, even if it declines to take that stance generally.

### IV-6: DMCA Misrepresentation

274.    To state a claim for DMCA misrepresentation, I must allege (A) the defendant issued a DMCA Takedown against one or more of my online submissions, (B) the takedown contained materially false statements by the issuer, (C) the issuer *knew* the statements in question were false, and (D) the ISP (in this case, Youtube) relied on those misrepresentations when removing the online content to my detriment.

275.    As I explained in Section III-11, Bibi Faizi had absolutely no claim to any content

---

17  Remember: Harassment is already both a crime in every state, and a civil tort in California. It is also a federal felony under 18 USC § 2261A(2)(B).

copyrighted by him (if he even has any copyrighted content to claim at all), being used in any of my videos, and no reasonable person would believe otherwise. He knew that the videos he was striking did not contain any of his content. Instead, the timing of the strikes (February 13, 2022, one day after SidAlpha published his smear video about me) means that it is overwhelmingly likely that he issued these DMCA Takedowns against me in order to extrajudicially punish me for the crimes that SidAlpha publicly (and falsely) accused me of, which counts as harassment per se, as I explained in ¶ 71 above. Therefore, I have sufficiently plead facts which support a claim of DMCA Misrepresentation.

## V: RELIEF REQUESTED

276.    I request the following relief from the defendants:

### V-1: Prospective Injunctive Relief against Perlmutter

277.    First, I request an injunction against Shira Perlmutter to register my copyright for my ten 2D images, with December 9, 2021 as the effective date of registration for purposes of 17 USC § 410(c), 17 USC § 412, and any other law where the effective date of registration is a relevant factor.

278.    This injunctive relief should apply, even if all the individual defendants' uses are found to be fair use, since an adverse ruling will permanently affect my legal rights going forward in all future cases.

### V-2: Prospective Injunctive Relief Against All Other Individual Defendants

279.    Next, I ask that all the individual defendants be ordered to …

(a)    Remove any instances of copyright infringement from their social media accounts and cloud storage accounts;

(b)    Submit all of their computers and smartphones for impounding to a third party, so that their devices may be cleansed of any instances of unauthorized infringements of my copyright, pursuant to **17 USC § 503**;

(c)    To cease and desist any infringement of my copyright; and

(d)    To remove, from any website, any instances of my copyright that would not have existed, but for their infringement, even if they personally weren't the ones who put them

there.

<h3 style="text-align:center">V-3: Damages</h3>

280.    I have alleged 26 different infringements of my copyright. For two of those infringements (#15 & #16), I am limited to actual damages. For one of those infringements (Infringement #22), I may opt for actual damages. This leaves a total of 23 other acts of infringement where I am eligible for statutory damages.

281.    I request statutory damages of $150,000 for each count of infringement. This makes for a grand total of $3,450,000 across the various defendants.

282.    For Infringements #15 & #16, I request to be compensated all of the profits (however much that may be) that Creetosis and YouTube LLC earned from their streams which infringed on my content.

283.    For Infringement #22 (assuming the judge's earlier verdict is overturned on appeal), I request actual damages of $20 for every view that SidAlpha's video about me earns before it is taken down.

<h3 style="text-align:center">V-4: Compensatory and Punitive Damages for DMCA Misrepresentation</h3>

284.    For the claim of DMCA Misrepresentation, I request compensatory damages of approximately $17,000. This amounts to $100 per day for every day that the ten videos were taken down (February 13 through March 1, 2022), for all ten videos.

285.    I reach this amount because, in the 1981 case of Maxwell v. Mason, 668 F. 2d 361 (8th Cir. 1981), the Eighth Circuit held that, for injuries that occur over a period of days, but where no inherent monetary value can be gleaned from it (such as administrative segregation in prison), compensatory damages in the vicinity of $100 per day was considered a reasonable amount of compensatory damages. In Trobaugh v. Hall, 176 F. 3d 1087 (8th Cir. 1999), they even reversed a district court's award of nominal damages, upholding the Maxwell precedent. See id at 1089.

286.    There were ten videos that were fraudulently struck. That amounts to $1,000 per day for all ten of them. These videos remained taken down for seventeen (17) days after that, (from February 13, 2022 until March 1, 2022 when the videos were finally reinstated) while my DMCA Counter-Notification was being processed and he was being given the opportunity to file

a lawsuit against me. 17 days at a rate of $1,000 per day comes out to $17,000 in compensatory damages.

287.    In addition to that, I also request punitive damages, up to $170,000 (or ten times the amount of compensatory damages, which is typically the maximum allowed multiplier for punitive damages) against Bibi Faizi. See Trobaugh, supra at 1089:

> "Further, we ask the District Court to reconsider awarding punitive damages against [the defendant]. The undisputed evidence showed that [the defendant] deliberately punished [the plaintiff] for exercising his First Amendment right to submit [DMCA Takedowns in good faith] … This conduct amounted to reckless or callous indifference to [the plaintiff]'s First Amendment right to submit [DMCA Takedowns in good faith], and may call for deterrence and punishment over and above that provided by a compensatory award."

288.    This makes for a grand total of $181,000 in damages from Bibi Faizi.

### V-5: Prospective Injunctive Relief against corporate defendants

289.    Even if the corporate defendants have safe harbor for everything else (such as Discord or Twitch), I can still obtain limited prospective injunctive relief against them pursuant to **17 USC § 512(j)**.

290.    Pursuant to this subsection, I ask that Youtube LLC, Discord Inc., and Twitch Interactive Inc. all be ordered to …

(a)    Remove any infringements of my copyright that have not already been removed, pursuant to **§ 512(j)(1)(A)(i)**;

(b)    Permanently terminate the accounts owned by the individual defendants that have not already been terminated, pursuant to **§ 512(j)(1)(A)(ii)**; and

(c)    Take reasonable measures, pursuant to **§ 512(j)(1)(A)(iii)**, to prevent any of the individual defendants from creating any new accounts.

291.    Also, to ensure that the DMCA misrepresentation (described in Sections III-11 and IV-6 of this Complaint) never happens again, I also ask that the corporate defendants be enjoined to never again entertain any DMCA Takedown Notices against me, unless they come from a verified copyright holder. If anyone else wants to sue me for copyright infringement, they know where to find me and can simply file a lawsuit.

## VI: STANDARDS FOR DISMISSAL AT THE PLEADING STAGE

292.    This Court has already dismissed the case with prejudice once already, on the grounds that I had failed to state a claim. To ensure that this does not happen again, I would like to take this opportunity to remind the Court of just how high the threshold is for dismissal at the pleading stage. Whether it be on a § 1915 review or a Rule 12(b) Motion to Dismiss, the Court must follow a series of rules when dismissing for failure to state a claim. Specifically, the Court must …

(a)    "take the allegations in the complaint as true1 and view them in the light most favorable to the plaintiff." See Does 1-6 v. Reddit, Inc., 51 F. 4th 1137, 1140 (9th Cir. 2022);

i.    A limited exception to this rule applies in the case of in forma pauperis complaints. Under Denton v. Hernandez, 504 US 25 (1992), District Courts can decline to accept an allegation in a complaint as true , even in the absence of judicially noticeable facts to the contrary, but only if the allegations rise to the level of "fanciful, fantastic, delusional, ... irrational, or ... wholly incredible." See id at 33. It requires much more than just your garden variety finding that my allegations have a few plot holes in them.

(b)    "not consider matters outside the scope of the complaint," or those which the Court can take judicial notice of. See In re Stoll, 252 BR 492, 496 n. 5 (9th Cir. 2000);

(c)    construe pro se complaints liberally and hold them to less stringent standards than those drafted by attorneys. See Haines v. Kerner, 404 US 519 (1972); and

(d)    dismiss a complaint for failure to state a claim only if the complaint is implausible. See Bell Atlantic Corp. v. Twombly, 550 US 544 (2007).

293.    Given the high bar for failure to state a claim in this case, the Court cannot properly dismiss the Complaint at this stage. The closest you can get to an implausible allegation is my allegation that *all* acts of infringement were done *solely* in order to harass and dox me and try to pass that off as criticism (or at the very least, that they would not have occurred were it not for the criticism). But even that does not rise to the level of delusional or wholly incredible that justifies dismissal on the pleadings as set forth in Denton. "An in forma pauperis complaint may not be dismissed ... simply because the court finds the plaintiff's allegations unlikely. Some

improbable allegations might properly be disposed of on summary judgment, but to dismiss them as frivolous without any factual development is to disregard the age-old insight that many allegations might be strange, but true; for truth is always strange, Stranger than fiction." See Denton, supra at 33.

## VII: CONCLUSION

294.    To bring this extremely long Complaint to a close, the defendants have completely ravaged me at every turn, not because I have done anything legitimately wrong, but simply because they see me as a punching bag. This is blatantly illegal behavior and it needs to be stamped out by any means necessary.

295.    Wherefore, premises considered, I respectfully request that judgment be entered in my favor, costs incurred be awarded, and for any other relief to which I may be entitled.

So requested on this, the 22nd day of April, 2023.

*/s/ David Stebbins*
David Stebbins
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com