David Stebbins (pro se Plaintiff)    123 W. Ridge Ave., APT D, Harrison, AR 72601
(870) 212-4947                       acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                          PLAINTIFF

VS.                          Case 3:22-cv-00546-JSW

ALPHABET INC, ET AL                                      DEFENDANTS

## OPPOSITION TO [58] MOTION TO DISMISS

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following Opposition to Dkt. 58, Motion to Dismiss in the above-styled action.

| Section | Page |
|---|---|
| I. TABLE OF CONTENTS | i |
| II. TABLE OF AUTHORITIES | ii |
| III. ARGUMENT | 1 |
| III-1: The defendants' reference to my previous sanctions are irrelevant and merely designed to stir up resentment against me | 1 |
| III-2: The Defendants' addition of Creetosis's two streams as exhibits to the Motion to Dismiss are in violation of their own Terms of Service | 2 |
| III-3: First Hour of STAG #6, and the Playlist of Clips | 3 |
| III-4: The Ninth Circuit has already ruled in my favor in a case that is quintessentially identical in merit to this one | 4 |
| III-5: My previous admissions are not dispositive. | 4 |
| III-6: Fair Use, Factor #1: Purpose and Character of the Use | 5 |
| III-7: Fair Use, Factor #2: Nature of the Copyrighted Work | 9 |
| III-8: Fair Use, Factor #3: Amount and Substantiality of the Portion Used | 11 |
| III-9: Fair Use, Factor #4: Effect on the Market | 13 |
| III-10: Fair use in conclusion. | 16 |
| III-11: The Court should be weary of opening Pandora's Box. | 16 |

III-12: I did not grant YouTube any license that is relevant to this case.         17

III-13: The "License to Other Users" section of YouTube's ToS doesn't

save them, either.                                                                 21

III-14: Again, the defendants are seeking to open Pandora's Box.                   23

IV.    CONCLUSION                                                                   24

## II: TABLE OF AUTHORITIES

**Statutes, Rules & Articles**                                          **Page(s)**

● Compendium of U.S. Copyright Office Practices                          11

   (3rd ed. Jan. 28, 2021) § 1906.1

● "Extrinsic evidence" by Cornell Law School's                          19

   Legal Information Institute, found at

   www.law.cornell.edu/wex/extrinsic_evidence

● John F Manning, 'The absurdity doctrine' (2003)                       7.17,23

   116 Harv L Rev 2387, 2390.

**Case Law**                                                           **Page(s)**

● Aggeller v. Nordman Company Hair & Compton,                           17

   Cal: Court of Appeal, 2nd Appellate Dist., 6th Div. 2015

● Cambridge University Press v. Patton,                                 9,14

   769 F. 3d 1232 (11th Cir. 2014)

● Campbell v. Acuff-Rose Music, Inc., 510 US 569 (1994)                 15

● Consumers Union v. General Signal, 724 F. 2d 1044 (2nd 1983)          14

● De Fontbrune v. Wofsy, 39 F. 4th 1214 (9th Cir. 2022)                 13

● Seuss v. Comicmix, 983 F. 3d 443 (9th Cir. 2020)                      6,9

● Harper & Row v. Nation, 471 US 539 (1985)                            13,17

● Hosseinzadeh v. Klein, 276 F. Supp. 3d 34 (SD NY 2017)                12

● Hustler Magazine v. Moral Majority, 796 F. 2d 1148 (9th Cir. 1986)    11,14,15

● Mattel v. Walking Mountain, 353 F. 3d 792 (9th Cir. 2003)             12

- Monge v. Maya Magazines, 688 F. 3d 1164 (9th Cir. 2012)    8,13
- Seltzer v. Green Day, Inc., 725 F. 3d 1170 (9th Cir. 2013)    12
- Worldwide Church of God v. Philadelphia Church of God,    11,13
  227 F. 3d 1110 (9th Cir. 2000)
- Yahoo v. National Union Fire Insurance Company,    17
  519 P. 3d 992 (2022)

### III: ARGUMENT

For the following reasons, the Defendant's Motion to Dismiss should be denied.

### III-1: The defendants' reference to my previous sanctions are irrelevant and merely designed to stir up resentment against me.

1.      The Court has discretion to strike, in whole or in part, any portion of any pleading that is scandalous, impertinent, or immaterial. See FRCP 12(f). The Court also has a duty to issue orders in limine to block the usage of inadmissible evidence. Evidence is inadmissible if, among other things, it is not relevant (see FRE 402) or when the relevance of the evidence is significantly outweighed by its prejudicial value (see FRE 403). Evidence is considered "relevant" if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. See FRE 401.

2.      Here, defendants Alphabet Inc and YouTube LLC have filed a motion to dismiss. See Dkt. 58. In this motion, they have included the fact that I have had my filing privileges restricted in the past. See id at Page 2, Lines 2-6.

3.      These declarations have no bearing on the instant case. As the defendants themselves concede, "[c]opyright is not a privilege reserved for the well-behaved." See Google Llc v. Oracle America, Inc., 141 S. Ct. 1183, 1204 (2021). See also Dream Games of Arizona, Inc. v. PC onsite, 561 F. 3d 983 (9th Cir. 2009):

> "[I]f the defendant can do no more than show that the complainant has committed some legal or moral offense, which affects the defendant only as it does the public at large, the court must grant the equitable remedy and leave the punishment of the offender to other forums.
> ...
> [T]he district court did not allow [the Defendant] to argue evidence of illegality to the jury. The court concluded that the jury should focus on the conduct of [the defendant], and that any possible illegal activity by [the Plaintiff] was irrelevant to the willfulness or innocence of [the Defendant]'s conduct.
> ...
> The court may exclude evidence when its probative value is substantially outweighed by the danger of unfair prejudice. 'Unfair prejudice' within this context means an undue tendency to suggest decision on an improper basis. Here... it was not an abuse of discretion to exclude evidence of illegal operations... illegal operation does not diminish copyright protections or undermine the punitive purposes

of the statutory damages provision. Further, illegal operation of a work does not provide information relevant to the nature of the copyright, the circumstances of the infringement, plaintiff's conduct during litigation, or any of the other factors commonly relied upon by decisionmakers in setting statutory damages awards.
...
Because illegal operation of a copyrighted work does not remove copyright protection or foreclose the award of either actual or statutory damages, we uphold the award of statutory damages to Dream Games. We also conclude that the district court did not abuse its discretion in excluding evidence of illegal operation from the jury's consideration." See id at 990-94 (citations and quotations omitted).

4.      The Defendants do not argue that I do not have a valid and enforceable copyright in the Fallout New Vegas Retrospective video, so that fact is not in dispute in this case in the first instance. Meanwhile, whether or not I have granted YouTube a license to reproduce my video, and/or whether or not the reaction streams in question are fair use, can be proven just as easily simply by referring to the rest of the defendants' Motion to Dismiss. There is no need to bring up my past in order to stir up resentment against me. Such evidence is redundant of the much more probative and direct evidence of fair use. If there is no direct evidence of fair use, then the reaction streams do not suddenly become fair use simply because of these past rulings.

5.      Therefore, even if this evidence makes any fact more or less probable (which I doubt), those facts are not "of consequence" in determining this action, as required by FRE 401(b). Therefore, the evidence is inadmissible under FRE 402.

6.      Alternatively, what little probative value this evidence may nominally provide is significantly outweighed by its prejudicial effect. Therefore, it is also inadmissible under FRE 403.

7.      I therefore ask the Court to (a) strike in part the defendant's pleadings which mention the declarations which other courts have issued against me, and (b) issue an order in limine, ordering the defendants (including the individual defendants who have not yet appeared in the case) not to submit any evidence of these prior judicial rulings at any point in this action.

**III-2: The Defendants' addition of Creetosis's two streams as exhibits to the Motion to Dismiss are in violation of their own Terms of Service.**

8.      In support of their Motion to Dismiss, the defendants attach the two underlying streams in their entirety. However, it is important to note that the only reason they *have* to attach them is

because, by their own admission, Creetosis took down the videos of his own accord in September of 2023.

9.      The Defendants' own terms of service state, in pertinent part, the following:

> "Duration of License
>
> The licenses granted by you continue for a commercially reasonable period of time after you remove or delete your Content from the Service. You understand and agree, however, that YouTube may retain, ***but not display, distribute, or perform, server copies of your videos that have been removed or deleted***."
>
> See https://www.youtube.com/t/terms#27dc3bf5d9 (emphasis added).

10.      So because the streams in question were removed, YouTube has forbidden itself from distributing their server copies of the streams.

### III-3: First Hour of STAG #6, and the Playlist of Clips

11.      To help illustrate the points I am about to make regading the alleged fair use of the two STAG streams, I will provide an analysis of only the first hour of this stream. I will attempt to showcase just how weak the case is for fair use by analyzing the supposedly transformative elements of only first hour. The Court can probably get a general picture of how transformative the rest of the two streams likely will be based on how the first hour went.

12.      You can see the first hour of STAG #6 here: https://www.youtube.com/watch?v=66h7tcaJi5c. I have labeled it "Grade 1" for reasons that will become apparent momentarily.

13.      To further assist the Court in understanding how fair the first hour is, I am further dividing the first hour into "Clips." I have an entire playlist of these clips, which you can see at the following URL: www.youtube.com/playlist?list=PLpL3n7W6QqgDXjAqTc2k8nbqx-MQfulMh. In this playlist of clips, the odd-numbered clips are where Creetosis provided original content, and the even-numbered clips are where he played portions of my copyrighted video.

14.      In addition, I am also dividing the first hour into two sections: The portions that are just original content, and the portions where he copies my video. In other words, one video is just the odd-numbered clips in the above playlist, and the other is just the even-numbered clips. These two videos can be found here:

(a)    Just the original content: https://www.youtube.com/watch?v=HErFGPxtrMI

(b)    Just the portions where he copied my video: https://www.youtube.com/watch?v=s4fKhZPDCvU

15.    I will provide "Grade 2" & "Grade 3" versions of this first hour when I discuss the criticism. This will hopefully demonstrate just how weak the defendants' case for fair use actually is.

### III-4: The Ninth Circuit has already ruled in my favor in a case that is quintessentially identical in merit to this one.

16.    It is worth noting that a dismissal of a case in this district that is identical in merit to the instant case has already been overturned in my favor by the Ninth Circuit Court of Appeals. Specifically, I am referring to Case 4:24-mc-80179-HSG (Stebbins v. Creetosis). That case was dismissed as "frivolous," with no explanation whatsoever. But in Dkt. 24 of that case (the judgment of the Court of Appeals as it was handed down to the district court), the Ninth Circuit overturned the dismissal of all but one of the copyright infringement claims, finding "Stebbins alleged that he owns valid copyrights on four videos and that defendant John Doe reproduced those videos in their entirety. Liberally construed, these allegations were 'sufficient to warrant ordering [defendants] to file an answer.'" Not a Motion to Dismiss under FRCP 12(b)(6), but an *Answer* under FRCP 7(a)(2).

### III-5: My previous admissions are not dispositive.

17.    The Defendants point out that I had previously admitted, in one of my own videos, I admitted that the two STAG streams contained "ample criticism and commentary." While this admission did occur, and while these types of confessions are absolutely *admissible* and *relevant* to the proceedings to which they relate, they are not dispositive.

18.    In the instant case, my prior admission that the streams were highly transformative was a mixed statement of fact and law, not merely a statement of pure fact. This means that my admissions, to the extent they involve legal conclusions, are not binding on the Court in the first instance.

19.    Even for admissions that are purely statements of fact, they are frequently not dispositive

of the cases at bar. For example, if I were to declare, publicly on social media, that my wife[1] wasn't cheating on me, only to later be confronted with irrefutable evidence that yes, she is indeed cheating on me, and has been for quite a while now, so I file for divorce accordingly[2], the divorce judge is not going to actively ignore all evidence of infidelity simply because I made that previous statement online.

20.      Even for admissions that usually do mean the kiss of death for a litigant's case, that kiss of death is neither automatic nor absolute. For example, suppose there's a murder case where the defendant is claiming self-defense. But the police are able to find a statement the defendant made on social media where he claimed that he didn't actually fear for his life after all. This would be a damning statement indeed, wouldn't it? However, if (A) the undisputed circumstances surrounding the killing were such that nobody in their right mind in the defendant's shoes *wouldn't* fear for their lives, and (B) the circumstances surrounding the online statement suggest that he might have just been boasting about his confidence in order to look like a badass to his viewers, then the jury may still be inclined to side with the defendant. They don't *have* to, and if the defendant were convicted, his conviction likely would not be overturned on appeal on the grounds that the verdict was against the clear weight of evidence, but it wouldn't be a 100% lost cause either.

21.      In the instant case, I now believe my previous statement was in error, now that I have had more opportunity to research the law and get a better understanding of how fair use works. As I discuss the first factor of fair use momentarily, and especially as I explain my "Grade 2" and "Grade 3" versions of the first hour as alluded to above, I pray that the Court will also agree with me that the streams are not nearly as transformative as I previously admitted they were.

### III-6: Fair Use, Factor #1: Purpose and Character of the Use

22.      As the two videos provided in ¶ 14(a)-(b) demonstrate, the first hour of STAG #6 contains 10 minutes 27 seconds of copying my video and a whopping 49 minutes 34 seconds of original content. At first glance, this seems like an incredible ratio for purposes of fair use, right?

23.      However, not all of that 49:34 of original content meets the legal definition of "transfor-

---

1   I'm not married; this is just a hypothetical example.
2   In my state (Arkansas), no-fault divorce is only permitted if the spouses have not cohabitated for at least eighteen
     months before the divorce. So I still need to prove adultery if I want an immediate divorce.

mative." As I pointed out in the Second Amended Complaint, the majority of time is actually spent going off on unrelated tangents while they talk about whatever suits their fancy. This does not qualify as transformative content. See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 453-54 (9th Cir. 2020) ("[Defendant]'s claim to transformative use rests on the fact that it has 'extensive new content.' But the addition of new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative. The new expression must be accompanied by the benchmarks of transformative use").

24.     See also https://www.youtube.com/clip/Ugkxx3910ym04KPfKtaOeZWvc0xC_uavq7IU ("Generally speaking, in copyright law, you have to comment and criticize the actual clip itself. You can't use the clip to comment on something else").

25.     This means that, before we can determine fair use, we must first remove all of Creetosis's original content that is not directly related to criticizing or commenting on my video directly. To that end, I created "New Vegas Retrospective Reaction - First 60 Mins - Grade 2," which you can view here: https://www.youtube.com/watch?v=0IWN527Dogk. Just like with ¶ 14 above, I also removed all the portions of Grade 2 where my video was copied, and created a version of Grade 2 that contained only the original content. You can view that video at the following URL: https://www.youtube.com/watch?v=2sVki85vHjc.

26.     As you can see, that 49 minutes 34 seconds of original content is now reduced to only 24 minutes 20 seconds. Just by removing the unrelated discussions, more than half of the original content from the first hour is removed. That alone significantly undermines the defendants' claim that the streams are "obviously fair use." However, we're not done yet.

27.     In addition to the majority of Creetosis's original content being stricken on the grounds of it being unrelated to the video he's reacting to, there is also the fact that even the portions where he criticizes the video directly are filled with redundancy. At multiple points in this first hour, he will give an opinion about the portion he just watched, only to immediately say the exact same thing he just said, with only minor, mostly semantic alterations. For example, in Grade 2 above, in the video with the url ending in Dogk, at timestamp 3:10 – 3:17, one of Creetosis's co-hosts makes two observations: I went through "it" (whatever "it" means) quickly, and I made no

inaccurate statements. Then, at timestamp 3:17 – 3:27, he says pretty much the exact same thing, worded only slightly differently. No new observations or analysis was provided.

28.     This should also be tossed out when considering fair use. If you could get additional transformative value simply by repeating the same things you've already said, then a movie reviewer could theoretically achieve unlimited transformative value without putting in any actual effort just by saying "This movie sucks. This movie sucks. This movie sucks," over and over again. Repeat 500-1,000 times, or as many times as needed, until you achieve the desired amount of transformative value, all without having to put any actual thought or effort into it. It is black letter law that courts should avoid interpretations of the law that would lead to these kinds of manifest absurdities. See Manning J, "The absurdity doctrine" (2003) 116 Harv L Rev 2387, 2390.

29.     So if we are to remove from consideration any original content that is redundant of any criticism or commentary previously made, and only count each substantive point they make once each, then we get "New Vegas Retrospective Reaction - First 60 Mins - Grade 3," which you can view here: https://www.youtube.com/watch?v=sUhgfsHgkJc. A version of Grade 3 containing only the original content can be seen here: https://www.youtube.com/watch?v=vQvIgrRys0k.

30.     Notice how little of Grade 1 is left over, after we remove all the stuff that does not contribute to the stream's transformative value. We started with 49 minutes 34 seconds of original content in the first hour of the reaction, but after removing all the unrelated and redundant material, we are left with a measly 8 minutes 51 seconds of *genuinely transformative*, non-redundant criticism and commentary. Remember from ¶ 14(b) above that Creetosis copied 10 minutes 26 seconds of my video in the first hour of the reaction. This means that he *literally* spent more time copying my work than he spend providing genuinely transformative, non-redundant criticism of it!

31.     Not only that, but even the original content that survives all the way to Grade 3 is watered down *even further* when you realize that it is the very definition of "threadbare." Of that approximately 9 minutes of non-redundant criticism, the vast majority of it is either (A) simply disagreeing with my opinions, or (B) arguing that it was my fault for having such high expectations for the game, but giving nothing more than their subjective opinions in support of that disagreement. That is the absolute bare minimum amount of criticism or commentary. Anybody can do

that. It doesn't require any exceptional skill, intelligence, effort, thought, or creativity.

32.    Exactly what "new insights" or "new understandings," as required by fair use law, do we gain from these threadbare opinions of his? Merely that he disagrees with my opinions, nothing more, nothing less. That, however, provides far more insight into Creetosis and his friends than it does for my video.

33.    Therefore, even what little of his original content survives all the way to Grade 3 only just barely qualifies as "bare minimum" transformative value added. The precedent of Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177 (9th Cir. 2012) is instructive here: "[Creetosis]'s minimal transformation of the [original work] is substantially undercut by its undisputed commercial use[3]. On balance, the first factor is at best neutral, and does not support [Defendant]'s claim of fair use."

34.    Now, to be fair, I only analyzed the first hour of the reaction. So maybe the defendants may try to insist that the entire reaction does in fact rise to the level of "highly transformative" once it's all said and done, even after removing all unrelated material and all related but redundant commentary. The defendants are certainly free to push that position in this case if they feel that is their best defense possible. But that will require they systematically go through the entirety of both streams, one sentence at a time (like picking individual grains of rice out of a swimming pool), classifying each and every sentence from Creetosis and his friends as being either unrelated to my video, related but redundant of points already made, or related and non-redundant. And if they decide that a sentence should fall into the third category, they need to justify that decision via argument. They will then need to create their own "Grade 2" and "Grade 3" versions of the reactions, this time covering the entirety of both streams (not just the first hour), and any content that survives into "Grade 3" must be justified as such.

35.    I certainly have no intention of undertaking such an arduous task myself, except for the one hour I've already done. That will be either the Court's or the defendants' job. After all, the 9th Circuit not only has "unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use," but they have also held that this is one of the few "absolute statements"

---

3   The defendants do not contest the allegation that the streams were monetized.

when it comes to fair use. See Seuss, supra 459.

36.    But even if the defendants ultimately prevail on that tactic, the fact remains that such a determination cannot be made at the pleading stage, which means that the Motion to Dismiss must be denied.

### III-7: Fair Use, Factor #2: Nature of the Copyrighted Work

37.    First of all, the defendants insist that the original video is "far from the core of copyright." However, this is not true. Works that are highly opinionated typically weigh against fair use. See Cambridge University Press v. Patton, 769 F. 3d 1232, 1270 (11th Cir. 2014) ("[W]e find that the District Court erred in holding that the second factor favored fair use … Where the excerpts of Plaintiffs' works contained evaluative, analytical, or subjectively descriptive material … or derives from the author's experiences or opinions, the District Court should have held that the second factor … weighed against fair use in cases of excerpts that were dominated by such material").

38.    In addition to that, the work is also legally unpublished. The defendants cite non-binding cases to support their belief that it is published, but to counter them, I cite Circular 66 from the US Copyright Office, the holdings of which are entitled to Chevron deference and therefore is binding authority. You can view Circular 66 here: https://www.copyright.gov/circs/circ66.pdf

39.    On pages 4-5 of that circular, it says in pertinent part …

> "The fact that a work has been placed online or posted on a website does not necessarily mean that the work has been published. The Office considers a work published when copies of it are distributed to the public by sale or other transfer of ownership if the copyright owner ***authorizes the end user to retain copies*** of the work. ***Merely displaying or performing a work online generally does not constitute publication.*** … ***Just because an end user can technically reproduce a work does not necessarily mean that the work has been published.*** A copyright owner must have expressly or implicitly authorized users to make ***retainable copies*** of a work by downloading, printing, or other means for the work to be considered published.
>
> The concepts of authorization and publication can be complicated and may have serious consequences for the author or copyright owner. For this reason, ***the Office generally lets the applicant decide whether a particular work is published or unpublished.*** In making this determination, you may wish to consider the

following general guidelines.

• Work made available only by streaming. ***Streaming is a performance***, which, in and of itself, ***does not constitute publication***, because, as a practical matter, the end user does not retain a copy of the work when the performance ends.

• Work for which downloading or reproduction is expressly prohibited. ***If there is a notice on a website in the terms of service for the site or another obvious place indicating that a work or the content on the site cannot be downloaded, printed, or copied, the work or content may be deemed unpublished***, because the end user is not authorized to download, print, or otherwise distribute copies.

…

• Work made available through an implied license. ***It may be unclear*** whether the copyright owner authorized the public to retain copies of the work if a work is posted on a website and there is no evident statement in the terms of service for the site—on the web page where the work is displayed or elsewhere—stating that the work can be downloaded, copied, forwarded, shared, or printed."

40.    Important sections of that excerpt were bolded and italicized for emphasis.

41.    Applying these rules to the instant case, the original video does not qualify as "published." They are merely "performed" on my YouTube channel, not licsensed or sold. There was no option to download these works for offline viewing, except by third party means. YouTube expressly forbids downloading any videos off of their site except through the methods they themselves provide[4], nor have I hosted the video on any service besides YouTube, so there is no way I posted it to any website which explicitly authorizes third party downloading.

42.    The only way you can "download" someone's video on YouTube is through the YouTube Premium option, but even then, I include the word "download" in quotation marks because it really is a download in name only. Remember that, to be considered published, end users must be able to download a ***retainable copy*** of the work. The downloads you get from YouTube Premium are not ***retainable***. You lose access to your entire library of downloaded videos the moment you

---

4    See https://www.youtube.com/t/terms:
       "The following restrictions apply to your use of the Service. You are not allowed to:
       1. access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders"

cancel your YouTube Premium subscription. You do not "own" your copy of the downloaded video any more so than you "own" a copy of a book you checked out from the library. Therefore, this feature does not cause the video to be considered "published" under Circular 66.

43.     However, even if my understanding of the law is wrong, it ultimately doesn't matter. Bear in mind that Circular 66 says that, sometimes, it may be "unclear" whether this counts as a "publication." Earlier in that excerpt, they also stated that, whenever it is factually ambiguous, ***the copyright owner gets to decide*** whether it is published or unpublished! This means that the burden falls to the defendant to prove, not just that I am wrong about this, but that I am objectively unreason-able in forming my belief. If there is any ambiguity in the facts, my preference is entitled deference. Therefore, the songs and videos are still legally classified as "unpublished" and there's no two ways about it.

44.     The only *binding* authority the defendants cite to the contrary is Compendium of U.S. Copyright Office Practices (3rd ed. Jan. 28, 2021) § 1906.1. However, the excerpt they cite only applies to *photographs*, and it clearly states as such in a portion the Defendants omit using elipses. So that source is inapposite here.

45.     Therefore, the second factor weighs against fair use.

### III-8: Fair Use, Factor #3: Amount and Substantiality of the Portion Used

46.     The Defendants concede, as they must, that the two reaction streams, combined, copy 100% of my original video, literally every single last second of it. Because of this undisputed fact, the third factor *must* weigh against fair use. This is binding precedent, and the district court has no discretion in this regard. In fact, it used to be the precedent in the 9th Circuit that, whenever a secondary user copied the entirety of the original work, that precluded fair use in its entirety. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1155 (9th Cir. 1986). Although that is no longer the case, the 9th Circuit has nonetheless held that using the entirety of the original work still means that the *third factor* weighs against fair use as a matter of course, without the district courts being afforded any discretion in this regard. See Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F. 3d 1110, 1118 (9th Cir. 2000) (citing Hustler, supra at 1155). While it is theoretically possible to still get fair use overall while copying 100%

of the original work, the district court must still find the *third factor* to weigh against fair use as a matter of binding precedent.

47.   The defendants cite multiple instances of precedent in a desperate attempt to provide authority for a finding in their favor, or at least a finding of neutrality. However, all of them are distinguishable for various reasons. For most of the cases they cite, none of them use the entire work. The most amount used in all the cases the defendants cite was 60% of the original work, which was from the case of Hosseinzadeh v. Klein, 276 F. Supp. 3d 34 (SD NY 2017).

48.   The only two cases the defendants cite where either (A) the *entire* work was used or (B) it was found that using the entire work would have been permissible if they had done it, are the cases of Mattel Inc. v. Walking Mountain Productions, 353 F. 3d 792 (9th Cir. 2003) and Seltzer v. Green Day, Inc., 725 F. 3d 1170 (9th Cir. 2013). However, in both of those cases, the Court of Appeals went out of their way to emphasize that there is an important exception to their precedents that was not applicable in those cases, but which is applicable here: The copyrighted works the plaintiffs were suing over in that case *couldn't* be easily broken up into smaller chunks, but they emphasized that other works (such as songs, and yes, even videos) can be, and so the secondary user is required to do so in order to comply with the third factor of fair use.

49.   Seltzer, supra states in pertinent part "unlike an episode of the Ed Sullivan show or a book manuscript, Scream Icon is not meaningfully divisible. Given that fact, this court has acknowledged that this factor will not weigh against an alleged infringer, even when he copies the whole work." See id at 1178.

50.   Meanwhile, Mattel, supra states in pertinent part "[Plaintiff]'s argument that [Defendant] could have taken a lesser portion of its work attempts to benefit from the somewhat unique nature of the copyrighted work in this case. Copyright infringement actions generally involve songs, video, or written works. Because parts of these works are naturally severable, the new work can easily choose portions of the original work and add to it. Here because the copyrighted material is a doll design and the infringing work is a photograph containing that doll, Forsythe, short of severing the doll, must add to it by creating a context around it." See id at 804.

51.   This creates an immediate and obvious distinction in the instant case. The original work

is a video, so it is easily divisible. Therefore, the Worldwide Church case is controlling, which in turn means that the third factor, as a matter of binding precedent, *must* weigh against fair use, full stop. No ifs ands or buts.

52.     But even if the defendants still wish to hold out for a finding of neutrality, they must ***actually prove*** that the use of the entire work – literally every single last second of it – was not only reasonable, but actually *necessary* to achieve the desired result. They argue that it was necessary "given the unusual enormity of the Livestreams' commentary." However, as I explained above, the vast majority of that original content doesn't count as far as fair use is concerned. Once all the unrelated and redundant fluff is taken out, it quickly becomes what the defendants concede to be a poor case for fair use: "a case in which the secondary work borrows disproportionality from the original only to provide minimal commentary in response." See Dkt. 58, Page 18, Lines 11-12.

53.     At a minimum, this still means that we cannot make this call just yet, and so the motion must still be denied and discovery must commence.

### III-9: Fair Use, Factor #4: Effect on the Market

54.     "This last factor is undoubtedly the single most important element of fair use." See De Fontbrune v. Wofsy, 39 F. 4th 1214, 1226 (9th Cir. 2022) (citing Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539 (1985)). Moreover, it is the one factor that has been expressly affirmed by the Supreme Court as being singularly capable of negating fair use in its entirety, all on its own. "[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." See Monge, supra at 1182 (emphasis in original). "If the defendant's work adversely affects the value of any of the rights in the copyrighted work … the use is not fair." Harper & Row at 568.

55.     When analyzing this factor, it is important to understand the different between "market destruction" and "market substitute." The latter weighs against fair use (and possibly nullifies it in its entirety), whereas the former does not. I explain the difference at timestamp 44:27 – 45:27 of this video: https://youtu.be/G1TWOuUehzY?t=2667. In that excerpt, I say the following:

> "When I say 'market substitute,' it's important to understand I'm not just talking about people hearing your review of my video and not wanting to waste their time watching my video because they know it's going to suck. That's not a market

substitute. That's market *destruction*. That *crushes* the market for my videos. Like, there is no longer any *demand* for my videos.

Market substitute, also known as market usurpation, means people still want to watch my videos, but they don't have to come onto my channel and give me, personally, any views or watch time in order to see those videos because you've already shown the whole thing in your reaction series. That's what it means by 'market substitution' – there is still a *demand* for my videos ... a *demand* that YOU are now *supplying*."

56.    I trust that the Court will agree that my understanding of the fourth factor of fair use is both succinct and accurate.

57.    That being said, Creetosis copied 100% of my original video, literally every single last second of it. This constitutes a market substitute, per se.

(a)    See Hustler Magazine v. Moral Majority, 796 F. 2d 1148, 1154 (9th Cir. 1986)

"[B]y copying all or substantially all of the copyrighted work, the distinction of function vanishes since whatever the intent of the copier, a verbatim reproduction will of necessity serve the function of the plaintiff's work as well as that of the defendant's."

(b)    See also Cambridge University Press v. Patton, 769 F. 3d 1232, 1271 (11th Cir. 2014)

"A book reviewer who copies snippets of a book is likely to increase the demand for the book, but were a book reviewer to quote the entire book in his review … he would be cutting into the publisher's market, and the defense of fair use would fail."

(c)    See also Consumers Union of US v. General Signal, 724 F. 2d 1044, 1051 (2nd 1983)

"The fourth fair use factor will come into play if too much is copied or if the entire plot is revealed, thereby usurping the demand for the original work."

(d)    See also https://youtu.be/1Jwo5qc78QU?t=1158 (timestamp 19:18 – 20:22)

"Mystery Science Theater was … absolutely transformative, but they still licensed the movies … because yeah, playing someone else's entire movie, just with wisecracks over it? Probably not fair use!"

(e)    See www.youtube.com/clip/UgkxDPeQBnbcZAewwjxh7tHyYQPpeMkYUrNS

"by showing those clips in full to the audience … it's entirely possible that you

might not watch the [original] videos because you saw, basically, the whole thing in [the defendant]'s videos."

(f)    See also www.youtube.com/clip/Ugkxp9Ev6N8qsYViDPqkrtAuE8nZZWpq8oD7

"So yes, you can add some original commentary to your reaction, but if it completely displaces the market for the original, it's probably not fair use, and it's pretty obvious that, once you see a video during a livestream, the way that most of these livestreamers do it, you're not gonna go back and watch the whole video again."

58.    The defendants insist that there is no market substitute here. They insist that the STAG streams "provide an entirely different user experience." But as I pointed out above, "by copying all or substantially all of the copyrighted work, the distinction of function vanishes since whatever the intent of the copier, a verbatim reproduction will of necessity serve the function of the plaintiff's work as well as that of the defendant's." See Hustler, supra.

59.    They argue that the streams "could not possibly" usurp the market for my videos and that "it would defy reality" to suggest that "anyone seeking to enjoy [Stebbins' Video] on its own will" instead choose to watch" the defendants' streams. But they offer no proof of this. This is nothing more than argument from incredulity, which is a categorically and per se invalid argument. I respect that this is their position on this matter, but the mere fact that they claim it does not make it true, especially when I provide source after source in ¶ 56 above stating the opposite: That copying all or nearly all of someone else's work does indeed create a market substitute. Again, I respect that this is the defendant's position. But now that they've made their claim, the burden of proof falls to them to *actually prove it is true*. And "[s]ince fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." See Campbell v. Acuff-Rose Music, Inc., 510 US 569, 590 (1994).

60.    Even if they could prove it, that alone doesn't save them. They say that anyone who watched Creetosis's streams already wasn't going to watch my videos anyway? Well, to that end, see https://www.youtube.com/clip/UgkxJnRtmjSH7kka63yIG87XX0ZHcbGSFdiP:

"They say 'Well it appears pretty transformative to me. *I wouldn't be watching Avatar if Pokemaine wasn't leading me through it*,' or as we'll get to, '*I wouldn't*

*be watching Master Chef if another streamer wasn't leading me through it.*' And that is value added. It doesn't get you out of the concept of you infringing on the original work. Just because you're a smart person that can add additional commentary doesn't give you the right under the law, by itself, to simply take another person's work, that they created and spent resources and money and time building, and making money on it yourself. So if you're using it for a commercial purpose, *regardless of whether or not somebody would be otherwise watching the underlying material*, you can still get in trouble."

61.    Italics and underlines are added for emphasis on the areas that relate to the instant case.

62.    So even if they could prove their own allegations, that's honestly a very weak argument to give in support of their case for fair use anyway.

63.    So all in all, the fourth factor egregiously weighs against fair use.

### III-10: Fair use in conclusion.

64.    When it's all said and done, the livestreams in question are egregiously weak cases for fair use. Even the first factor – the one factor that Creetosis made even the slightest, most nominal effort to comply with – becomes laughably weak when you actually take out all the non-transformative fluff that he uses to pad the stream without actually having to put any effort into his criticism. Then, the fact that the second, third, and fourth factors egregiously weigh against fair use means that Creetosis's (and, by proxy, YouTube's and Alphabet's) case for fair use is effectively dead on arrival.

### III-11: The Court should be weary of opening Pandora's Box.

65.    When issuing rulings, courts should be mindful, not only of what is equitable in the instant case, but also the precedent they may be setting for future cases. The Court should be mindful of the latter in the instant case.

66.    If the Court holds that this reaction stream is fair use, then it is holding that reaction streams of this nature are fair use for *everyone!* If you decide that it's fair use to use literally 100% of someone else's work, as long as you add hours upon hours of additional content, even if that content has nothing at all to do with the work they're reacting to, and even if they only provide nominal criticism of the original work, then what's to stop reaction channels from doing the same thing with AAA blockbuster Hollywood movies? After all, all they have to do is provide just a

few moments of giving layperson opinions about the movie they watch, and spend the rest of their time just talking about whatever, and poof, instant fair use. Anybody can do that. It doesn't require exceptional skill, effort, or creativity, yet it would give even the most mundane of people carte blanche to reproduce multi-million dollar works in their entirety with minimal effort. "The promise of copyright would be an empty one[5]" if that were all it took.

67.     As I alluded to earlier, courts have a duty to avoid interpretations of the law that would result in manifestly absurd consequences. See Manning, supra. This is such an instance. Therefore, the Court should hold that the underlying streams are not fair use.

#### III-12: I did not grant YouTube any license that is relevant to this case.

68.     Most likely because they know that their case for fair use is a long shot, they're also including another defense. They claim that I gave them a license to have this reaction stream on their website.

69.     Licenses are contracts, and therefore are governed by the law of contracts. One of the things you need to keep in mind about contracts is that there must be a "meeting of the minds" in order for it to be enforceable. That means that both parties must fully understand what they are signing up for. This means that, whenever one party seeks to enforce a particular interpretation that is not present from the plain text of the contract, the burden of proof falls on that party to prove, not just that this is what they intended the contract to mean, but that I also *subjectively understood* it to mean that as well.

70.     Meanwhile, any ambiguities in the contract are to be resolved in favor of the party who didn't draft the contract (in this case, me). This is called "contra proferentem," and it is black letter law in all fifty states, including California. See Yahoo Inc. v. National Union Fire Insurance Company, 519 P. 3d 992, 72 (2022) ("[T]he principle of contra proferentem... is justified on the grounds that the drafter of a contract should bear the responsibility for ambiguities the drafter could have resolved"). "[T]he doctrine of contra proferentem... applies with even greater force when the person who prepared the writing is a lawyer." See Aggeller v. Nordman Company Hair & Compton, Cal: Court of Appeal, 2nd Appellate Dist., 6th Div. 2015. Here, it is undisputed that

---

5   Harper & Row, supra at 557.

the Terms of Service (ToS for short) were drafted by YouTube, but it is unclear whether or not the individual employees who drafted it were lawyers. If the Court is on the fence on this issue, it may order discovery so we can see exactly who drafted the ToS and, therefore, to what extent contra proferentem applies.

71.     Here, the defendants insist that their ToS gives them a license, not to use the content themselves to promote their own service, but to authorize *other people* to use it, and gives them legal permission to refuse to take the content down under the DMCA without suffering vicarious liability. This is such an absurd interpretation of their own ToS that it's almost certainly something they just made up in response to the instant case.

72.     No reasonable person would interpret the "License to YouTube" section of ToS to mean this. The only thing a reasonable person would interpret is that I give YouTube the right to display *my own videos* (not somebody else reposting the videos) in a manner consistent with the YouTube website. In other words, if someone clicks on my video with the intent to watch it, YouTube has my permission to actually show it to them. YouTube also has my permission to show my thumbnails and video titles on their home page, search results pages, and "suggested videos" feeds in order to entice people to click on the videos and therefore watch them. So on and so forth.

73.     This interpretation is further evidenced by this video: https://www.youtube.com/watch?v=OaS_XnDAPYE. In that video, a lawyer named Richard Hoeg addresses another ToS from another company named Ubisoft, which contains the exact same language that the Defendants are offering here – "you [the customer] grant to [the service provider] a worldwide, non-exclusive, royalty-free, ... license to use that Content... in connection with the Service" – and he explains how this is not as massive and expansive as some people initially thought it was. From this lawyer's point of view, this kind of language is actually quite standard, and lawyers and courts instinctively know what it means and what the limitations on it are.

74.     Throughout this entire video, he explains that all this language does is give the service provider (in that case, Ubisoft) permission to use the user-generated content (maps, skins, etc.) in order to share said content with other people playing that same game, so they can download the

skins, play on those same maps, etc., as well as depict your character wearing those skins to other players in the game. So on and so forth. At timestamp 11:47, he further corroborates this understanding by giving the example "It is the very same kind of language that you would see in the Twitters of the world, where they have to get the license to allow people to retweet things, or else they could run into copyright issues."

75.    Nothing in his video suggests that Ubisoft has blanket immunity from copyright law in its entirety. In fact, given the *title* of that video, it appears that debunking that misconception was the whole point of that video. And again, he heavily implies that this sort of language (which is repeated verbatim in the section of YouTube's ToS that they offer here) is standard language, and everyone who is licensed to practice law instinctively knows what it does and doesn't mean. Therefore, the Court should likewise narrowly interpret YouTube's identical language in its ToS.

76.    In fact, YouTube's own behavior and statements consistently undermines its own preferred interpretation of the ToS. This is relevant because it is "parol evidence," aka extrinsic evidence that helps to shed light on ambiguous contract terms. Where, as here, a contract term is subject to at least two reasonable interpretations (if you could even call YouTube's preferred interpretation "reasonable"), and the parties consistently and over a great period of time behave in a manner consistent with Interpretation A, while also making public statements consistent with same, but then suddenly, one party arbitrarily and without the consent of the other insists on Interpretation B, simply because it suits their narrative at the moment, courts generally will reject Interpretation B and find Interpretation A to be the correct, binding interpretation. See www.law.cornell.edu/wex/extrinsic_evidence (noting that "statements between parties" as well as "the parties' subsequent conduct" are examples of useful parol evidence to resolve contract ambiguities).

77.    Applying this logic to the instant case, the defendants' behavior consistently suggests that they don't even believe, themselves, that they've given themselves blanket immunity from DMCA vicarious liability through this section of their ToS. Examples of this behavior include, but are not limited to...

    (a)    The very next section of the ToS is titled "License to Other Users." This clearly dem-

onstrates that the people drafting YouTube's ToS (who may or may not have been lawyers; see above) did not consider the "License to YouTube" section to apply to cases like this, where *someone else* used my content and YouTube is only *vicariously* liable because they failed to take it down. Clearly, the "License to YouTube" section only applies to things that YouTube themselves do directly, not what they allow or enable *other people* to do.

     i.     To be clear, this section of the ToS does not save the defendants either, for reasons I will discuss in the next section, but for the time being, the fact that this other section of the ToS even exists at all shows that the "License to YouTube" section is inapposite to the instant case.

(b)     On their webpage "Frequently asked questions about copyright" (which the Court can view here: https://support.google.com/youtube/answer/2797449), when answering the question "How do I get permission to use someone else's content in my video," it says, in pertinent part, the following:

> "If you plan to include copyright-protected material in your video, you'll generally need to seek permission to do so first. ***YouTube can't grant you these rights*** and we can't help you find the parties who can grant them to you. You'll have to research and handle this process on your own or with a lawyer's help.
>
> For example, ***YouTube cannot grant you the rights to use content that has already been uploaded to the site.*** If you wish to use someone else's YouTube video, you may want to reach out to them directly. Some creators list ways they can be contacted in their channel."

     i.     Emphasis added. A copy of this webpage is hereby attached as **Exhibit A**.

(c)     YouTube consistently removes most reaction or response videos that fit into this formula (copying 100% of someone else's video and only providing nominal criticism or commentary of it) whenever the copyright holder issues a DMCA Takedown against them. They have even done so multiple times for me, including but not limited to four instances in Case 3:24-cv-00398-LJC (Stebbins v. Baz)[6] in this district, as well as four separate occasions

---

6  The Defendants may attempt to argue that the Baz case is distinguishable from the instant case because that defendant "borrows disproportionality from the original only to provide minimal commentary in response," which, at Page 18, Lines 11-12 of their Motion to Dismiss, the Defendants concede strips the secondary use of its fairness. However, First of all, at this point, we're talking licenses, not fair use, so the distinction is irrelevant at this stage.

in Case 4:24-mc-80179-HSG (Stebbins v. Creetosis) (dismissed as frivolous, but overturned on appeal), also in this district. If they believed their own ToS had given them a blanket immunity from the DMCA's requirements, they wouldn't have taken these videos down to protect themselves from vicarious liability.

78.     For all of these reasons and more, the Court should reject the Defendant's position that the license I granted to them applies to the instant case. At a minimum, it should order discovery and require the defendants to *actually prove* that there was a meeting of the minds in this regard.

**III-13: The "License to Other Users" section of YouTube's ToS doesn't save them, either.**

79.     The very next section, after "License to YouTube," in their ToS is called "License to Other Users," and it purports to explicitly cover "derivative works." However, that still doesn't save them, because the Defendants themselves wrote in an exception to that very section that is immediately applicable to the instant case.

80.     The section states the following:

"You also grant each other user of the Service a worldwide, non-exclusive, royalty-free license to access your Content through the Service, and to use that Content, including to reproduce, distribute, prepare derivative works, display, and perform it, ***only as enabled by a feature of the Service (such as video playback or embeds). For clarity, this license does not grant any rights or permissions for a user to make use of your Content independent of the Service***."

See https://www.youtube.com/t/terms#27dc3bf5d9 (emphasis added).

81.     The fact that they give "video playback or embeds" as two examples of this limitation on the license is highly telling. It shows that YouTube only intended to grant other users a similar amount of license to that which I described in ¶ 72 above: Simply watching my videos alone or in groups, but not to publicly rebroadcast them. Furthermore, in order to be covered by this license, the usage and/or reproduction must be done *entirely* using YouTube's own services.

---

Second, as I explained above, using the "Grade 2" and "Grade 3" versions of the first hour of Creetosis's stream, Creetosis is indeed guilty of the exact same thing. You just have to remove all the non-transformative padding to see that. Barring that, YouTube still removed four videos from Creetosis's channel (but still didn't terminate him as required under the DMCA, which sitll makes them vicariously liable regardless) in the other case in this district, and those four videos were all 100% identical in merit to the stream in the instant case, with no notable distinctions whatsoever.

82.     To the extent this license may potentially apply to *derivative* works, the best example thereof would probably be YouTube's "shorts remix" feature, which is YouTube's equivalent to TikTok's duet and stitch features. A video giving instructions and overview of how remixes are made can be found here: https://www.youtube.com/watch?v=NSn42IlGDlM As the Court can see from that video, when a user does a remix of another video, absolutely everything about the video's creation – from the taking of someone else's video, to the clipping out of portions he doesn't need, to the shooting of original footage using your phone's camera and microphone, to the editing of the video, to even the uploading of the subsequent remix to YouTube's servers for publication – all happen *entirely* within YouTube's Services. There isn't a single step in the remix process that utilizes any software not provided by YouTube[7].

83.     Because the license to other users explicitly excludes any works that are created independently of the Service, that means that it does not cover instances where the secondary user A) used a third-party download app (such as WinX Video Downloader or the website of www.youtube4kdownloader.com) to download a copy of my videos for offline use, B) used his own video capture software (such as OBS Studio or MS Camera) to record his own original footage, C) used third-party video editing software (such as Adobe Premiere Studio or NCH VideoPad) to intersperse portions of my video with his original content, and D) uploaded that finished product to YouTube. Just because Step D might have occurred on the Service is not enough for it to be covered by the license to other users. Fair use may still protect the secondary user, but the ToS does not.

84.     Applying this logic to the instant case, Creetosis almost certainly did not use exclusively YouTube software to make his STAG streams. To my knowledge, it isn't even *possible* to make a multi-hour-long reaction video like these using exclusively YouTube software. More than likely, he used an app called Discord so he and his co-hosts could talk to each other while watching the video together, and he also most likely used some third party streaming software (most likely developed by OBS, such as OBS Studio or OBS Streamlabs) to combine all the various elements

---

7   with maybe the exception of your phone's operating system, but that would hardly count anyway, and even then, that's only if you're on an iPhone, since the Android OS is also owned by Google, one of YouTube's sister corporations

of his stream into one viewing experience for his viewers. Therefore, it is most likely not covered by the license contained in the ToS. Just because he ultimately ended up streaming it to YouTube (as opposed to another streaming site like Twitch, Rumble, or TikTok) does not change that; that would just be the livestream equivalent to Step D above (uploading a pre-made video to YouTube and saying *that* was "enabled by the Service").

85.    But even if that speculation ends up not being true, and maybe Creetosis did indeed use exclusively in-Service features to make the STAG streams happen using a method I previously didn't know even existed, the bottom line is that such a finding cannot be made at this stage, and so the Court must deny the Motion to Dismiss and order discovery for more factual development.

### III-14: Again, the defendants are seeking to open Pandora's Box.

86.    Just like with the Defendant's preferred standard for fair use, their preferred interpretation of their own ToS risks opening the floodgates to a wide range of absurd consequences, and courts are sworn to reject these kinds of manifest absurdities. See Manning, supra.

87.    If the defendants got there way in this case, then that would effectively eliminate 99% of copyright holders' ability to enforce 99% of their copyright over the Internet. Once any movie that has been uploaded to YouTube by the copyright holder, even if they're locked behind a paywall[8], then millions upon millions of users would suddenly have carte blanche to make whatever derivative videos they want, using literally 100% of those movies. It may not be fair use, but fair use isn't necessary when you have a license.

88.    Then we must think about the music industry. There are very few currently living musicians with even an iota of fame who *don't* upload large portions of their discographies (if not their entire discographies) to YouTube. Lots of YouTubers (myself included) like to include background music in our videos, and while I went out and hired my own composer to compose my own music for my channel, YouTube is currently saying that I didn't need to do that! As long as the song has been uploaded to YouTube by its rightful copyright holder, no matter how popular or valuable that song might be, then all YouTube users are *already* legally empowered to use that song in their own videos however they wish! No royalties necessary, no fair use necessary! And

---

8    Such as this AAA Hollywood movie: https://www.youtube.com/watch?v=8RcFZLkc24c

YouTube would be under no obligation to take these works down, either!

89.     In fact, the fact that so many multi-millionaire musicians and so many multi-billion-dollar corporate movie studios have posted their content to YouTube over the years only serves as more proof that no reasonable person would interpret YouTube's ToS as giving them or their users this kind of license. Do you honestly think even 1% of those extremely wealthy, popular, and powerful celebrities and corporations – and all the powerhouse lawyers they have at their disposal – would have agreed to post their highly valuable copyrighted material to YouTube if they knew, or even felt there was a nominal chance, that they would be giving everyone and their mother carte blanche to make these kinds of unfair uses of their works?! The fact that so many of them have done exactly that further proves this interpretation of the ToS is ludicrous on its face, and one that no reasonable person would assume, which in turn means that the doctrines of "meeting of the minds" and "contra proferentem" must compel a ruling in my favor.

### IV: CONCLUSION

90.     Wherefore, premises considered, I respectfully pray that the Motion to Dismiss be denied, and for any other relief to which I may be entitled.

So requested on this, the 18th day of February, 2025.

*/s/ David Stebbins*
David Stebbins