1  LAURA HERNANDEZ, State Bar No. 344641
   WILSON SONSINI GOODRICH & ROSATI
2  Professional Corporation
   One Market Plaza, Spear Tower, Suite 3300
3  San Francisco, CA 94105-1126
   Telephone: (415) 947-2000
4  Facsimile: (866) 974-7329
   Email: lhernandez@wsgr.com
5
   JEREMY P. AUSTER (*admitted pro hac vice*)
6  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
7  1301 Avenue of the Americas, 40th Floor
   New York, NY 10019-6022
8  Telephone: (212) 999-5800
   Facsimile: (866) 974-7329
9  Email: jauster@wsgr.com

10 *Counsel for Defendant YouTube, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID A. STEBBINS, | Case No.: 4:22-cv-00546-JSW |
| Plaintiff, | **DEFENDANT YOUTUBE, LLC'S REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS** |
| v. | |
| ALPHABET INC. et al., | Judge: Jeffrey S. White |
| Defendants. | Date: April 25, 2025 |
| | Time: 9:00 a.m. |
| | Action Filed: January 27, 2022 |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 1

    I.    CREETOSIS' LIVESTREAMS ARE A FAIR USE OF STEBBINS' VIDEO ........................................................................................................................ 1

        A.    Factor 1: Creetosis' Livestreams Are Highly Transformative ..................... 1

        B.    Factor 2: Stebbins' Video Is Far from the Core of Copyright .................... 5

        C.    Factor 3: Creetosis' Use Was Reasonable in Relation to the Purpose ........ 7

        D.    Factor 4: Creetosis' Livestreams Do Not Affect Any Market for the Video ........................................................................................................... 8

    II.    STEBBINS' INFRINGEMENT CLAIM IS DEFEATED BY THE LICENSE HE GRANTED YOUTUBE ................................................................. 10

CONCLUSION ............................................................................................................................. 12

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
　598 U.S. 508 (2023) .................................................................................................................. 4

*Brunson v. Cook*,
　2023 WL 2668498 (M.D. Tenn. Mar. 28, 2023) .................................................................. 6, 7

*Brunson v. Cook*,
　3:20-cv-01056 (M.D. Tenn. Jan. 29, 2024) ............................................................................. 6

*Bus. Casual Holdings, LLC v. YouTube, LLC*,
　2022 WL 837596 (S.D.N.Y. Nov. 22, 2022),
　*aff'd*, 2023 WL 6842449 (2d Cir. 2023) ........................................................................... 11, 12

*Cambridge Univ. Press v. Patton*,
　769 F.3d 1232 (11th Cir. 2014) ............................................................................................ 5, 7

*Campbell v. Acuff-Rose Music, Inc.*,
　510 U.S. 569 (1994) ............................................................................................... 2, 4, 5, 7, 8, 9

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
　983 F.3d 443 (9th Cir. 2020) ................................................................................................... 4

*Elsmere Music, Inc. v. Nat'l Broad. Co.*,
　482 F. Supp. 741 (S.D.N.Y. 1980),
　*aff'd*, 623 F.2d 252 (2d Cir. 1980) ........................................................................................... 3

*Google LLC v. Oracle Am., Inc.*,
　593 U.S. 1 (2021) ...................................................................................................................... 3

*Harper & Row Publishers, Inc. v. Nation Enters.*,
　471 U.S. 539 (1985) .................................................................................................................. 6

*Hosseinzadeh v. Klein*,
　276 F. Supp. 3d 34 (S.D.N.Y. 2017) .................................................................................... 3, 9

*Leadsinger, Inc. v. BMG Music Pub.*,
　512 F.3d 522 (9th Cir. 2008) ................................................................................................. 10

*Mattel, Inc. v. Walking Mountain Productions*,
　353 F.3d 792 (9th Cir. 2003) ................................................................................................... 8

*Monge v. Maya Mags., Inc.*,
　688 F.3d 1164 (9th Cir. 2012) ................................................................................................. 4

*Perfect 10, Inc. v. Amazon.com, Inc.*,
　508 F.3d 1146 (9th Cir. 2007) ............................................................................................. 6, 7

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
　494 F.3d 788 (9th Cir. 2007) ................................................................................................. 11

*Savage v. Council on Am.-Islamic Rels., Inc.*,
   2008 WL 2951281 (N.D. Cal. July 25, 2008) ................................................................ 8

*Sidney-Vinstein v. A.H. Robins Co.*,
   697 F.2d 880 (9th Cir. 1983) ...................................................................................... 10

*Stebbins v. Doe*,
   No. 24-4992 (9th Cir. Jan. 28, 2025) .......................................................................... 10

*Stebbins v. Doe*,
   No. 4:24-mc-80179-HSG (N.D. Cal. Aug. 13, 2024) ................................................. 10

*Stebbins v. Google*,
   2023 WL 6139454 (N.D. Cal. Aug. 30, 2023),
   *appeal filed*, No. 24-1936 (9th Cir. Apr. 1, 2024) .............................................. 5, 9, 10

*Stebbins v. Microsoft, Inc.*,
   2012 WL 12896360 (W.D. Wash. Jan. 13, 2012) ......................................................... 1

*Thiccc Boy Prods. Inc. v. Swindelle*,
   2024 WL 733425 (D.R.I. Feb. 22, 2024),
   *appeal filed*, No. 24-1207 (1st Cir. Mar. 8, 2024) ................................................... 2, 9

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
   227 F. 3d 1110 (9th Cir. 2000) ..................................................................................... 8

**STATUTES**

17 U.S.C. § 101 .......................................................................................................................... 5

17 U.S.C. § 107 .......................................................................................................................... 7

**RULES**

Fed. R. Civ. P. 7 ....................................................................................................................... 10

Fed. R. Civ. P. 12(f) ................................................................................................................. 10

**MISCELLANEOUS**

U.S. Copyright Office,
   *Compendium of U.S. Copyright Office Practices* § 101 (3rd ed. 2021) .................. 5, 6

# INTRODUCTION

In dismissing one of Stebbins' many baseless lawsuits, a court described his arguments as "wildly untethered from any valid interpretation" of applicable law. *Stebbins v. Microsoft, Inc.*, 2012 WL 12896360, at *1 (W.D. Wash. Jan. 13, 2012). The same can be said of Stebbins' overlong Opposition to YouTube's Motion to Dismiss. ECF No. 67 ("Opp.").

Stebbins attempts to salvage his latest claim against YouTube by:

- relying on made-up legal principles and fair use "Grade" levels;
- misrepresenting basic facts about the allegedly infringing Livestreams that are manifest from the videos, facts that Stebbins conceded in his prior complaint;
- ignoring the vast majority of cases cited in YouTube's Motion (ECF No. 58); and
- waxing about arguments that YouTube did not make.

None of this moves the needle. Now that the relevant materials are properly before the Court (without any opposition from Stebbins), there can be no doubt that the Livestreams make fair use of Stebbins' Video. His claim is also barred by the license he granted YouTube under the YouTube TOS because the only conduct by YouTube about which Stebbins complains is conduct squarely authorized by that broad license.

As his Opposition confirms, Stebbins is once again "pursu[ing] [an] ultimately meritless copyright infringement claim[] in an effort to silence online criticism." ECF No. 20 at 4. The Court should dismiss Stebbins' latest vexatious infringement claim with prejudice.

# ARGUMENT

## I.  CREETOSIS' LIVESTREAMS ARE A FAIR USE OF STEBBINS' VIDEO

### A.  Factor 1: Creetosis' Livestreams Are Highly Transformative

Stebbins asks this Court to turn a blind eye to the manifestly transformative nature of Creetosis' Livestreams and instead embrace a three-tier grading system of transformativeness that he apparently devised for his brief. According to Stebbins, his system shows that only a "measly" portion of the Livestreams are transformative.[1] Opp. ¶¶ 22-36. But Stebbins' latest review of the

---

[1] All capitalized terms used herein have the meaning ascribed to them in YouTube's Motion.

1  Livestreams is specious. Stebbins had it right in his prior complaint, where he "freely admit[ted]"
2  that the Livestreams contain "ample criticism and commentary about my [Video]" and are "highly
3  transformative." FAC ¶¶ 86-87, 92. Stebbins offers no credible explanation for his about-face. *See*
4  Opp. ¶ 17 (falsely suggesting that his prior "admission" came "in one of my own videos" rather
5  than his FAC). Nor does he have any response to the Motion's highly illustrative examples of each
6  Livestream's transformative criticism and commentary (Mot. at 5 n.4, 8 n.7), or to the numerous
7  cases dismissing claims that targeted similarly transformative YouTube "reaction" videos (*id.* at
8  9-11).²

9  Stebbins instead rests his argument entirely on the Livestreams' alleged failure to qualify
10 for his passing transformativeness "grade," since what he calls the "genuinely transformative"
11 portions of criticism and commentary are supposedly outweighed by commentary that is similarly
12 transformative but "redundant" and commentary that he dismisses without explanation as
13 "unrelated tangents." Opp. ¶¶ 23, 29-30. But the grade that Stebbins would bestow upon the
14 Livestreams has no place in the fair use analysis.

15 As detailed in the Motion, the Livestreams generally play portions of Stebbins' Video for
16 mere seconds before pausing playback so that Creetosis and the other participants can directly
17 respond to that segment of the Video and the opinions Stebbins expresses about *Fallout* therein,
18 and in many instances engage in additional back-and-forth commentary during which they share
19 their further views about *Fallout* and respond to third-party comments about the game. *See* Mot.
20 at 4-5, 8-9. *All* of that is transformative. The enormous amount of "directly related" commentary
21 and criticism is "transformative," as Stebbins still concedes. Opp. ¶¶ 25, 30.³ So too are the

---

² *See also, e.g.*, *Thiccc Boy Prods. Inc. v. Swindelle*, 2024 WL 733425, at *1, 3 (D.R.I. Feb. 22, 2024) (granting summary judgment for defendant on fair use grounds where defendant's YouTube "reaction videos" "undisputedly commented on the quality of the discussion in the [plaintiff's] copyrighted" YouTube videos, and thus were transformative "criticism" and "commentary"), *appeal filed*, No. 24-1207 (1st Cir. Mar. 8, 2024).

³ Stebbins grasps for straws by suggesting that much of the transformative criticism and commentary does not "count" because the commentators allegedly "repeat[]" themselves. Opp. ¶¶ 28-29. Stebbins offers only one example of supposedly "redundant" commentary, (*id.* ¶ 27), and in any event his theory finds no support in the case law. Many of the classic examples of transformative fair use contain repetition, such as parodic songs that use repeating melodies and lyrics. *See, e.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 589 (1994) (fair use where
(continued...)

1  commentators' additional discussions about *Fallout*, which, far from being "unrelated tangents,"
2  "add[] something new, with a further purpose or different character," by "altering [Stebbins']
3  copyrighted [Video]" through the interspersion of the commentators' own "new expression,
4  meaning or message" about the *Fallout* game. *Google LLC v. Oracle Am., Inc.,* 593 U.S. 1, 29
5  (2021) (emphases added) (quotations omitted)). Courts addressing analogous reaction videos
6  interspersed with commentary have consistently held the same. *See* Mot. at 8 (collecting cases).
7  That should be the end of the analysis.

8  Stebbins also misses the mark by arguing that the Livestreams are somehow not
9  transformative because—in his unexplained and self-interested view—they did not require any
10 "exceptional skill, intelligence, effort, thought, or creativity." Opp. ¶¶ 31–33. There is no
11 "exceptionality" requirement for transformativeness. "Irrespective of whether one finds it
12 necessary, accurate, or well-executed, the [Creetosis] video[s]" serve a transformative purpose by
13 providing extensive "criticism and commentary on the [Stebbins] video," and thus the "first factor
14 weighs in" favor of fair use. *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 46 (S.D.N.Y. 2017).
15 Stebbins' attempts to obscure the indisputably transformative nature of the Livestreams by *again*
16 misrepresenting their contents and by slicing-and-dicing them beyond recognition cannot save his
17 claim.[4]

---

parodic song "copied the bass riff and repeated it"); *Elsmere Music, Inc. v. Nat'l Broad. Co.*, 482 F. Supp. 741, 744 (S.D.N.Y. 1980) (same, where parodic song repeated lyrics multiple times), *aff'd*, 623 F.2d 252 (2d Cir. 1980).

[4] Stebbins' breakdown of the hour-long portion of Livestream #1 (or "Stag #6") that his argument relies on is as misleading as his amended allegations. *See* Opp. ¶¶ 12-14, 25-34. According to Stebbins, although the sampled hour contains over forty-nine minutes of commentary, only eight-and-a-half minutes is "genuinely transformative," "Grade 3" commentary. *Id.* ¶¶ 14(a), 29-30. But even a cursory review reveals that Stebbins' "Grade 3" video misleadingly omits large swaths of transformative content. For example, Stebbins' Clip #7 (*id.* ¶ 13) contains 3 minutes and 10 seconds of Creetosis commentary, yet only 26 seconds of it is included in Stebbins' "Grade 3" video (at 00:00:46-00:01:12). *Id.* ¶ 29. But the 2 minutes and 44 seconds of Clip #7 that Stebbins omits is chock full of transformative criticism and commentary. *See* Clip #7 at 00:00:17-00:00:30 (criticizing Stebbins' preconceived notions about *Fallout* as "poison[ing] the well" for his opinions in the Video); 00:00:30-00:00:40 (criticizing the Video's scene transitions as "distracting"); 00:00:41-00:01:31 (criticizing and disagreeing with Stebbins' opinion that the *Fallout* game was overhyped); 00:01:32-00:02:26 (discussing how the hype generated by a game affects the commentators' own opinions, responding to a third-party comment about Stebbins' discussion of *Fallout* hype, and discussing the need to "cut through the hype" and be objective in
(continued...)

Stebbins' argument also finds no support in the two cases he passingly cites, both of which are readily distinguishable. In *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020), the Ninth Circuit held that the defendant's "mash-up" book—which copied elements of various Dr. Seuss books and used the "Seussian landscape" as a setting for a *Star Trek* story—was not transformative because the defendant's book did not "critique[] or comment[]" on the Dr. Seuss works or have any "critical bearing on the[ir] substance or style," *id.* at 449, 453, (quoting *Campbell*, 510 U.S. at 580), but instead "paralleled" their purpose by "propounding the same message" and story-telling themes, *id.* at 454. Here, in contrast, it is incontestable that the Livestreams' purpose is to comment on and criticize Stebbins' Video, and their substantial critical bearing on the "substance" and "style" of the Video place them "at *Campbell's* [highest] ebb" of transformativeness. *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 530, 546 (2023) (quotation omitted).

As for the "commercial" element of factor one, Stebbins cites *Monge v. Maya Mags., Inc.*, 688 F.3d 1164 (9th Cir. 2012) (Opp. ¶ 33), which is also inapposite. In *Monge*, the Ninth Circuit held that factor one did not favor fair use where a celebrity gossip magazine published a "wholesale copy[]" of the plaintiffs' unpublished wedding photos but did not "comment on" the original photos or add any "new expression, meaning or message," rendering the for-profit magazine's "undisputedly commercial [] nature" more important to the factor one analysis. *Id.* at 1175-77 (citations omitted; cleaned up). Unlike in *Monge*, the Livestreams are highly transformative, thus minimizing the relevance of any alleged (and minor) commercial benefit to Creetosis. Mot. at 8-9 (collecting cases).

Despite Stebbins' repeated efforts to mislead the Court and sow confusion, there is no doubt that each Livestream is a paradigmatic transformative work and that factor one weighs decisively in favor of fair use. Nor does the Court need to sift through "each and every sentence" of the Livestreams to reach this conclusion. Opp. ¶ 34. The Court can press "play" at virtually any point in the Livestreams and readily observe their transformative nature.

---

a *Fallout* review); 00:02:27-00:03:10 (presenting theories as to why Stebbins chose a particular user interface color for his Video footage).

### B.    Factor 2: Stebbins' Video Is Far from the Core of Copyright

Stebbins has virtually nothing to say about the supposed creativity of his Video, other than the unelaborated claim that "[w]orks that are highly opinionated typically weigh against fair use." Opp. ¶ 37 (citing *Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014)). But *Cambridge* does not support that assertion, and the "advanced scholarly," "research-based" academic textbooks and journals at issue in that case are nothing like Plaintiffs' Video. 769 F.3d at 1238. Here, the actual contents of the Video—Plaintiffs' voiceover summation and opinions about basic elements of the *Fallout* game and "preexisting" *Fallout* footage and music that are "excluded" from his copyright (Mot. at 10-11, Auster Decl., Ex. 7)—make clear that Stebbins' video is more informational than creative, and not at the "core of intended copyright protection." *Campbell*, 510 U.S. at 586; *accord Stebbins v. Google*, 2023 WL 6139454 (N.D. Cal. Aug. 30, 2023), at *7 (Stebbins' "opinions about a game" are "undoubtedly more informational than creative"), *appeal filed*, No. 24-1936 (9th Cir. Apr. 1, 2024); Mot. at 10-11. And given the Video's "informational" nature, Plaintiff cannot hang his hat on his supposedly creative "tone and inflections" and the "unique choice of colorful words" he uses to express his opinions. SAC ¶ 37(a)-(b). This Court has already rejected that exact argument. *See* Screening Order at 6 (second factor favored fair use of Stebbins' "informational" video despite allegations that it was "creative due to his video editing and pronouncing words in a 'snarky tone.'").

Unable to dispute that his Video is informational and minimally creative, Stebbins bases his factor two argument on the Video supposedly being "legally unpublished." Opp. ¶ 38. Stebbins is wrong as a matter of law. His quotation of the Copyright Office's Circular 66 (Opp. ¶ 39) omits the relevant language from the Copyright Act's definition of "Publication," which includes "offering to ***distribute copies*** or phonorecords to a group of persons ***for purposes of further distribution***, public performance, or public display." 17 U.S.C. § 101 (emphasis added); *accord* U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 101 (3rd ed. 2021) ("Compendium") § 1008.3(B) (explaining that offering a work to a "website for purposes of further distribution or public display creates a reasonable inference that an offer to distribute to a group of persons has been made and that publication has occurred."). Here, Stebbins' "work was published

when it was made available on YouTube," because in so doing he "clearly offered to distribute the work to" YouTube under the "YouTube terms of use" "for the purposes of further distribution" to a "theoretically infinite number of individuals." *Brunson v. Cook*, 2023 WL 2668498, at *10, 12-14 (M.D. Tenn. Mar. 28, 2023) (citing *Compendium* § 1008.3(B)) (cleaned up). Stebbins dismisses *Brunson* as non-binding authority (Opp. ¶ 44), but the Copyright Office agrees with the *Brunson* court that posting works to platforms like YouTube constitutes a publication, given the licenses granted in the "terms of use and service" that authorize copying and further distribution. Resp. of Reg. of Copyrights at 14, *Brunson v. Cook*, 3:20-cv-01056 (M.D. Tenn. Jan. 29, 2024), ECF No. 186-1 (concluding that posting work to Twitter constituted publication). And *Brunson* is consistent with Ninth Circuit precedent. *Cf. Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1167 (9th Cir. 2007) ("Once Perfect 10 has exploited this commercially valuable right of first publication by putting its images on the Internet for paid subscribers, Perfect 10 is no longer entitled to the enhanced protection available for an unpublished work.").

        Stebbins argues that no publication occurred because YouTube's "end users" do not have the option to "download" a "retainable" copy of his Video for "offline viewing." Opp. ¶¶ 41-42. But as *Brunson* and the *Compendium* both explain, making a work available on a website where the "copyright owner authorizes the end user to retain" downloadable copies is an *alternative* basis for online publication. *Compendium* § 1008.3(B); *accord Brunson*, 2023 WL 2668498, at *8-9, 12 ("the Compendium suggests that distribution occurs when a work is made available to *either* streaming or download services"). In the present context, where Stebbins made and still makes his Video available on YouTube pursuant to a license that grants YouTube "wide latitude" to further distribute and display the Video across the world, the fact that "end users who interfaced with Plaintiff's work on YouTube … could not download" the Video is "inconsequential to the … question of whether the work was published." *Brunson,* 2023 WL 2668498, at *13-14.

        Stebbins' argument also ignores *why* publication is relevant to the second fair use factor. As the Supreme Court has explained, "the author's right to control the first public appearance of his expression weighs against" a secondary fair use of "the work *before* its release." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 564 (1985) (emphasis added). Here, Stebbins

1  *did* control the first appearance of his Video when he posted it on YouTube for the world to view free of charge. "And of course, the entire purpose of sharing a work to [YouTube] is to reach as wide an audience as possible." *Brunson*, 2023 WL 2668498, at *12. Stebbins thus has no "entitle[ment] to the enhanced protection available for an unpublished work." *Perfect 10*, 508 F.3d at 1167. Factor 2 weighs strongly in favor of fair use.

### C.   Factor 3: Creetosis' Use Was Reasonable in Relation to the Purpose

Stebbins' argument on the third factor refuses to acknowledge basic realities about the Livestreams: (i) each Livestream is a separately allegedly infringing work; (ii) each Livestream uses different portions of Stebbins' Video (and neither uses all of it); and (iii) each Livestream uses the copied portions to further a highly transformative purpose. *See* Mot. at 3-5, 11-12. That tilts the third factor in favor of fair use, as courts addressing similar reaction videos have consistently held. *Id.* at 11-12 (collecting cases).

Ignoring all of this, Stebbins argues that the Livestreams, "combined, copy 100% of my original video, literally every single last second of it," and that as such "the third factor *must* weigh against fair use." Opp. ¶ 46. Stebbins cites no authority for his suggestion that the Livestreams can be "combined" when assessing the third factor (or fair use more generally). And his theory is defeated by the express language of the Copyright Act, which requires that fair use be assessed based on each specific "use made of a work." 17 U.S.C. § 107; *accord Campbell*, 510 U.S. at 586–87 (fair use considers "the purpose and character of *the use*") (emphasis added); *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1275, 1259-61 (11th Cir. 2014) (holding that "[f]air use must be determined on a case-by-case basis" and affirming that district court properly applied the fair use factors separately to the "individual instances of alleged infringement involved in this case"). Here, Stebbins' infringement claim is based on two *separate* allegedly infringing Creetosis Livestreams created on "two different sittings" on two different dates (SAC ¶ 171; FAC ¶ 88), each of which make "use" of entirely different portions of Stebbins' Video (Mot. at 3-4, 11-12). In arguing based on a faulty premise, Stebbins does not actually dispute that the third factor favors fair use when each Livestream is properly considered on its own. His silence is telling.

The supposedly "controlling" case Stebbins relies on also bears no resemblance to this one. Opp. ¶¶ 46, 51. In *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F. 3d 1110, 1112-13, 1118 (9th Cir. 2000), a dispute between two religious organizations, factor three weighed against fair use because the defendant made and distributed "verbatim" copies of the plaintiff's entire 380-page book with virtually no alterations, and used the copies for the "same" purpose as the plaintiff (as part of a "religious practice"). Here, as mentioned, neither Livestream copies the entirety of Stebbins' Video, and unlike the unaltered, word-for-word reproduction in *Worldwide Church* for an identical purpose, both Livestreams heavily edit Stebbins' Video by interspersing the exceptionally short segments of Video playback with many hours of commentary that serve a transformative purpose. Mot. at 11-12.

Ironically, Stebbins claims that a "secondary user is required to" break up "easily divisible" copyrighted works like his Video "into smaller chunks" to "comply with the third factor." Opp. ¶¶ 48-51. Although that is yet another made-up legal standard, it is also **precisely** what Creetosis did. Mot. at 3-4, 11-12. Regardless, the relevant factor three question is whether the secondary use was "justifiable" in light of the user's purpose, *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 804 (9th Cir. 2003), an inquiry which "harken[s] back to the first of the statutory factors" and allows for a greater "extent of permissible copying" if the purpose is transformative. *Campbell*, 510 U.S. at 586–87. Given each Livestream's highly transformative nature, factor three favors fair use.

### D. Factor 4: Creetosis' Livestreams Do Not Affect Any Market for the Video

Stebbins does not dispute that there cannot plausibly exist a commercial market for a 1.5-hour video-game review that has been freely available to the world on YouTube for over five years. *See* SAC ¶ 34. Nor does he suggest that there could exist any market for derivatives of the Video. That alone resolves factor four, because Creetosis' Livestreams cannot usurp a market that does not exist. *See Savage v. Council on Am.-Islamic Rels., Inc.*, 2008 WL 2951281, at *9 (N.D. Cal. July 25, 2008) (fair use where "plaintiff fail[ed] to allege … that plaintiff currently has, or ever had, any kind of market for the copyrighted work …."); Mot. at 12-14.

Stebbins' only response is to reiterate his baseless allegation that the Livestreams "constitute[] a market substitute, per se" because "Creetosis copied 100% of my original video, literally every single last second of it." Opp. ¶ 57. But that simply is not the test and actually confuses this factor with the third. Here too though, Stebbins ignores that his infringement claim is based on two separately allegedly infringing Livestream videos. Neither copied "100%" of his Video or could possibly constitute a market substitute "per se." *See* Mot. at 13 n.8. And whether considered separately or even (wrongly) in combination, it is simply "not reasonable to suggest that the allegedly infringing" Livestreams could have "any significant effect on" any imagined market for Stebbins' Video. *Stebbins v. Google*, 2023 WL 6139454, at *8. No one desirous of watching *Stebbins'* Video and hearing *his* views about the *Fallout* game would ever endeavor to watch the Video in seconds-long segments across two Livestreams totaling **nineteen-and-a-half hours**, **eighteen hours** (**or 92%**) of which do not include playback of the Video. Mot. at 4. Far from a hypothetical book review that "quote[s] the entire book" in the review, Opp. ¶ 57(b) (quotations omitted), the Livestreams self-evidently provide "a very different experience" by "respond[ing] to and transform[ing]" Stebbins' Video through hours upon hours of "moment-by-moment commentary." *Hosseinzadeh*, 276 F. Supp. 3d at 47. The "nature of" the Livestreams thus "make clear" that they are "highly transformative and do[] not replace Plaintiff's" Video. Screening Order at 7. Nor could the critical Livestreams possibly usurp any derivative market for the Video, since "there is no protectible derivative market for criticism." *Campbell*, 510 U.S. at 592. And aside from the Video and Livestreams themselves, no other "evidence" or "proof" is needed to reach these conclusions. Opp. ¶ 59. As established by the numerous cases Stebbins ignores, critical secondary uses like the Livestreams cannot, as a matter of law, cause the type of market substitution harm that copyright law protects. Mot. at 13-14; *accord Thiccc Boy*, 2024 WL 733425, at *1, 3, 5 (fourth factor favored fair use where YouTube reaction videos that "function[ed] as criticism or commentary" of plaintiff's YouTube videos were "unlikely to function as substitutes for the copyrighted videos in their original and potential derivative markets" in "a way cognizable" under Copyright Act).

Because each Livestream is a non-infringing fair use of Stebbins' Video, his vicarious infringement claim against YouTube necessarily fails.[5] And because "no additional allegations … can remedy Plaintiff's claim," it should be dismissed with prejudice. *Stebbins v. Google*, 2023 WL 6139454, at *8 (dismissing Stebbins' vicarious infringement claim against Google with prejudice based on fair use); *accord Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (affirming dismissal in copyright case where "amendment relating to … fair use … would have been futile").[6]

## II.  STEBBINS' INFRINGEMENT CLAIM IS DEFEATED BY THE LICENSE HE GRANTED YOUTUBE

Stebbins' digressive response to YouTube's license defense does not change the fact that the license he granted YouTube covers its alleged act of infringement in this case. Mot. at 14-15. Stebbins does not actually dispute that he agreed to YouTube's TOS when he created his channel, and that he broadly licensed his Video to YouTube under the TOS when he posted it to the platform. *See* TOS at 8 ("License to YouTube"). Stebbins instead suggests that the "License to YouTube" provision in the TOS is somehow "ambiguous," Opp. ¶ 76, but he does not actually

---

[5] Stebbins leaves out the relevant context by misleadingly suggesting that the Ninth Circuit ruled "in my favor" by overturning the "dismissal of a case in this district that is identical in merit to the instant case." Opp. ¶ 16. In June 2024, Stebbins filed yet another copyright infringement complaint against YouTube and Creetosis, which Judge Haywood S. Gilliam, Jr. screened pursuant to Judge Thompson's vexatious litigant order and barred from being filed, finding that it was "frivolous and meritless[.]" *Stebbins v. Doe*, No. 4:24-mc-80179-HSG (N.D. Cal. Aug. 13, 2024), ECF No. 18 at 2. Although the Ninth Circuit reversed the dismissal of several of Stebbins' copyright claims (while affirming the dismissal of the only copyright claim actually pled against YouTube), it explained that "[w]e express no view on the merits of Stebbins's claims or the availability of any defenses." *Stebbins v. Doe*, No. 24-4992 (9th Cir. Jan. 28, 2025), ECF No. 20.1 at 2-3.

[6] The Court should also reject Stebbins' throw-in requests to "strike" references to his vexatious litigation history from YouTube's Motion and for an "order in limine" ordering YouTube and the individual defendants who have not even appeared in this case "not to submit any evidence of these prior judicial rulings at any point in this action." Opp. ¶¶ 1-2, 7. First, Rule 12(f) expressly applies to pleadings, not motions. *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983) ("Under the express language of the rule, only pleadings are subject to motions to strike.") (emphasis in original); *see also* Fed. R. Civ. P. 7 (defining "pleadings"). And second, the Motion's references to prior orders dismissing Stebbins' baseless claims targeting fair use criticism are not proffered as "evidence," but as *legal* authority illustrating why Stebbins' claim here is similarly meritless. Stebbins' tactic of asking courts to silence any mention of his prior litigation misconduct and dismissals is not new, and should be rejected here too. *See Stebbins v. Google LLC,* 2023 WL 6139454, at *5 (N.D. Cal. Aug. 31, 2023) (denying similar motion to strike Google's motion to dismiss and references therein to Stebbins' litigation history).

engage with the language of the provision. *See* Opp. ¶¶ 73-77 (irrelevant discussion about a YouTube video from "a lawyer named Richard Hoeg" concerning the "ToS from another company named Ubisoft").

Stebbins' actual argument appears to be that YouTube's license defense, if credited, would give it "blanket immunity" from "vicarious liability," and it must therefore be rejected. *Id.* ¶ 77. But YouTube's Motion makes no such sweeping assertion. And Stebbins' argument ignores the basis for *his* vicarious infringement claim in *this* case, and why his license to YouTube bars it. Indeed, Stebbins' claim is no ordinary or proper "vicarious" infringement claim. Such a claim requires a plaintiff to "allege that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007). The SAC does not mention those elements or plead a single fact related to them. For example, Stebbins does not allege that YouTube had any ability to control Creetosis' creation of the allegedly infringing Livestreams, or that YouTube somehow received a direct financial benefit from the Livestreams.

Instead, Stebbins' charge is that YouTube is "vicariously liable" for Creetosis' Livestreams because YouTube hosted the Livestreams containing Stebbins' Content on its service. SAC ¶¶ 172, 247. But that claim is barred by Stebbins' "License to YouTube," which expressly authorized YouTube "to reproduce, distribute, prepare derivative works, display and perform" his "Content" on the service. TOS at 8. Stebbins mistakenly imagines that the license he granted YouTube distinguishes between claims based on whether they are labeled as "direct" or "vicarious" infringement. Opp. ¶¶ 71-72, 77. It does not. What matters is whether the language authorizes YouTube to engage in the conduct that underlies Stebbins' claim. Here, the licensing provision makes no distinction between YouTube's hosting of Stebbins' Video and its hosting of other users' videos (the Livestreams) that include Stebbins' content. *Bus. Casual Holdings, LLC v. YouTube, LLC*, 2022 WL 837596 (S.D.N.Y. Nov. 22, 2022), at *4 (YouTube's license defeated infringement claim based on its hosting of allegedly infringing third-party videos that included portions of the plaintiff's licensed YouTube videos), *aff'd*, 2023 WL 6842449 (2d Cir. 2023); Mot. at 14-15. It blanketly authorizes YouTube to reproduce and distribute the content. That language bars

Stebbins' claim. And there is nothing unclear or surprising about that result. The license helps ensure YouTube can freely operate a service on which users engage with one another's "Content" without incurring liability.

Stebbins' arguments about the TOS' "License to Other Users" are irrelevant (and misguided). Opp. ¶¶ 77-85, Ex. A. YouTube is not arguing that Stebbins' license to *YouTube* "absolve[s]" third-party YouTube users "of liability for alleged infringement [that] may support a claim of direct copyright infringement" against them. *See Bus. Casual Holdings,* 2022 WL 837596, at *5. Any claims Stebbins may have against such users have nothing to do with the "clear and broad License" he granted *YouTube. Id.* Regardless, YouTube did not assert the separate license Stebbins granted to users as a ground for this Motion. The Court need not consider it to determine that Stebbins' license to YouTube bars his claim against YouTube in this case.

## CONCLUSION

For these reasons, Stebbins' claim against YouTube should be dismissed with prejudice.

Dated: February 26, 2025

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ *Jeremy P. Auster*
Jeremy P. Auster (*admitted pro hac vice*)
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
E-mail: jauster@wsgr.com

Laura Hernandez, State Bar No. 344641
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 9105
Telephone: (415) 947-2000
Facsimile: (866) 974-7329
E-mail: lhernandez@wsgr.com

*Counsel for Defendant YouTube, LLC*